**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| In re: WHIRLPOOL CORP.<br>FRONT-LOADING WASHER PRODUCTS<br>LIABILITY LITIGATION | 1:08-wp-65000<br><br>MDL No. 2001<br><br>Class Action<br><br>Judge:  James S. Gwin |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY AN OHIO CLASS**

# TABLE OF CONTENTS

**Page**

I.     STATEMENT OF ISSUES AND SUMMARY OF ARGUMENT ...................... 1

II.    PROCEDURAL HISTORY AND STATEMENT OF FACTS............................ 3

    A.    Procedural History ................................................... 3

    B.    Factual Background ................................................... 4

        1.    The Uniform Product .................................................. 4

        2.    The Design Of The Washing Machines Leads To Biofilm And Mold Problems.................................................... 4

        3.    The Common Defect .................................................. 7

            a.    The Washing Machines Do Not Adequately Self-Clean. ................................................... 7

            b.    The Washing Machines Develop Substantial Biofilm. ................................................... 8

            c.    The Defect Causes Biofilm To Develop............................ 9

        4.    Whirlpool's Uniform Concealment Of The Mold Problems ....... 11

            a.    Whirlpool Knew The Machines Do Not Adequately Self-Clean. ................................................... 11

            b.    Despite Its Knowledge, Whirlpool Concealed The Defect From Plaintiffs And Consumers.......................... 14

        5.    The Uniform Harm .................................................. 16

            a.    Plaintiffs and Consumers Had No Reasons To Expect Their Washing Machines To Have Mold Problems. ................................................... 16

            b.    Plaintiffs And Consumers Have Been Injured................. 16

            c.    Plaintiffs' Experiences Are Not Unique. ......................... 17

III.    LEGAL STANDARD......................................................... 18

IV.    ARGUMENT ................................................................ 19

    A.    Plaintiffs Satisfy The Requirements Of Rule 23(a). ................. 20

        1.    The Proposed Class Is So Numerous That Joinder Is Impracticable.................................................... 20

        2.    The Case Presents Common Questions Of Law Or Fact............. 21

        3.    Plaintiffs Are Typical Of All Class Members............................. 21

**TABLE OF CONTENTS**
**(continued)**

Page

4.  Plaintiffs And Their Counsel Will Fairly And Adequately Protect The Interests Of The Class. ............................................ 24

B.  Plaintiffs Satisfy The Requirements Of Rule 23(b)(3). .......................... 25

1.  Common Factual Or Legal Issues Predominate........................... 25

2.  A Class Action Is Superior To Any Alternative. ......................... 26

a.  Interest Of Individual Class Members In Controlling The Litigation ............................................... 27

b.  The Extent And Nature Of Any Litigation Already Commenced By The Class .............................................. 28

c.  The Desirability Of Concentrating The Litigation In A Single Forum .............................................................. 28

d.  Management Difficulties, If Any, Do Not Preclude Certification. .................................................................. 28

V.  CONCLUSION ................................................................................................. 30

854266.8

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alkire v. Irving*,
  330 F.3d 802 (6th Cir. 2003) ............................................................. 20

*Almendares v. Palmer*,
  222 F.R.D. 324 (N.D. Ohio 2004) ....................................................... 23

*Amchem Prods., Inc. v. Windsor Prods.*,
  521 U.S. 591 (1997) ........................................................ 17, 24, 25, 28

*Beattie v. CenturyTel, Inc.*,
  511 F.3d 554 (6th Cir. 2007) ............................................... 17, 21, 24, 25

*Bittinger v. Tecumseh Prods. Co.*,
  123 F.3d 877 (6th Cir. 1997) ............................................................. 21

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005) ............................................................... 2

*Daffin v. Ford Motor Co.*,
  458 F.3d 549 (6th Cir. 2006) ..................................................... passim

*Eddleman v. Jefferson Co.*,
  1996 WL 495013 (6th Cir. Aug. 29, 1996) ............................................ 18

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) .................................................................. 17, 18

*Gen. Tel. Co. of the Sw. v. Falcon*,
  457 U.S. 147 (1982) .................................................................. 18, 20

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) ....................................................................... 17

*In re Am. Med. Sys., Inc.*,
  75 F.3d 1069 (6th Cir. 1996) ....................................................... 20, 21, 24

*In re Foundry Resins Antitrust Litig.*,
  242 F.R.D. 393 (S.D. Ohio 2007) ......................................................... 20

*In re Welding Fume Prods. Liab. Litig.*,
  245 F.R.D. 279 (N.D. Ohio 2007) ........................................................ 18

*Kelly v. Montgomery Lynch & Assocs., Inc.*,
  2007 WL 4562913 (N.D. Ohio Dec. 19, 2007) (Gwin, J.) ........................... passim

*Olden v. LaFarge Corp.*,
  383 F.3d 495 (6th Cir. 2004) ............................................................. 25

*Reeb v. Ohio Dep't of Rehab. and Corr.*,
  81 Fed. App'x 550 (6th Cir. 2003) ...................................................... 17

**TABLE OF AUTHORITIES**
(continued)

Page

*Roth v. Sears Roebuck & Co.*,
 Case No. 04-5156, Court of Common Pleas, Bucks County, Minn., filed
 August 5, 2004 ................................................................................................ 11

*Senter v. Gen. Motors Corp.*,
 532 F.2d 511 (6th Cir. 1976) .............................................................. 18, 21, 23

*Sprague v. Gen. Motors Corp.*,
 133 F.3d 388 (6th Cir. 1998) ...................................................................... 20, 21

*Van Horn v. Nationwide Property and Cas. Ins. Co.*,
 2009 WL 347758 (N.D. Ohio Feb. 10, 2009) ............................................ 25, 28

**STATUTES**

Ohio Rev. Code Ann.
 § 1345.01 ........................................................................................................... 2

**OTHER AUTHORITIES**

109 P.L. 2 § 2(a)(1) (2005) ..................................................................................... 17

**RULES**

Federal Rules of Civil Procedure

Rule 23(a) ............................................................................................... 2, 18, 20

Rule 23(a)(1) ...................................................................................................... 19

Rule 23(a)(2) ...................................................................................................... 20

Rule 23(a)(4) ...................................................................................................... 23

Rule 23(b) ........................................................................................................... 24

Rule 23(b)(3) ............................................................................................. 2, 25, 26

854266.8

## I.    STATEMENT OF ISSUES AND SUMMARY OF ARGUMENT

Ohio residents Gina Glazer and Trina Allison ("Plaintiffs") allege that Defendant Whirlpool Corporation ("Whirlpool") marketed and sold to them – and thousands of consumers across Ohio – front-loading washing machines that it knew to be defective and that, quite literally, stink. Rather than disclose the problem so that consumers could make an informed purchase choice, Whirlpool opted to conceal the defect from everyone. When consumers experienced the problems – and they did, by Whirlpool's own estimates, at a remarkable rate of 35-50% – Whirlpool blamed the problem on the consumers, and tried to shift the burden of dealing with it to them (even though consumers could not themselves fix the fundamental design defect). Whirlpool even developed and charged its customers for a product – Affresh – that only temporarily mitigates the problem. Plaintiffs seek, through this consumer class action, to hold Whirlpool accountable and provide relief to Ohio consumers.

This case arises out of Whirlpool's marketing and sale of Duet®, Duet HT®, and Duet Sport® Front-Loading Automatic Washers (the "Washing Machines" or "Machines"). Due to a uniform and inherent design defect, the Washing Machines fail to prevent and/or eliminate residue ("biofilm") that accumulates in the Machines, thereby causing the formation of mold, mildew, and/or associated foul odors ("Mold Problems"). Whirlpool knew of this defect and the Mold Problems, but uniformly failed to disclose them to Plaintiffs and consumers generally. As a result, thousands of Whirlpool customers throughout Ohio bought these Machines and have experienced Mold Problems.

Based on these facts, Plaintiffs Glazer and Allison assert three claims on behalf of an Ohio class: (1) violation of the Ohio Consumer Sales Practice Act ("OCSPA"), Ohio Rev. Code Ann. § 1345.01, *et seq.*; (2) tortious breach of warranty; and (3) negligent design and failure to warn. (CAC ¶¶ 122-45.) To establish Whirlpool's liability for these claims, each Class member

would have to marshal evidence of, and prove, the same core facts relating to the defect and

Whirlpool's knowledge, including that:

- Prior to selling its Washing Machines, Whirlpool knew that the Machines were defectively designed and would experience Mold Problems.  A Whirlpool scientist stated as early as 2004 that "[a]s both a biologist and a chemist this problem is very trobling [sic] in that we are fooling ourselves if we think we can eliminate mold and bacteria[] when our HA wash platforms are the ideal environment for mold and bacteria[] to flurish [sic].  Perhaps we should shift our focus to "handling" / "controlling" mold and bacterial levels in our products."[1] (*See* App'x to Pls.' Mem. of Law In Supp. Of Pls.' Mot. For Class Certification ("App'x") Ex. 1 (Memorandum dated June 24, 2004) at 1.)

- All Whirlpool Washing Machines have the propensity for biofilm build-up. Plaintiffs' expert Dr. R. Gary Wilson, an appliance engineer at Whirlpool for over 20 years and its Director of Laundry Technology from 1997 to 1999, has found that "[a]ll HA washers manufactured by Whirlpool have an inherent propensity to grow mold and bacteria on the interior surfaces of the machines."  (App'x Ex. 2 (Expert Rebuttal Report by Dr. R. Gary Wilson ("Wilson Rebuttal")) at 3.)

- The odor complaint rate for Whirlpool Washing Machines is 35-50%.  (App'x Ex. 3 ("Biofilm Quickfix" presentation dated 2005) at 10; App'x Ex. 4 ("Affresh" presentation dated Sept. 2008) at 2.)

- Despite its knowledge that the Washing Machines experience Mold Problems as a result of a common design defect, Whirlpool concealed – and continues to conceal – material information concerning the defect from its customers.

Plaintiffs hereby seek certification of an Ohio class, pursuant to Rule 23(a) and (b)(3) of

the Federal Rules of Civil Procedure, comprised of current residents of Ohio who purchased a

Washing Machine for primarily personal, family or household purposes, and not for resale, in

Ohio (subject to exclusions defined *infra* pp. 19-20).  (*Id.* ¶ 114.)

This is precisely the type of case the Sixth Circuit and other appellate courts have found

appropriate for class treatment.  *See e.g., Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006)

(affirming certification of consumer express warranty class); *Chamberlan v. Ford Motor Co.*,

---

[1] As explained herein, Whirlpool subsequently followed this advice and created a product specifically intended to address the Mold Problems in the Washing Machines.  Whirlpool marketed and sold the product to its customers, and thereby further profited from the design defect in the Washing Machines.

402 F.3d 952 (9th Cir. 2005) (affirming certification of consumer fraud class).  Accordingly, and for the reasons set forth below, Plaintiffs respectfully request that the Court grant their motion to certify an Ohio class.

## II.    PROCEDURAL HISTORY AND STATEMENT OF FACTS

### A.    Procedural History

On February 13, 2009, Plaintiffs filed their Master Class Action Complaint ("MCAC") asserting claims against Whirlpool for its defective design of the Duet®, Duet HT®, and Duet Sport® Front-Loading Automatic Washers ("Washing Machines" or "Machines"), and its concealment of the defect from its customers.  (Dkt #7.)  On March 13, 2009, Whirlpool filed its motion seeking partial dismissal of Plaintiffs' claims.  (Dkt #21.)  With the Court's permission, Plaintiffs amended the MCAC on September 25, 2009.  (Dkt #66.)

On November 4, 2009, the Court issued its order:  (1) affirming Plaintiffs' OCSPA claim; (2) affirming Plaintiffs' negligent design and failure to warn claim; and (3) dismissing Plaintiffs' unjust enrichment claims.  (Dkt #77 at 6-15.)  The Court also denied Whirlpool's motion to dismiss Plaintiff Allison's claims generally.  (*Id.* at 31.)  Whirlpool did not seek dismissal of Plaintiffs' tortious breach of warranty claim.

On November 16, 2009, Plaintiffs filed their Third Amended Master Class Action Complaint to reflect the Court's November 4, 2009 rulings.  (Dkt #80 ("CAC").)  Currently, Plaintiffs assert the following claims on behalf of an Ohio class:  (1) OCSPA (Count One); (2) tortious breach of warranty (Count Two); and (3) negligent design and failure to warn (Count Three).  (CAC ¶¶ 122-45.)

B.     **Factual Background**

1.     **The Uniform Product**

This case concerns certain models of Whirlpool's front-load washing machines, which are sold at a substantial premium (ranging from $700 to over $1,000). The design features of front-load washing machines requires the manufacturer to make engineering choices for its machines. (*See* Wilson Rebuttal at 6 ("Whirlpool was willing to accept the accumulation of Biofilm and the resultant growth of mold and bacteria as a 'trade off' for HE technology").) Whirlpool spent years and millions of dollars developing the Washing Machines before they were sold in the United States. (App'x Ex. 5 (Deposition of Joseph Zahrn (Oct. 7, 2009) 143:7-11).) All of the Machines share a nearly identical design with only minor differences, none of which are relevant to the defect at issue here.[2]

2.     **The Design Of The Washing Machines Leads To Biofilm And Mold Problems.**

Washing machines generally, including top-loaders, are repeatedly subjected to heat, moisture, and foreign substances (through dirty laundry). As a result, washing machines are susceptible to the build-up of organic and inorganic materials, *i.e.*, scrud, sludge, and biofilm. (App'x Ex. 6 (Aff. of Anthony Hardaway (Aug. 19, 2008)) ("Hardaway Aff.") ¶ 17.) Front-load washing machines are more susceptible to such problems because of certain characteristics. They include: a sealed environment that does not adequately vent and thereby traps humidity;

---

[2] Whirlpool manufactures the Washing Machines using two front-loading platforms, the "Access" and "Horizon". According to Whirlpool, the Duet® and Duet HT® washing machine models are built on the Access engineering platform, and the Duet Sport® and Duet Sport HT® are built on the Horizon engineering platform. (Aff. of Anthony Hardaway (Aug. 19, 2008) ¶¶ 5, 7.) The two platforms are nearly identical. The Access is slightly larger than the Horizon, and its axis is tilted ("canted") a few degrees up from the horizontal axis (the Horizon is not canted). (Wilson Report at 6.) These are the only engineering differences between the two platforms. (*Id.*) Neither is relevant to the uniform defect at issue here. (*Id.* at 8.)

-4-

the use of less water to rinse out residues; and lower water temperatures that reduce the ability of front-loaders to kill bacteria and/or fungus.  (*Id.* ¶¶ 10, 18.)[3]

The Washing Machines are comprised of several uniform components:  the clothes basket; the tub in which the clothes basket sits; tubing inside and outside of the tub (through which water enters and drains); a pump to move the water; a dispenser and tubing for detergent and softener; a motor to turn the basket; and an electric control panel.  (*See* App'x Ex. 7 (Expert Report by Dr. R. Gary Wilson ("Wilson Report")) at 5-7.)  Other than the control panel and motor, each of these components is exposed to water and substances that the water carries (*i.e.*, suds, debris) with every wash.  (*Id.* at 8-9.)  A schematic diagram of the basic design for the Washing Machines appears on page 6 of Dr. Wilson's Report.  (*Id.* at 6.)  These "wet areas" of the machine are all mounted in a cabinet with a door that seals the basket and tub.  (*See id.*)  The cabinet and door reduce the ventilation of the internal environment (including by sealing it when the door is closed).  (Hardaway Aff. ¶ 18.)  That internal environment traps moisture and heat, and prevents the dissipation of moisture and heat inside the machine.  (*Id.* ¶¶ 17-18.)

Front-load washing machines offer greater water and energy savings compared to top-load washing machines.  Top-load machines generally fill the basket with water.  The tub in front-load washing machines rotate on a horizontal axis that repeatedly submerges clothes into just a few inches of water.  (*Id.* ¶ 11.)  Front-load washing machines also use less energy than top-load washing machines, in three respects:  (1) they require less energy to heat the water (*id.* ¶ 12); (2) they have lower temperatures during wash (*id.* ¶¶ 10, 12); and (3) they use a

---

[3] Anthony Hardaway, a 30(b)(6) designee, is a senior Whirlpool officer who formed and headed Whirlpool's "Biofilm" project team, and the most knowledgeable person at Whirlpool regarding biofilm in front-load washing machines.

"tumbling" mechanical motion that is more energy efficient than the "spinning" of the agitator in top-load machines (*id.* ¶¶ 13, 15).

These design features, however, exacerbate Mold Problems in the Washing Machines. The reduced ventilation retains the high moisture and heat, which in turn promotes bacterial and fungal growth.  (App'x Ex. 1 at 1.)  The lower amounts of water used results in more suds, which also can promote bacterial and fungal growth through sudsing.  (App'x Ex. 8 (Memorandum dated Sept. 20, 2007); App'x Ex. 9 (Deposition of Anthony Hardaway (Sept. 15-16, 2009) ("Hardaway Dep.")) 23:20-24, 30:3-8.)  Finally, the use of lower temperatures during washes reduces the ability of the Machines to kill bacteria and fungus.  (App'x Ex. 1 at 1; App'x Ex. 10 at 8 ("Bio Film and Corrosion" presentation dated March 1, 2006) at 8.)

The moisture and heat inside the Washing Machines provide an environment that, left unaddressed, promotes "biofilm," "a generic term that describes the buildup of soils, residues of any type . . . ."  (Hardaway Dep. 23:14-23.)  The residues include "detergent, water hardness residues – literally anything [that may cause] the subsequent potential for growth, both bacteria or fungi on those particular residues . . . .  In a washer, any residues that build up on a washer would be considered a biofilm."  (*Id.*)  The biofilm, in turn, can cause "[b]ad odo[r] and/or disgusting brown layers".  (App'x Ex. 11 (Memorandum dated Nov. 5, 2004) at 1.)  Whirlpool has acknowledged that "[t]he consumer sees and smells Bio Film," "[b]lack mo[]ld can appear on the bellows or inside the dispenser," "[a]s BioFilm decays bad smells develop," and "[i]f the machine is heavily infected even the laundry will smell musty after the programme has ended." (App'x Ex. 10 at 3.)

### 3. The Common Defect

#### a. The Washing Machines Do Not Adequately Self-Clean.

Due to a common design defect, the Washing Machines uniformly fail to prevent and/or eliminate residue that accumulates in the Machines. The accumulated residue, in turn, promotes bacterial and fungal growth, thereby causing the Mold Problems. (Wilson Report at 8-10; App'x Ex. 12 (Expert Rebuttal Report by Dr. Chin S. Yang ("Yang Rebuttal Report")) ¶ 33; App'x Ex. 1 at 1.) The Mold Problems do not occur in traditional top-load washing machines. As detailed in Plaintiffs' expert reports, in particular that of Dr. Gary Wilson, a 20-year Whirlpool engineer and its former Director of Laundry Technology, they instead result from Whirlpool's failure to engineer and design its front-load washing machines in a manner that adequately prevents and/or reduces the accumulation of residues. (Wilson Report at 8-10.) The common design defect in the Washing Machines causes residue to build-up in various collection points, and fails to adequately clean those collection points. (*Id.* at 8-9.) Moreover, many of those collection points are not visible or accessible to the customer without taking the machine apart. (*Id.* at 6, 8-10.) In particular, the Machines uniformly fail to adequately clean several components, including: the tub walls; the aluminum bracket that attaches to the basket; the sump area; the pump strainer; the drain hose; the door gasket area; the air vent duct; and the detergent dispenser duct. (*Id.* at 8.) Each of these components has cavities, ribs, or other areas that function as collection points for residue, and is not adequately cleaned by the Washing Machines' rinse or self-wash cycles. (*See id.* at 9-10.)

The Washing Machines' uniform failure to adequately clean or rinse these components causes the build-up of various substances and ultimately results in "biofilm." (*Id.* at 8.) Bacteria and mold feed on the biofilm, and their excretions produce the malodors that numerous

-7-

consumers have experienced in their Washing Machines.  (*Id*.)  Ultimately, this common design

defect leads to the Mold Problems that customers like Plaintiffs have experienced.  (*Id*.)

### b.   The Washing Machines Develop Substantial Biofilm.

Based on, *inter alia*, inspections of representative Washing Machines, Plaintiffs have

determined that in ordinary use, the Washing Machines develop and exhibit significant amounts

of biofilm.  Photos depicting examples of biofilm are presented in Dr. Wilson's Report on pages

27-28 and 43-44.  Dr. Wilson's Report also provides several photos showing the "wet areas" in

the Washing Machines.  (*See, e.g., id.* at 35, 42, 48, 69, 78.)

| Before Consumer Use | After Consumer Use |
|---|---|



 

### c.      **The Defect Causes Biofilm To Develop.**

The biofilm in the Washing Machines results from the common defective design that promotes the build-up of biofilm and fails to adequately clean the Machines.  (Wilson Report at 8-10; Yang Rebuttal Report ¶ 33; App'x Ex. 1 at 1.)  The Washing Machines have nearly identical engineering.  (Hardaway Aff. ¶¶ 6-8.)  The only differences between the Access and Horizon platforms – the only platforms used for the Washing Machines – are the size of the machines and the tilt of the tub.  As Dr. Wilson explains, neither difference is material to the defect in the Machines, *i.e.*, a failure to adequately self-clean.  (Wilson Report at 8.)

After reviewing evidence of Whirlpool's design of the Machines and inspecting several machines contaminated with biofilm (including Machines owned by several of the Plaintiffs in this MDL action), Dr. Wilson opines that "[a]ll HA washers manufactured by Whirlpool have an inherent propensity to grow mold and bacteria on the interior surfaces of the machines."  (Wilson Rebuttal at 3.)  According to Dr. Wilson:

> This is because of the moist, warm environment of washing machines generally, combined with the characteristics of High Efficiency ("HE") washers to use less water, lower water temperature, and a low air ventilation environment resulting in the accumulation of Biofilm on the interior surfaces of all HA washers.  The accumulation of Biofilm on the interior surfaces under these conditions results in an inherent propensity to grow mold and bacteria on the interior washer components.

(*Id*.)  Dr. Wilson explains that the Washing Machines uniformly promote the development of biofilm and fail to adequately clean themselves:

> By design the machine operates with low water/energy consumption which directly causes an increased occurrence of Biofilm if the machine is not also "designed" to rinse the interior well enough to minimize the buildup of residue and also designed to reduce the areas where biofilm is likely to accumulate.  Clearly these machines are not rinsing themselves well enough to prevent this problem and there are too many locations where biofilm can collect.

(*Id*. at 7.  *See also id*. ("[T]he design is a major cause of the buildup since the machine was clearly not designed to minimize the buildup of these residues and rinse itself well").)

Dr. Chin Yang, a microbiologist, agrees that the design defect in the Washing Machines causes the Mold Problems. Dr. Yang "agree[s] with Dr. Wilson's assessment that design issues in the tub, basket bracket, sump area, pump strainer and drain hose, door gasket, and other areas make the subject washers susceptible to microbial colonization and growth, and the formation and accumulation of biofilms in the subject washers." (Yang Rebuttal Report ¶ 33.) Dr. Yang explains that "[t]he deep cavities and ribs in the subject washers increase the surface areas for bacterial and biofilm adhesion and buildup, allow for accumulation of residues, dirt and moisture, and promote biofilm expansion." (*Id*. ¶ 34.) According to Dr. Yang, "[t]his [design] is a recipe for microbial colonization and biofilm formation, especially [if] the machines did not clean themselves of this build-up to prevent re-contamination." (*Id*. ¶ 34.) Dr. Yang explains that "[e]stablished biofilm can also serve as the source of microbes for new biofilms down stream. For example, biofilm growth in the basket or tub of the subject washers can contribute to the biofilm formation in the sump area, pump strainer and drain hose." (*Id*. ¶ 22.)

None of Whirlpool's belated attempts at corrective measures worked. (*See* Wilson Rebuttal at 6 ("[t]he results of the clean out cycles with bleach or Affresh were only temporally effective at best"), 10 ("not using HE detergents is not a root cause of the problem"), 11 (the 20% of deposits that remain after a "service cycle" is run act as "seeds" that "recontaminate the machine").) Indeed, consumers have continued to report Mold Problems in their Washing Machines after each. (*See infra* p. 23.) Nor did changes to the language in the UCGs (provided to consumers post-sale) address the Mold Problems. Although over time Whirlpool listed possible ways to mitigate the Mold Problems, they persist to this day. Even as it publicly blames the Mold Problems on consumer failure to follow instructions, Whirlpool itself has acknowledged internally what Dr. Wilson has concluded: that the design of its Machines cause

-10-

the Mold Problems.  (App'x Ex. 10 at 7 (listing design "[r]equirements to discourage deposits

and growth of bio film").)  Moreover, Whirlpool's belated instructions to consumers who already

own the Machines, even if they addressed the Mold Problems (and they do not) (Wilson Rebuttal

at 6), merely attempt to shift the burden of addressing the defect to its consumers.

### 4.    Whirlpool's Uniform Concealment Of The Mold Problems

#### a.    Whirlpool Knew The Machines Do Not Adequately Self-Clean.

When it designed the Washing Machines, Whirlpool knew that front-load washing

machines would experience Mold Problems, and that its design would not adequately prevent

them.  Whirlpool acknowledges that biofilm, bacteria, and/or mold are issues that the washing

machine industry has been concerned with for more than 25 years.  (Hardaway Aff. ¶ 20; App'x

Ex. 13 (Biofilm in Washers presentation dated Jan. 24, 2005) at 7; Ex. 14 (Letter dated Nov. 24,

2004) at 2.)  Once moisture and heat are introduced to a low ventilation area such as the inside of

a front-load (*i.e.*, horizontal access or "HA") washing machine, the environment can cause mold

spores and bacteria to multiply rapidly.  (App'x Ex. 1 at 1.)

Whirlpool knew as early as its initial development of the Washing Machines, *i.e.*, before

a single Machine was sold, that the Machines would not adequately prevent the development of

bacterial and fungal growth, and also do not adequately clean the Machines.  In an internal

company document dated June 24, 2004, Hardaway expressed his concerns:

> As both a biologist and a chemist this problem is very trobling [sic] in that we are fooling
> ourselves if we think we can eliminate mold and bacteria[] when our HA wash platforms
> are the ideal environment for mold and bacteria[] to flurish [sic].  Perhaps we should shift
> our focus to "handling" / "controlling" mold and bacterial levels in our products.

(*Id.*)  Early in the development of the Washing Machines, Whirlpool determined that the initial

biofilm buildup occurs behind the basket, the same areas identified in the photos above (*supra*

p. 8) as where water gets past the basket and enters other parts of the Machine:

-11-

> You will notice . . . that in Horizon as with Access both the ribbed areas and everything between (entire tub back) are initiating points.  These appear to be areas with low water contact/movement?  Pooling areas in Access seem to accelerate the buildup.

(App'x Ex. 15 (Email dated Oct. 18, 2004) at 1.)  Whirlpool identified the following components as collection points for biofilm:  bellows; tub; basket; dispenser; pump; drain hoses; and cross-bar.  (App'x Ex. 13 at 5.)  Whirlpool knew that Mold Problems result from the inherent design of front-load washing machines, including its own.

According to Hardaway, "our HA wash platforms are the ideal environment for mold and bacteria[] to flourish."  (App'x Ex. 1 at 1.)  Whirlpool has stated that "Biofilm has been observed in Calypso[4], *Access*, and *Horizon* washer platforms" (App'x Ex. 16 (Minutes Oct. 26, 2004) at 1 (emphasis added)), and that it appears "[i]n all Whirlpool HE Washer Platforms" (App'x Ex. 17 ("Biofilm in HE Washers" presentation dated Sept. 22, 2004) at 7).  Whirlpool, moreover, knew that the biofilm results from the defective design of the Washing Machines, and not any other potential causes.  (*See id.* at 7 ("Possibly inherent to HE Systems?").)  Whirlpool developed – and sells – "Affresh" to deal with the Mold Problems, and thereby profits from them.  In an internal document dated 2007, Whirlpool stated that it developed "[Affresh] to assist customers with the odor-causing residue and mold and mildew stain issues that can occur in all HE washers[.]"  (App'x Ex. 8 at 2.)

Whirlpool knew that the inherent design of front-loading washing machines, left unaddressed, causes the build-up of biofilm, and that it therefore was necessary to design the Washing Machines so as to prevent and/or effectively remove biofilm.  According to Whirlpool,

---

[4] Calypso was the predecessor line of front load washing machines manufactured and sold by Whirlpool. The Calypso machine was subject of a class action for biofilm issues, a suit that predated the manufacturing date for the majority of machines at issue in this case (*Roth v. Sears Roebuck & Co.*, Case No. 04-5156, Court of Common Pleas, Bucks County, Minn., filed August 5, 2004).  Whirlpool was a named defendant in that class case.

"[m]odern high-efficiency washers use less water and seal more tightly than older, less-efficient machines," and therefore "are more prone to residue build-up." (*Id.* at 1.)  In particular, "[d]ue to the efficient design of the HE [('high efficiency')] machines, ***mold and mildew stains*** have a higher potential for build-up in HE machines." (*Id.* (emphasis added).)  According to Hardaway, "[t]he 'HE' washer can provide a nearly perfect condition for both fungi and bacteria growth." (App'x Ex. 18 (Email dated Sept. 23, 2004) at 1.  *See also* App'x Ex. 19 (Minutes dated Oct. 26, 2004) at 1-2.)  The washer environment is "a warm, moist, low air flow container [that] provides optimum conditions to support biofilm growth . . . [that] may take the form of odor and/or visual buildups." (App'x Ex. 13 at 7.)  "Once moisture and elevated temperatures are added in a low ventilation area (the inside of an [sic] low temperature HA washer or a closed dryer) the mold spore multiply rapidly." (App'x Ex. 1 at 1.)  "Once contaminated the problem spreads rapidly throughout the washer." (App'x Ex. 20 (Email dated April 29, 2004) at 1.)

Whirlpool also has acknowledged that external circumstances do not cause or prevent biofilm.  "Chemical and Biological characteristics appear to be secondary characteristics resulting from a design that permits build-ups over time." (*Id.* at 1.)  "Biofilm is an issue we see globally on multiple washer platforms.  It is **not only** an issue which we have in one region and it is not linked to one platform only!" (App'x Ex. 16 at 1 (emphasis in original).  *See also* App'x Ex. 11 at 1 ("It seems not to be restricted to certain markets or certain types of HA-washers.  Complaints have been found in US, EU and Asia (Hong Kong), from all HA-platforms Access, Alliance (TL), Delta, Tatry.").)

Based on its knowledge that biofilm was a prevalent problem in front-load washing machines, in early 2004, Whirlpool formed a biofilm team to investigate the defect.  (App'x

Ex. 21 (Email dated April 28, 2004) at 1.)  The biofilm team identified several design

characteristics that front-load washing machines require in order to prevent biofilm:

> Requirements to discourage deposits and growth of bio film inside tub, especially on the cross piece:
>
> - Machine must keep itself clean.
>
> - Robust design of tub, drum and cross piece to avoid deposit growth and facilitate self cleaning
>
> - Water system must make internal rinsing of tub possible
>
> - Wash programs must include internal cleaning steps

(App'x Ex. 10 at 7.)  Despite knowing that inadequate cleaning causes biofilm, Whirlpool

designed the Washing Machines without adequate self-cleaning.

### b. Despite Its Knowledge, Whirlpool Concealed The Defect From Plaintiffs And Consumers.

At all relevant times, Whirlpool concealed from its customers that the design of the

Washing Machines causes Mold Problems due to the Washing Machines' inability to prevent or

eliminate biofilm.

Whirlpool sold its Washing Machines exclusively through third-party authorized dealers

(with the exception of sales to its own employees), and controlled the information that was

provided to customers who purchased its Machines.  (*Glazer v. Whirlpool Corp.*, Civ. No. 1:08-

cv-1624, Dkt. #6-2 (Decl. of Pamela S. Rogers) ¶ 8.)  According to Whirlpool, the UCGs were

the only communications that Whirlpool provided to its customers prior to, at the time of, or after

purchase of the Machines.  (Hardaway Dep. 306:1-22.)

Whirlpool did not provide any information to Plaintiffs regarding the potential for Mold

Problems either prior to or at the time of purchase.  (*See* Hardaway Dep. 306:1-22; App'x Ex. 22

(Expert Report by Todd B. Hilsee ("Hilsee Report")) ¶¶ 10-11.)  The only information Whirlpool

-14-

provided to Plaintiffs that even remotely suggested the potential for odor issues were the Use and

Care Guides ("UCG"), which Whirlpool provided to customers *upon delivery* of the Washing

Machines, *i.e.*, after purchase of the Machines.  (App'x Ex. 23 (Deposition of Gina Glazer (June

17, 2009) ("Glazer Dep.")) 75:13-21; App'x Ex. 24 (Deposition of Trina Allison (June 10, 2009)

("Allison Dep.")) 23:25-24:10.)  Mr. Hilsee has explained that "Use and Care Guides are not

devices designed to provide prospective purchasers with information to read and study prior to

purchase," and therefore are not "part of the selling and informational process before customers

purchase products."  (Hilsee Report ¶ 13.)  In addition, based on his detailed analysis of more

than 50 UCGs printed between 2001 and 2009, Mr. Hilsee concludes that the statements in the

UCGs fail to communicate to consumers an accurate description of the Mold Problems.  (*Id.*

¶¶ 5, 12, 14-29.)

Regardless of the particular language Whirlpool used in the UCGs, inasmuch as the

UCGs addressed consumer behavior – rather than the inherent design defect of the Washing

Machines – they were useless in preventing or fixing the Mold Problems.  Indeed, despite having

read and followed the instructions in the UCG, Plaintiffs each experienced Mold Problems.

(Glazer Dep. 174:14-25, 145:4-25, 132:16-23, 136:4-137:23, 58:15-59:9, 61:21-62:1, 89:12-17,

90:20-24, 139:8-10; Allison Dep. 33:1-4; 42:1-4, 78:17-20, 30:20-24, 42:14-16, 89:1-4.)

Plaintiffs, like other customers who purchased the Washing Machines, reasonably expected that

the Machines would not develop Mold Problems.  (App'x Ex. 25 (Decl. of Gina Glazer ("Glazer

Decl.")) ¶ 3; App'x Ex. 26 (Declaration of Trina Allison ("Allison Decl.")) ¶ 3; Glazer Dep.

181:5-9, 230:2-17; Allison Dep. 85:4-25.)  Both Plaintiffs have stated that, had Whirlpool

disclosed the nature and extent of the Mold Problems, they would not have purchased the

-15-

Machines, or would have paid a lower price for them.  (Glazer Decl. ¶ 6; Allison Decl. ¶ 6; Allison Dep. 93:23-94:20, 97:10-14.)

> **5.**  **The Uniform Harm**
>
> > **a.**  **Plaintiffs and Consumers Had No Reasons To Expect Their Washing Machines To Have Mold Problems.**

Prior to and at the time of purchase, Plaintiffs did not know that the Washing Machines had Mold Problems, were not told that the Machines would experience Mold Problems, and had no reason to expect Mold Problems.  (Glazer Dep. 181:5-9, 230:2-17; Allison Dep. 85:4-19, 95:6-11.)   For decades, top-loading washing machines were designed to adequately self-clean. When Whirlpool introduced front-loading machines and sold them at a premium based upon representations that they were superior to top-loading machines (*e.g.*, reduced water and energy use), it knew, as detailed above, that the new design resulted in Mold Problems that, at a minimum, required a change in consumer behavior if not expectations.  Notwithstanding that knowledge, Whirlpool opted not to disclose that information to its customers, thereby preventing them from making informed choices in their purchase decisions.

> **b.**  **Plaintiffs And Consumers Have Been Injured.**

When Plaintiffs purchased their Washing Machines, they reasonably expected their Machines would clean their clothes.  (Glazer Decl. ¶ 3; Allison Decl. ¶ 3; Glazer Dep. 227:15-25; Allison Dep. 78:12-16, 167:5-17.)   Contrary to their reasonable expectations, the Washing Machines instead have caused their clothes and their Washing Machines to smell like mold and/or mildew.  (CAC ¶¶ 64-65; Glazer Dep. 145:4-25, 58:15-59:15, 60:22-62:1, 89:12-17, 90:20-24, 139:8-10; Allison Dep. 30:4-24, 35:10-18, 42:14-16, 56:22-57:15, 59:1-60:3, 89:1-4, 176:21-177:1, 182:19-183:8.)

Both Plaintiffs have testified that, had they known about the Mold Problems, they would not have purchased the Machines, or would have paid a lower price for them. (Glazer Decl. ¶ 6; Allison Decl. ¶ 6; Allison Dep. 93:23-94:20, 97:10-14.) As a result of Whirlpool's defective design of the Washing Machines, and its failure to adequately disclose that the Mold Problems, Plaintiffs, and consumers like them, have been injured.

### c. Plaintiffs' Experiences Are Not Unique.

Notwithstanding Whirlpool's attempts to downplay the magnitude and scope of the Mold Problems, both to the public and to this Court, the record demonstrates that 35-50% of Washing Machines experience Mold Problems.

- Latest data available indicates that 35% of Duet customers complain of odors. (App'x Ex. 3 at 10.)

- Background high # of customers (35%) complaining about bad odors in Whirlpool Duet Washers. (App'x Ex. 27 (Memorandum dated February 7, 2005) at 1.)

- Question 1: Have you ever noticed a smell or odor in your washer? 157 Respondents, 54 Yes (54 / 157 = 34.9%). (App'x Ex. 28 (Whirlpool phone survey) at 1.)

- Assume 50% may have odor concerns. (App'x Ex. 4 at 2.)

Moreover, the 35-50% range reflects only *actual reports* during the course of Whirlpool's study of consumer use – it does not include *unreported* instances of Mold Problems. Plaintiffs' expert Dr. Richard L. Oliver, a leading academic in the field of consumer (dis)satisfaction, explains that regardless of what the *reporting* rate is, that number systematically underestimates the *actual* number of customers who have experienced Mold Problems. According to Dr. Oliver, "a past claims basis for estimating actual dissatisfaction rates or future claims [is] inaccurate and deficient." (App'x Ex. 29 (Expert Report by Dr. Richard L. Oliver ("Oliver Report")) at 4.) Dr. Oliver provides several reasons for the under-reporting, including

-17-

consumer unfamiliarity with front-load washing machines generally.  According to Dr. Oliver, "[i]ntroduced in the U.S. in approximately 2000, residential front-loaders were an innovative washer and its drawbacks were most likely unknown to consumers."  (*Id.* at 5.)  "Because the predecessor top loaders were virtually maintenance free, it was likely that consumers either had never head of biofilm or reasoned that it was an unlikely occurrence and not of their concern." (*Id.*)  Moreover, Whirlpool's failure to fully disclose the nature, likelihood, and severity of Mold Problems contribute to consumer inability to recognize – let alone report – the Mold Problems. (*Id.* at 5-6.)

## III.   LEGAL STANDARD

"Class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm." Class Action Fairness Act of 2005, 109 P.L. 2 § 2(a)(1) (2005); *see also Amchem Prods., Inc. v. Windsor Prods.*, 521 U.S. 591, 617 (1997) (the "very core" of the justification for a class action is offering a path to relief that otherwise would be too "paltry" for individual suit), *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[C]lass actions serve an important function in our system of civil justice.").

"The district court maintains substantial discretion in determining whether to certify a class, as it possesses the inherent power to manage and control its own pending litigation." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 559 (6th Cir. 2007) (internal quotation marks omitted). "In reviewing a class certification motion, the court does not evaluate the merits of the plaintiff's claims and accepts as true the allegations in the complaint."  *Kelly v. Montgomery Lynch & Assocs., Inc.*, 2007 WL 4562913, at *2 (N.D. Ohio Dec. 19, 2007) (Gwin, J.) (citing *Reeb v. Ohio Dep't of Rehab. and Corr.*, 81 Fed. App'x 550, 552 n.2 (6th Cir. 2003)).  *See also Eisen v.*

-18-

*Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).  "The court, however, may need to 'probe behind the pleadings before coming to rest on the certification question.'"  *Kelly*, 2007 WL 4562913, at *2 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).  "The Sixth Circuit recognizes a presumption in favor of certification."  *Id.* (citing *Eddleman v. Jefferson Co.*, 1996 WL 495013, at *3 (6th Cir. Aug. 29, 1996) (unpublished table decision) ("When evaluating whether to certify the class . . . any doubts as to certification should be resolved in favor of plaintiffs")).

In order to certify a class, the movant must demonstrate that Rule 23(a)'s four requisites and at least one part of Rule 23(b) are met.  Fed. R. Civ. P. 23(a); *see also Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976).  The four requirements of Rule 23(a) are:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Plaintiffs seek certification under Rule 23(b)(3), which requires that:

> Questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).  A decision to certify a class is to be undertaken without consideration of the merits of the Plaintiffs' claims.  *See Eisen*, 417 U.S. at 177; *Daffin*, 458 F.3d at 553.  *See also In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279, 289 (N.D. Ohio 2007) ("the strength of a plaintiff's claim should not affect the certification decision").

## IV.    **ARGUMENT**

Plaintiffs presently move for certification of an Ohio-only class, defined as:

> All persons who are current residents of Ohio and purchased a Washing Machine for primarily personal, family or household purposes, and not for resale, in Ohio ("Class").

-19-

> The Class excludes: (1) Whirlpool, any entity in which Whirlpool has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and successors; (2) Washing Machines purchased through Whirlpool's Employee Purchase Program; (3) the Judge to whom this case is assigned and any member of the Judge's immediate family; (4) persons or entities who distribute or resell the Washing Machines; (5) government entities; and (6) claims for personal injury, wrongful death, and/or emotional distress.

(CAC ¶ 114.) "Washing Machines" include Whirlpool's Duet®, Duet HT®, and Duet Sport® Front-Loading Automatic Washers. (*Id.* ¶ 2.) For the reasons explained below, Plaintiffs satisfy the requirements of Federal Rules of Procedure Rule 23(a) and (b)(3), and the Class should be certified.

### A.  Plaintiffs Satisfy The Requirements Of Rule 23(a).

#### 1.  The Proposed Class Is So Numerous That Joinder Is Impracticable.

Rule 23(a)(1) requires that the proposed Class be "so numerous that joinder of all members is impracticable." "There is no strict numerical test for determining when too many parties make joinder impracticable, and the court should look to the specific facts of each case." *Kelly v. Montgomery Lynch & Assocs., Inc.*, 2007 WL 4562913, at *2 (N.D. Ohio Dec. 19, 2007) (Gwin, J.). "The practicability of joinder depends on the size of the class, the ease of identifying members, the ability to make service, and their geographic dispersion." *Id.* "[A]lthough no firm numerical test exists, substantial numbers are usually enough to satisfy the numerosity requirement, and 'it is generally accepted that a class of 40 or more members is sufficient.'" *Id.* at *2 n.1 (quotation omitted).

Here, although it is not possible to quantify the precise number of Class members, Whirlpool's documents reflect that it sold over 120,000 Washing Machines throughout Ohio, thereby making joinder impracticable. (App'x Ex. 30 (Def.'s First Suppl. Resp. to Consolidated Pls.' First Set of Interrogs.) at 10-11.)

### 2.      The Case Presents Common Questions Of Law Or Fact.

Rule 23(a)(2) requires that there be questions of law or fact common to the class.  To satisfy the commonality requirement, "there need only be one question common to the class," so long as the resolution of that question "will advance the litigation."  *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc).  *See also Kelly*, 2007 WL 4562913, at *3 (citing *Sprague*, 133 F.3d at 397); *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996); *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 404 (S.D. Ohio 2007).  To satisfy Rule 23(a)(2), a class representative must "'be part of the class and possess the same interest and suffer the same injury as the class members.'" *Kelly*, 2007 WL 4562913, at *3 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotation marks omitted)).  Factual differences between plaintiffs' claims and those of class members do not defeat the commonality requirement.  *In re Am. Med. Sys., Inc.*, 75 F.3d at 1080.

Here, there are a number of common questions of law and fact.  As set out in the CAC ¶ 116 and below (*infra* pp. 25-26), such questions center on the defective nature of the Washing Machines, *i.e.*, their uniform failure to adequately prevent biofilm and/or self-clean, Whirlpool's knowledge and concealment of that defect, and Whirlpool's statutory and common law duties relating to its misconduct.  Any one of these common issues is sufficient to satisfy the Rule 23(a) commonality requirement.  *Daffin*, 458 F.3d at 552 (issue of whether common feature was defective satisfied commonality requirement).

### 3.      Plaintiffs Are Typical Of All Class Members.

Rule 23(a)(3) requires that "the claims and defenses of the representative parties are typical of the claims or defenses of the class."  "'[T]ypicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class,

so that the court may properly attribute a collective nature to the challenged conduct.'" *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *Sprague*, 133 F.3d at 399). "A claim is typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Beattie*, 511 F.3d at 561 (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082). "[F]or the district court to conclude that the typicality requirement is satisfied, 'a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law.'" *Beattie*, 511 F.3d at 561 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n.31 (6th Cir. 1976)). The requirement is satisfied if, "as goes the claim of the named plaintiff, so go the claims of the class." *See Sprague*, 133 F.3d at 399. The typicality requirement may be satisfied even if the evidence relevant to the class representative's claim varies from other class members, some class members would be subject to different defenses, and the members may have suffered varying levels of injury. *See Daffin*, 458 F.3d at 553, *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884-85 (6th Cir. 1997).

Here, the Class is comprised of current residents of Ohio who purchased a Washing Machine for primarily personal, family or household purposes, and not for resale, in Ohio. Plaintiffs each purchased and owns a Washing Machine. (CAC ¶¶ 64-65.) Prior to using their respective Washing Machine, each Plaintiff received and read the UCG that was provided with the Machine. (Glazer Dep. 75:17-21, 174:14-25; Allison Dep. 42:1-4, 78:17-20.) Each of the Plaintiffs used their Washing Machines for personal and family purposes only, and not for any other purpose. (Glazer Decl. ¶ 5; Allison Decl. ¶ 5.) Both followed the UCG instructions, including using HE detergent (Glazer initially used a reduced amount of regular detergent, then switched to HE). (Glazer Dep. 126:17-24, 179:11-23, 185:18-21; Allison Dep. 26:6-12, 33:1-4,

-22-

42:1-4, 78:17-20.)  Despite following the UCG instructions, Plaintiffs both experienced mold,

mildew, and/or biofilm growing in their Washing Machines, as well as malodors on laundry and

inside the Machines.  (Glazer Dep. 174:14-25, 145:4-25, 132:16-23, 136:4-137:23, 58:15-59:9,

61:21-62:1, 89:12-17, 90:20-24, 139:8-10; Allison Dep. 30:20-24, 35:10-18, 42:14-16, 56:22-

57:15, 59:5-20, 89:1-4, 176:21-177:1, 182:19-183:8.)  Plaintiffs each complained to Whirlpool,

by phone and email, about their Mold Problems.  (Glazer Dep. 36:12-37:18; Allison Dep. 18:6-8,

27:18-28:19-29:3.)  Prior to and after their respective complaints to Whirlpool, Plaintiffs each

took steps – many recommended by Whirlpool – in attempts to fix the Mold Problems,

including:  leaving the door open; wiping the seal or "boot"; wiping the detergent dispenser;

wiping out standing water; using Affresh; and running cleaning cycles.  (Glazer Dep. 132:16-23,

136:4-137:25; 146:4-16; Allison Dep. 33:1-36:14, 55:5-60:19.)  None of these actions fixed the

Mold Problems – at best, they temporarily reduced the severity of the Mold Problems, which

nevertheless persisted.  (Glazer Dep. 58:15-59:9, 61:21-62:1, 89:12-17, 90:20-24, 139:8-10;

Allison Dep. 32:12-14, 87:25-88:8.)

Based on these experiences with their Washing Machines, Plaintiffs allege on behalf of

themselves and all Class members that Whirlpool engaged in a common course of conduct in

designing, advertising, distributing, and selling a product it knew was defective, and in

concealing the nature of that defect from consumers.  (CAC ¶¶ 26-50.)  Plaintiffs specifically

allege Whirlpool knew the Washing Machines were defectively designed, caused the Mold

Problems, and otherwise failed to perform as a reasonable consumer would expect.  (*Id.* ¶¶ 46-

48, 59.)  Plaintiffs satisfy the typicality requirement.

**4.**     **Plaintiffs And Their Counsel Will Fairly And Adequately Protect The Interests Of The Class.**

Rule 23(a)(4) requires that the named representatives "will fairly and adequately protect the interests of the class."  The Sixth Circuit has outlined two criteria to consider in determining whether the representation of the class would be adequate:  "1) The representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel."  *Senter*, 523 F.2d at 524-25.  "Arguments challenging the adequacy of class representatives should be viewed skeptically."  *Almendares v. Palmer*, 222 F.R.D. 324, 332 (N.D. Ohio 2004).

Plaintiffs satisfy both criteria here.  As to the first requirement, Plaintiffs' interests are coextensive with those of the Class because both are Ohio residents who purchased their Washing Machines in Ohio, each Plaintiff and Class member has been injured or threatened with injury in the same manner by Whirlpool, and Plaintiffs seek relief that is identical to that which would be sought by all Class members.  (CAC ¶¶ 50; Glazer Decl. ¶ 6; Allison Decl. ¶ 6.)  Moreover, Plaintiffs have expended significant time and effort in prosecuting this case, including having their Washing Machines inspected by Whirlpool, responding to written discovery requests, being deposed, and retaining experienced and competent counsel.  (Glazer Decl. ¶ 7; Allison Decl. ¶ 7.)  Plaintiffs understand and take seriously their obligations to the Class.  (Glazer Decl. ¶ 8; Allison Decl. ¶ 8.)  Nothing more is required.

Second, Plaintiffs' counsel have extensive experience in prosecuting complex product defect actions such as this one.  (*See* Dkt ## 2-3 (Decl. of Jonathan D. Selbin), 2-4 (Decl. of Paul M. Weiss), 2-5 (Decl. of George K. Lang), 2-6 (Decl. of Steven A. Schwartz), 2-7 (Decl. of James C. Shah), 2-8 (Decl. of Jonathan Shub), 2-9 (Decl. of Mark Schlachet), 2-10 (Decl. of

-24-

Brian Ruschel).)  Class counsel's full experience is set forth therein, and qualifies them to vigorously prosecute the action on behalf of the Class.

### B.    Plaintiffs Satisfy The Requirements Of Rule 23(b)(3).

#### 1.    Common Factual Or Legal Issues Predominate.

"Rule 23(b)(3) establishes that a class action may be maintained if 'the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . .'"  *Kelly*, 2007 WL 4562913, at *5 (quoting Fed. R. Civ. P. 23(b)).  "The requirement that 'common' issues predominate over individual issues assures that the goal of judicial economy is served in fact, not just in theory."  *Id.* (citing *Am. Med. Sys., Inc.*, 75 F.3d at 1085).  The predominance requirement "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Beattie*, 511 F.3d at 564 (*quoting Amchem*, 521 U.S. at 632).  To satisfy the predominance requirement, "a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof."  *Id.* (internal quotations omitted).  "The fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones."  *Id.* (internal quotation marks omitted).

*Daffin* is instructive.  There, the Sixth Circuit held that "The issues that predominate include:  (1) whether the throttle body assembly is defective, (2) whether the defect reduces the value of the car, and (3) whether Ford's express 'repair or replace' warranty covers the latent defect at issue in this case."  458 F.3d at 554.  Similar issues predominate here:

(1)    Whether the Washing Machines are defective;

(2)    Whether Whirlpool knew that the Washing Machines are defective;

(3)    Whether Whirlpool concealed that defect; and

(4)     Whether, as a result of Whirlpool's conduct, Plaintiffs and the Class have suffered damages.

As with *Daffin*, "this is not a case like *Amchem*, 521 U.S. at 624, in which different class members were exposed to different products such that the uncommon issue of causation predominated over the lesser shared  issues."  458 F.3d at 554.  Moreover, *Amchem* itself held that the predominance requirement is readily met in consumer fraud cases like this one.  *See Amchem*, 521 U.S. at 625.

The fact that class members may eventually be required to come forward and make an individual showing of damages does not defeat predominance or preclude class certification. *Van Horn v. Nationwide Property and Cas. Ins. Co.*, 2009 WL 347758, at *11 (Gwin, J.) ("[T]he Sixth Circuit [has] affirmed certification of a class where 'individual *damage* determinations might be necessary' because 'the plaintiffs . . . raised common allegations which would likely allow the court to determine liability . . . for the class as a whole.'") (quoting *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004)) (emphasis in original); *Beattie*, 511 F.3d at 564 ("[C]ommon issues may predominate when liability can be determined on a classwide basis, even when there are some individualized damage issues").

Plaintiffs' claims and those of Class members arise from a common nucleus of operative facts involving Whirlpool's design, manufacture, advertising, and sale of its defective Washing Machines and Whirlpool's concealment of the defect.  The claims also are based on the same legal theories and therefore require determination of the same legal issues.  Common issues predominate.

## 2.     A Class Action Is Superior To Any Alternative.

Certification is appropriate if the Court finds that "class action is superior to other available methods for fair and efficient adjudication of the controversy."  Fed. R. Civ. P.

23(b)(3).  The matters pertinent to the findings include:  (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.  *Id.*  Each of these factors is discussed in turn, below.

*Daffin* is again instructive.  There, the Sixth Circuit concluded that requiring individual vehicle owners to litigate their claims was "vastly inferior" to class-wide adjudication of the common issues.  458 F.3d at 554.  The same is true here.  Class-wide resolution of the issues in this case will reduce litigation costs and promote efficiency for the Court as well as the litigants.  The evidence which will be presented as to the design of Whirlpool's Washing Machines — and the concealment of that defect — will not vary from one Class member to the next.  Any trial on these issues — whether class or individual — will require presentation of the same evidence regarding the design defect, and Whirlpool's knowledge and concealment of the defect.

In sum, and as is made clear in the discussion of the four relevant considerations below, the class action device is superior because there simply are no practical or economic alternative procedures available to the parties which might be used to adjudicate these claims in a more (or even equally) fair or efficient manner.

### a. Interest Of Individual Class Members In Controlling The Litigation

There is nothing to suggest Class members have a strong interest in controlling their own lawsuits relating to Whirlpool's Washing Machines.  Such lawsuits are difficult and expensive, particularly since they involve extensive and expensive expert analysis.  Having numerous lawsuits concerning the same legal and factual issues is not the best use of judicial resources or

the parties' time and resources, especially in light of the uniformity and commonality of the key

factual and legal issues.  Should any Class member desire to control his or her own lawsuit, they

will be provided notice, as discussed below, and the opportunity to opt out of the Class.

**b.      The Extent And Nature Of Any Litigation Already
             Commenced By The Class**

Aside from the present MDL action, Plaintiffs are not aware of any similar pending

individual or class litigation in Ohio, or in any other State.

**c.      The Desirability Of Concentrating The Litigation In A
             Single Forum**

As noted above, the key factual and legal issues are uniform and common to all Class

members, and turn on a common nucleus of operative facts and common legal theories.

Plaintiffs and all Class members reside in Ohio, and Whirlpool advertised, distributed,

warranted, and sold the Washing Machines here.  Ohio is the central locus of facts giving rise to

the claims of Ohio Class members, and it is thus beneficial to concentrate the litigation in this

Court.

**d.      Management Difficulties, If Any, Do Not Preclude
             Certification.**

There are no difficulties in management unique to this case that preclude certification.

The factual and legal issues are premised on a common nucleus of operative facts and common

legal theories, such that proof as to one is proof as to all with respect to most, if not all, issues in

the case.  Plaintiffs' claims and those of Class members are all governed by Ohio law.

There is no meaningful alternative for the prosecution of these claims.  This action

provides an efficient vehicle for resolution of a controversy affecting thousands of class

members in a single proceeding.  Further, this product defect case is typical of other product

defect cases in that it is expensive to litigate and bring to trial, whether it proceeds as an

854266.8

individual action or a class action. In this case, prosecution of the common issues requires resources well beyond that available to or justified for an individual class member. To prove up this case, Plaintiffs have undertaken massive discovery efforts and retained and worked with 6 experts, at tremendous cost of time and money. Such effort would have to be duplicated by every individual in the class to prove this case, an obviously inefficient and prohibitive endeavor. The expense of individual litigation will deter class members from vindicating their rights. *See Amchem*, 521 U.S. at 617 (Rule 23(b)(3) aims to vindicate "the rights of groups of people who individually would be without effective strength to bring their opponent into court at all.").

Indeed, the United States Supreme Court and this Court both have observed that due to such expense, the realistic alternative to this type of class action is not multiple individual suits, but zero individual suits. *Amchem*, 521 U.S. at 617 ("[T]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."); *Van Horn*, 2009 WL 347758, at *10 (Gwin, J.) ("Here, we find that the putative class members would have little interest in individually controlling the litigation. The claims presented here are the type of small claims that are generally best treated under the class action procedure.").

Moreover, even if possible, the litigation of thousands of individual cases would unnecessarily burden the courts. Adjudicating Plaintiffs' claims in the form of class action is more efficient than overwhelming the court system with hundreds or thousands of complex individual actions. By essentially consolidating thousands of potential individual actions, the class action device here will enable the Court to manage this litigation in the most efficient way, minimizing the time, effort, and expense for both the litigants and the judiciary. *See Kelly*, 2007

WL 4562913, at *6 (holding class action "is the most appropriate mechanism . . . to advance the interests of the potential parties and to conserve the time and resources of this Court").

## V.    <u>CONCLUSION</u>

Plaintiffs respectfully submit that this is a paradigmatic case for class certification. Whirlpool sold Washing Machines to tens of thousands of consumers across Ohio that it knew were uniformly defective in that they did not adequately self-clean, with the result that they develop Mold Problems and stink.  Rather than disclose that knowledge to consumers so they could make an informed choice between the benefits and downside of front-loader washers, Whirlpool opted to conceal that information from everyone in the chain of distribution prior to the time of sale.  When consumers experienced Mold Problems – and a remarkable 35-50% of them have – Whirlpool blamed the problem on the consumers, sought to shift the burden of dealing with it to them, and even developed and sold them a product – Affresh – that only temporarily mitigates the problem.  A class action is the only way to hold Whirlpool accountable and provide relief to these Ohio consumers.

For these reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion to Certify an Ohio Class.

Dated:  January 29, 2010            Respectfully submitted,


                                    By:_____ */s/ Jonathan D. Selbin*_____
                                            Jonathan D. Selbin


                                    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                    250 Hudson Street, 8th Floor
                                    New York, NY  10013-1413
                                    Telephone:  (212) 355-9500
                                    Facsimile:  (212) 355-9592

854266.8

By: _____ /s/ Mark P. Chalos _____
                Mark P. Chalos

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN  37219
Telephone:  (615) 313-9000
Facsimile:  (615) 313-9965


By: _____ /s/ George Lang _____
                George Lang

FREED & WEISS LLC
111 West Washington Street, Suite 1331
Chicago, IL  60602
Telephone:  (312) 220-0000
Facsimile:  (312) 220-7777


By: _____ /s/ James C. Shah _____
                James C. Shah

SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
35 East State Street
Media, PA  19063
Telephone:  (610) 891-9880
Facsimile:  (610) 891-9883


By: _____ /s/ Steven A. Schwartz _____
                Steven A. Schwartz

CHIMICLES & TIKELLIS LLP
One Haverford Centre
Haverford, PA  19041
Telephone:  (610) 645-4720
Facsimile:  (610) 649-3633

854266.8

By:      _/s/ Steven Wittels_
          Steven Wittels

SANFORD WITTELS & HEISLER, LLP
950 Third Avenue, 10th Floor
New York, NY  10022
Telephone:  (646) 723-2454
Facsimile:  (646) 723-2948


By:      _/s/ Scott A. George_
          Scott A. George

SEEGER WEISS LLP
1515 Market Street
Philadelphia, PA  19102
Telephone:  (215) 564-2300
Facsimile:  (215) 851-8029


By:      _/s/ Brian Ruschel_
          Brian Ruschel

925 Euclid Avenue, Suite 660
Cleveland OH  44115
Telephone:  (216) 621-3370
Facsimile:  (216) 621-3371


By:      _/s/ Mark Schlachet_
          Mark Schlachet

LAW OFFICE OF MARK SCHLACHET
3637 South Green Road, 2nd Floor
Beachwood, OH  44122
Telephone:  (216) 896-0714
Facsimile:  (216) 514-6406

_Attorneys for Plaintiffs and the Proposed Class_

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 29, 2010, service of this document was accomplished

pursuant to the Court's electronic filing procedures by filing this document through the ECF

system.

*/s/ Mark P. Chalos*

Mark P. Chalos
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, TN  37219
Telephone:  (615) 313-9000
Facsimile:  (615) 313-9965
mchalos@lchb.com

854266.8