# EXHIBIT 29

CONFIDENTIAL

November 16,  2009


RE: WHIRLPOOL CORPORATION FRONT-LOADING WASHER PRODUCTS LIABILITY
LITIGATION, 1-08-wp-65000, MDL No. 2001, Class Action


## RULE 26 REPORT OF RICHARD L. OLIVER, Ph.D.

I am Professor of Management, Emeritus, Vanderbilt University.  I have acquired a general

theoretical and applied perspective on the principles set forth in this Declaration and am qualified to

testify.  Within the last ten years, I was deposed and qualified as an expert witness in the case of

William Arthur Ruff, *et al.* vs. Parex, Inc., *et al.* 96 CVS 0059, failure of stucco siding, but did not

testify. In another matter, (Edward Roy vs. American Cemwood Corp., (MSC99-00499), failure of

roofing materials, I prepared a declaration; the case was settled without further involvement on my

part. In another action (Chambers, *et al.* vs. Weyerhaeuser Company, No. 98-2-21084-2KNT), I

prepared a declaration; the case was settled without further involvement on my part. In yet another

matter (Albert Thornton *et al.* vs. Boise Cascade Corporation, Civil Action No. 2-99CV159-TJW), I

was deposed but was not asked to testify. In a case involving Bridgestone/Firestone, Inc. ATX,

ATX II, and Wilderness tires products liability litigation (Master File No. IP00-9373-C-B/S MDL

No. 1373), I prepared a rebuttal report, but was not deposed and did not testify. In the case of

(Banks vs. Behr Process Corp, et al., CV-2000-2281 Alabama Circuit Court), I prepared materials

and consulted with attorneys. The case was settled without further action on my part. In my last

litigation matter, (Robert Blangeres *et al.* vs. Stimson Lumber Company, No. 00-2-02122-4SEA), I

prepared a declaration; the case was settled as far as I am aware. Prior to this ten-year period, I had

worked on: a class action suit against Masonite Corp. (failed residential siding), a case of corporate-

to-corporate sale of perished inventory, and a case of pirated satisfaction research methodology.

I was retained by Plaintiffs' Attorneys to opine on the reasonableness of using Whirlpool's warranty claims data as a proxy or predictor of actual problem rates or future claims rates as described in this litigation. My experience in researching and writing on this issue is extensive. I have studied consumer behavior, customer satisfaction/dissatisfaction, and consumer responses in general to both satisfactory and unsatisfactory product performance for some 35 years and have written a book, now in its revised edition (*Satisfaction: A Behavioral Analysis of the Consumer, 2nd* Armonk NY: ME Sharpe 2010 copyright), and numerous peer-reviewed articles on these matters. A copy of my resume is attached to this Declaration as Exhibit 1. Recognition for my work in these areas is supported by appointments as a Fellow of both the national American Psychological Association and the Society for Consumer Psychology, the consumer psychology division of the American Psychological Association.

I am being compensated for all work related to this matter at the rate of $500 per hour.

To assist in my opinion and conclusions, Plaintiff's Attorneys have provided a number of documents to date.  These include a copy of the original and amended Master Complaint, the depositions of plaintiff's Glazer, Glennon, Hollander, Nordan, Schaeffer, and Snyder, and related interrogatories. In addition, I was provided internal (to Whirlpool) hard-drive data on service-related matters. I also received the affidavit of Nammick and deposition of Hardaway representing the defendant.

2

**General Statement**

Based on a large body of related literature, I conclude that the number of final customer ("consumer") complaints ("claims") to manufacturers and final resellers varies by the nature of the product but, in general, is only a fraction of the actual number of: dissatisfied consumers having experienced unsatisfactory product performance and have not contacted either manufacturer or reseller, consumers about to experience problems in a reasonable future period of time, consumers who are using the product but are unaware of the "problem" (of biofilm in the present case), consumers experiencing a specific problem but are unaware of complaint or redress channels, consumers who believe they have no recourse because the literature provided does not address the (biofilm) problem or its redress, and consumers who have experienced unsatisfactory performance and have elected to seek a solution "outside the channel," including personal remedies and/or third parties (e.g., independent service contractors, home improvement or personal care consultants). These phenomena, taken together, are known as the "tip of the iceberg" problem in the dissatisfaction literature.

Based on this same literature, I conclude that the nature of the product under litigation reduces the likelihood that unsatisfactory product will result in claims for all affected and yet-to-be affected parties. This result has many causes including, but not limited to, the following: unawareness of the potential for product problems, a belief that the unsatisfactory performance is "normal" for this type of product, unawareness of the claims procedures, a belief that the claims process is overly burdensome relative to the likely redress obtained, and a willingness to accept blame for personal dissatisfaction.

3

The combined impact of these observations of the various consumer behaviors noted here, namely the underrepresentation of actual dissatisfactory product in the claims reports, renders a past claims basis for estimating actual dissatisfaction rates or future claims inaccurate and deficient.  In other words, past claims history is neither a proxy for, nor predictive of, either actual dissatisfaction rates or future dissatisfaction rates.

**Specific Points Addressed**

In order, the following will be addressed; this list is not exhaustive and may be amended as further information becomes available: (1) inferring customer (dis)satisfaction from past levels of customer communications to Whirlpool regardless of claims activity or (lack of) redress, (2) awareness levels of the potentiality of biofilm problems; (3) awareness of potential redress should the problem occur, (4) the degree to which salespeople and the Owner's Manual adequately addressed the potential for mold and mildew buildup in the Duet washers and the role played in the generation of consumer expectations, and (5) the consequences of Whirlpool's response to complainants who believed they had mold and mildew problems with their Duet washers as it pertains to future claims activity and that of others.

Regarding point 1: This issue has already been partially addressed. The literature is clear. In the main over many product categories, the modal response to dissatisfaction is to "do nothing" at a reporting rate of approximately 40%. This is a complicated phenomenon because the number of possible explanations is vast. These explanations range from simple unawareness (to be addressed) to a psychological resignation to tolerate the problem. Some consumers find the process of complaining intimidating, distasteful, generally unpleasant, burdensome, unproductive (fruitless), or culturally prohibitive. Living with the problem is often a path of least resistance, much like tolerating a dilapidated auto, particularly where the failure is not one where a product ceases to

4

function such as in the case of a total failure whereby the consumable does not in fact turn on at all.

Regarding point 2: This issue will be discussed in greater detail in point 4. The present discussion centers on the general awareness levels of "new product" understanding and draws on the diffusion of innovation literature. The American consumer was weaned on top-loading washers beginning with the wringer washers of lore. Front-loading or horizontal axis (HA) washers were known mostly from the self-serve washer industry which used a higher water fill industrial design. Introduced in the U.S. in approximately 2000, residential front-loaders were an innovative washer variation and its drawbacks were most likely unknown to consumers. Because the predecessor top loaders were virtually maintenance free, it was likely that consumers either had never heard of biofilm or reasoned that it was an unlikely occurrence and not of their concern. This is a common response to low likelihood events regardless of consequences (e.g., a 100 year flood).

Regarding point 3: Despite the fact that the owner's manual warranty is limited to parts, consumers had no reasonable means of knowing of other courses of redress. They had only the seller, which typically referred them to Whirlpool's customer contact personnel, or direct to Whirlpool. Based on what I have seen, the Whirlpool response was to send out a service technician under the one-year (or extended) warranties or to counsel the consumer as to the remedial steps available to them. These included the bleach wash, aerating the washer via door ajar/open, and later the Affresh (or substitute) tablet wash. These steps would also be recommended by the service technicians as well. Unawareness on this point is actually a mischaracterization as the biofilm problems of odors, smells, and the redepositing of biofilm agents on clothing were unexpected consequences of the nature or design of HA washers and, in this particular case, that of Whirlpool front loaders. With the exception of washer care instructions, the manual makes no mention of what actions the consumer may take *after the fact*. There are no qualifying phrases such as *if you have*

*odor*… or words to that effect. And most definitely, there are no guidelines to recruit Whirlpool's intervention in assisting the consumer. Almost incredibly, Whirlpool refused to send free "starter" packages of Affresh to consumers after odor claims were made – this despite the fact that Affresh was Whirlpool's product and the outlay to the company was wholesale cost. This is a classic failure of goodwill on the part of Whirlpool.

Regarding point 4: The issue here is one of forewarning and the setting of consumer expectations (of problems). This section is complicated by a number of factors. The first is that many, if not most (percent unknown) are "upgrading" from a top-loader to a HE front-loader and do not realize the additional "care" required to maintain the latter. The second is that salespeople apparently are not forthcoming with this information (and why should they? – their intent is to sell product). The third is that none of Whirlpool's advertising that I have seen mentions this fact. The fourth is that rarely are operating manuals "studied" until the product is delivered. The fifth is that early (pre 2004) versions of the owner's manual did not discuss washer care in any detail as near as I can tell. The sixth is that some (earlier? – no copyright dates are printed) versions of the manual do not discuss "washer care" until p. 19. Here a complicated set of keystrokes (a "hidden" key dance) is required to access this cycle. Seventh, and relatedly, the (later?) version of the manual, presumably after complaints began arriving, now mention the "clean washer" cycle at pp. 15 & 20. Now, the removal of "foreign objects" is discussed as is "washer odor" at p. 23. The net impact of these factors is that consumers had little forewarning of problems and may not have been aware that they have any recourse when the problems were to occur (and, indeed, they

6

did not).

Regarding point 5: The phenomenon as described here is referred to in the consumer behavior literature as one of "double dissatisfaction," occurring when dissatisfaction with the product is followed by dissatisfaction with the nature of redress. The relevance of this point is that the sum total of dissatisfied consumers, and hence the actual number of claims is understated by two factors. One is that of consumer resignation or failure to follow-up in the expectation that nothing more can be done. Although the first claim may appear in the Whirlpool database, subsequent bouts of continuing dissatisfaction many or will not be registered. The second phenomenon of note is that, as word of mouth spreads whether by Internet or one-on-one conversation, others will be disinclined to report their concerns resulting in greater numbers of unreported problems. This phenomenon, that of unresponsiveness to consumer complaints, is well-known in the literature. That of the Intel Pentium chip fiasco is a case in point.

My opinions, of course, are subject to further modification and development upon learning of additional documentation, testimony, and other information relating to the matters addressed. I hold the opinions set forth in this report to a reasonable degree of professional certainty.

*Richard L. Oliver* Ph D
_____
RICHARD L. OLIVER, PH.D.

7