**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **In re: WHIRLPOOL CORP. FRONT-LOADING WASHER PRODUCTS LIABILITY LITIGATION**<br><br><br>Gina Glazer v. Whirlpool Corporation | **1:08-wp-65001**<br>**1:08-wp-65000**<br><br>**MDL No. 2001**<br><br>**Class action**<br><br>**Judge:  James S. Gwin** |

**WHIRLPOOL CORPORATION'S OPPOSITION**
**TO PLAINTIFFS' MOTION TO CERTIFY AN OHIO CLASS**

Table of Contents

Page

Table of Authorities ............................................................................................................iii

INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED......................................1

STATEMENT OF FACTS ............................................................................................3

I.  THE DESIGN, MANUFACTURE, AND SALE OF THE WASHERS ............................3

    A.  The Access, Sierra, and Horizon Washer Platforms...............................3

    B.  Access and Horizon Models Confer Undisputed Consumer
       Benefits ...............................................................................4

    C.  Whirlpool's Design, Testing, and Manufacturing Practices Have
       Ensured That the Vast Majority of Washer Owners Would Not
       Experience the Alleged "Mold Problem" ....................................5

    D.  Differences Among Washer Models Show That the Putative Class
       Members Are Nowhere Nearly Similarly Situated.....................5

II.  THE WASHERS' SERVICE HISTORY CONFIRMS THAT THERE IS
    NO COMMON "MOLD PROBLEM" AMONG THE WASHER
    OWNERS.....................................................................................9

III.  OWNERS DID NOT RECEIVE ANY COMMON REPRESENTATION
    ABOUT RELIABILITY OR ABSENCE OF "MOLD PROBLEMS"............................12

IV.  PLAINTIFFS' EXPERIENCES DIFFERED FROM THE EXPERIENCES
    OF OTHER OWNERS OF THE WASHERS ...............................................13

SUMMARY OF ARGUMENT ....................................................................................15

ARGUMENT ..............................................................................................................16

I.  STANDARDS FOR RULE 23 CLASS CERTIFICATION...............................16

II.  PLAINTIFFS' PROPOSED CLASS IS OVER-INCLUSIVE .............................17

III.  PLAINTIFFS HAVE FAILED TO PROVE THE EXISTENCE OF
    COMMON QUESTIONS OF FACT OR LAW, AND INDIVIDUAL
    QUESTIONS DOMINATE .....................................................................20

IV.  PLAINTIFFS HAVE FAILED TO PROVE THAT THEIR CLAIMS ARE
    TYPICAL OF THE CLAIMS OF THE PROPOSED CLASS .........................26

V.      PLAINTIFFS HAVE FAILED TO PROVE THAT A CLASS ACTION IS
        SUPERIOR TO OTHER AVAILABLE METHODS FOR THE FAIR
        AND EFFICIENT ADJUDICATION OF THEIR CONTROVERSY .............................27

VI.     PLAINTIFFS CANNOT BRING AN OCSPA CLASS CLAIM
        BECAUSE THEY DO NOT PLEAD FACTS SHOWING THAT
        WHIRLPOOL'S CONDUCT PREVIOUSLY HAD BEEN
        DETERMINED TO BE DECEPTIVE ...............................................................................30

CONCLUSION...........................................................................................................................31

Table of Authorities

<u>Cases</u>                                                                                            <u>Page</u>

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)................................................................................     20

*Briehl v. Gen. Motors Corp.,*
172 F.3d 623 (8th Cir. 1999) .............................................................     18,19

*Chesner v. Stewart Title Guar. Co.,*
No. 1:06CV00476, 2009 WL 585821 (N.D. Ohio Feb. 24, 2009) .........     17

*Clay v. Am. Tobacco Co.,*
188 F.R.D. 483 (S.D. Ill. 1999) ..........................................................     18

*Daffin v. Ford Motor Co.,*                                                                       2,17,19,
458 F.3d 549 (6th Cir. 2006) ...............................................................     20

*Eisen v. Carlisle & Jacquelin,*
417 U.S. 156 (1974)..............................................................................     17

*Faktor v. Lifestyle Lift,*                                                                         2,22,26,
No. 1:09-CV-511, 2010 WL 271346 (N.D. Ohio Jan. 15, 2010) ...........     27,28

*Faralli v. Hair Today, Gone Tomorrow,*
No. 1:06 CV 504, 2007 WL 120664 (N.D. Ohio Jan. 10, 2007) ............     19,30

*Findlay v. Hotels.Com, L.P.,*
441 F. Supp. 2d 855 (N.D. Ohio 2006)................................................     30

*Floyd v. Pride Mobility Prods. Corp.,*
No. 1:05-CV-00389, 2007 WL 4404049 (S.D. Ohio Dec. 12, 2007)......     21

*Gariety v. Grant Thornton, LLP,*
368 F.3d 356 (4th Cir. 2004) ...............................................................     17

*Gen. Tel. Co. v. Falcon,*
457 U.S. 147 (1982)..............................................................................     16

*Gentek Building Prods., Inc. v. Sherwin-Williams Co.,*
No. 1:02CV00013, slip op. (N.D. Ohio Feb. 22, 2005)..........................     18

*Glasstech, Inc. v. Chi. Blower Corp.,*
No. 3:07 CV 1422, 2009 WL 5124986 (N.D. Ohio Nov. 24, 2009) .......     21

*Hawley v. CertainTeed Corp.*,
No. 99-CA-7350, 2000 WL 840508 (Ohio Ct. App. June 28, 2000)...................... 25

*Hoffer v. Cooper Wiring Devices, Inc.*,
No. 1:06CV762, 2007 WL 1725317 (N.D. Ohio June 13, 2007) ........................... 19,30

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ................................................................. *passim*

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*,
288 F.3d 1012 (7th Cir. 2002) ................................................................ 19,21, 22

*In re Initial Public Offering Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) ................................................................... 17

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ............................................................. 20

*Oshana v. Coca-Cola Bottling Co.*,
225 F.R.D. 575 (N.D. Ill. 2005)............................................................. 18

*Pettrey v. Enter. Title Agency, Inc.*,
241 F.R.D. 268 (N.D. Ohio 2006) ......................................................... 30

*Rodney v. Nw. Airlines*,
146 Fed. Appx. 783 (6th Cir. 2005)....................................................... 17,20, 21,25

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) ................................................................ 16,20

*State Auto Mutual Ins. Co. v. Chrysler Corp.*,
304 N.E.2d 891 (Ohio 1973).................................................................. 21

*St. Clair v. Kroger Co.*,
581 F. Supp. 2d 896 (N.D. Ohio 2008)................................................... 30

*Taylor v. CSX Transp., Inc.*,
Nos. 3:05cv7383 & 3:06cv1116, 2007 WL 2891085
(N.D. Ohio Sept. 28, 2007)................................................................... 28

*Temple v. Fleetwood Enter., Inc.*,
133 Fed. Appx. 254 (6th Cir. 2005)....................................................... 21

*Temple v. Wean United, Inc.*,
364 N.E.2d 267 (Ohio 1977).................................................................. 21

*Van Horn v. Nationwide Prop. & Cas. Ins. Co.*,
No. 1:08-cv-605, slip op. (N.D. Ohio Feb. 10, 2009) ............................................. 18

*Wilson v. Am. Cablevision of Kan. City, Inc.*,
133 F.R.D. 573 (D. Minn. 1990) ............................................................................... 29

<u>Statutes, Rules, and Regulations</u>

Fed. R. Civ. P. 23 ...................................................................................................... *passim*

Ohio Rev. Code § 1345.09(B) ................................................................................... 30

Ohio Rev. Code § 1345.10 ......................................................................................... 25

Ohio Rev. Code § 1925.01 ......................................................................................... 28

Ohio Rev. Code § 1925.02 ......................................................................................... 28

Fed. R. Evid. 23 Adv. Comm. Notes 2003 ............................................................... 17

**INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED**

Plaintiffs Gina Glazer and Trina Allison ("Plaintiffs") have moved for an order certifying a class of all current Ohio residents who bought Whirlpool Duet® and Duet HT® washing machines ("Duet washers") and Duet Sport® washing machines ("Duet Sport washers") (collectively, the "Washers").  (Pls.' Mot. to Certify an Ohio Class ("Mot.") at 1.)  Plaintiffs base their motion on claims of uniform product design, common defect, uniform concealment of "Mold Problems," and uniform harm to the putative class members.  Those claims, however, have been proved false by deposition admissions of Plaintiffs themselves and Plaintiffs' own expert witnesses and by Whirlpool's uncontradicted evidence.  The motion should be denied.

Over a 9-year span, the putative class members bought more than 21 different models of Washers built on 3 different engineering platforms (Access, Sierra, and Horizon) in different model years with different engineering designs and different functional features.  They received different usage and maintenance instructions, made their purchase decisions for different reasons after receiving different representations from Whirlpool or third parties, and had different warranties and service plans.  They treated and maintained their machines differently.  They had either no problem or different problems.  If they had a problem, they made no effort or different efforts at remediation and received different remedies from Whirlpool and third parties.[1] Plaintiffs' own expert has admitted that literally ***all*** washing machines develop some amount of biofilm (mold, mildew, and bacteria) and that the amount in any particular washing machine depends on multiple factors, including several related to the owner's own laundry habits.

---

[1] *See* Def.'s App. A (Appendix of Key Facts Showing Differences Among Plaintiffs' and Putative Class Members' Experiences with Whirlpool Duet and Duet Sport Washers); Table Summarizing Def.'s App. A., Def.'s Evid. Subm. Ex. 1.

Only a tiny percentage of the buyers of the more than 3,219,000 Washers sold in the U.S. from 2001 through 2009 have reported the "Mold Problems" alleged by Plaintiffs—*i.e.*, biofilm that results in noticeable, offensive odors.  The tiny percentages of Duet washer and Duet Sport washer buyers (3.31% and 2.22%, respectively) who have reported any problem potentially related to biofilm or malodor preclude any inference that all Washers have a defect that has resulted in a common, class-wide injury.

The vast weight of authority supports denial of class certification in fraud and other tort cases that, like this one, involve various consumer product models and designs, because such cases are rife with individual questions of fact and law.  *See, e.g.*, *In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996) (reversing class certification because there were 10 different models of the prosthesis at issue and each class member would present unique considerations); *Faktor v. Lifestyle Lift*, No. 1:09-CV-511, 2010 WL 271346, at *4-5 (N.D. Ohio Jan. 15, 2010) (denying certification because of need for individual inquiry to determine what statements each class member had received).  Not surprisingly, therefore, Plaintiffs rely heavily on a case wholly unlike this one:  *Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006).  (Pls.' Mem. in Support of Mot. ("Mem.") at 2, 22, 25-26, 27.)  *Daffin* involved (i) certification of an express-warranty claim only and (ii) class members all of whom had received the identical single allegedly defective automotive part and identical written warranties.  458 F.3d at 551-52.  In contrast, (i) this case has no express-warranty claim, and (ii) the putative class members received a wide variety of complex products and a wide variety of information about them.  Thus, Plaintiffs' heavy reliance on *Daffin* implicitly concedes the absence of support for their motion.

In short, Plaintiffs fail in multiple respects to meet the requirements for class certification.  Accordingly, their motion should be denied.

## STATEMENT OF FACTS

I.     **THE DESIGN, MANUFACTURE, AND SALE OF THE WASHERS**

A.     **The Access, Sierra, and Horizon Washer Platforms**

Whirlpool began manufacturing front-loading washing machines for the U.S. in mid-2001.  (Decl. of Richard J. Conrad ("Conrad Decl.") ¶ 5, Def.'s Evid. Subm. Ex. 2.)  They were designated as high-efficiency, or "HE," because they were designed to save water and satisfy the U.S. Department of Energy's stringent Energy Star® energy-efficiency standards.  They were first sold in the U.S. under the Whirlpool® brand with the model names "Duet" and "Duet HT" and were built on an engineering platform called "Access."  (*Id.* ¶ 6.)  Since 2007, a Whirlpool subsidiary has manufactured additional Access models in Monterrey, Mexico, referred to as "Sierra platform" models.  (*Id.* ¶ 11.)  From 2001 through 2009, Whirlpool sold more than 2,414,000 Access and Sierra washers in the U.S., including 17 differently engineered models.  (*Id.* ¶ 6.)   Of those, Whirlpool shipped approximately 137,000 to Ohio.  (Unless expressly stated otherwise, this memorandum hereafter refers to all Whirlpool-brand Access and Sierra models as "Access" models.)

In 2006, Whirlpool began selling a smaller, lower-priced, Whirlpool-brand HE front-loading washer model built on a different platform.  (Conrad Decl. ¶¶ 8-9.)  Whirlpool has internally referred to the initial model and all subsequent models of this platform as "Horizon platform" washers and has sold them under the model names Duet Sport® and Duet Sport HT® ("Horizon models").  (*Id.* ¶¶ 9, 15.)  Horizon models differ from Access models and have only a few components in common.  (*See* Tr. of Dep. of Joseph Zahrn, Oct. 7, 2009 ("Zahrn Dep."), at 109:7-8, Def.'s Evid. Subm. Ex. 3.)  Since 2006, Whirlpool has manufactured and sold four differently engineered Horizon models.  (Conrad Decl. ¶ 9.)  From 2006 through 2009,

-3-

Whirlpool sold approximately 805,000 Horizon washers in the U.S. (*Id.*) Of those, Whirlpool shipped approximately 50,000 to Ohio. (*Id.*)[2]

### B.    Access and Horizon Models Confer Undisputed Consumer Benefits

The technology of the various front-loading Washer models departs dramatically from the decades-old technology used in conventional top-loading washers sold in the U.S. (*See* Decl. of Anthony H. Hardaway ("Hardaway Decl.") ¶ 18, Def.'s Evid. Subm. Ex. 4.) Those differences enable the Washer models to provide energy and water savings, better cleaning performance, and less damage to laundry fabrics. (*Id.*)

Plaintiffs and their experts have admitted these benefits. (*See* Pls.' Mem. at 5-6 (admitting "greater water and energy savings"); Tr. of Dep. of Dr. R. Gary Wilson, Feb. 25-26, 2010 ("Wilson Dep."), at 232:2–233:22 (admitting less fabric damage and better stain removal), Def.'s Evid. Subm. Ex. 5.) Since their initial launch in 2001, Access and Horizon models have been Energy Star® certified under the Department of Energy's program. (Hardaway Decl. ¶ 20.) Numerous state and local governments and utility companies, including utilities in Ohio, have offered rebates of up to $300 to encourage consumers to buy these energy-saving machines. (*Id.*)

Consumers Union has consistently recommended these washers to consumers. Year after year from 2002 to 2010, *Consumer Reports* has ranked one or more Access models among the four best front-loading washer models. (*See id.* ¶ 21 & Exs. A-J.) *Consumer Reports* also has

---

[2] Whirlpool has sold Access-platform and Horizon-platform washers to Sears for resale to Sears customers both under the Whirlpool name and under Sears' Kenmore Elite® and Kenmore® brand names. (Conrad Decl. ¶¶ 5-6, 8.) Only Whirlpool-brand washers are included in this litigation.

ranked Horizon models, from their introduction in 2006 to 2010, among the best in the mid-size

front-loader class.  (*See id.* ¶ 21 & Exs. E-H.)

> **C.**  **Whirlpool's Design, Testing, and Manufacturing Practices Have Ensured That the Vast Majority of Washer Owners Would Not Experience the Alleged "Mold Problem"**

By 1998, based on years of global experience with residue build-up in top-loading

washers caused by the chemical interaction between detergents and fabric softeners (a

phenomenon known as Global Laundry Sludge or "GLS"), Whirlpool had developed a test

protocol, known as T-555, to evaluate new designs for residue accumulation.  (Hardaway Decl. ¶

28.)  Before approving the first Access model for production in 2001, Whirlpool conducted T-

555 testing, and the Access platform passed with "excellent" results, showing less affinity for

residue buildup than Whirlpool's conventional top-loading platform.  (*Id.* ¶ 34.)

In 2000 and 2001, Whirlpool also conducted multiple engineering and consumer field

tests in the U.S. with prototype designs before approving the first Access model for production.

(Hardaway Decl. ¶ 33.)  The in-home consumer field tests revealed no "Mold Problems."  (*Id.*)

> **D.**  **Differences Among Washer Models Show That the Putative Class Members Are Nowhere Nearly Similarly Situated**

After it began selling Access models, Whirlpool actively monitored its warranty and

customer call center data, to continually improve quality and reduce warranty costs.  (*Id.* ¶ 24.)

In late 2003 and early 2004, when several hundred thousand Access washers and Kenmore

washers built on that platform were in consumers' homes, Whirlpool's and Sears' call centers

were receiving complaints *at a rate less than two-tenths of one percent per year* related to mold

and musty odors in Access washers and Kenmore washers built on that platform.  (*Id.*)

Nevertheless, in April 2004, Whirlpool assembled an engineering team to identify the

root cause(s) of the complaints and recommend design, manufacturing, or literature changes that

could reduce even further the already tiny chance that a consumer would experience mold and malodor.  (*Id*. ¶ 25.)  By December 2004 the team had identified several owner-use factors contributing to mold or malodors, primarily arising from owners' lack of familiarity with the new HE machines and HE detergents.  (*Id.* ¶ 26.)  These factors included owners' use of regular, rather than  HE detergents; using too much detergent (because HE detergents are far more concentrated, smaller amounts must be used); increasing use of cold-water washes; use of liquid fabric softener; decreasing use of chlorine bleach; keeping the washer door closed between uses, which reduces ventilation that would dry the washer's interior; failing to clean the detergent dispenser periodically; and failing to inspect and clean the rubber door seal periodically.  (*Id.*) Three additional factors were a direct result of the water- and energy-saving front-loading design: the more tightly-sealed door needed to keep water from escaping when it reached door-level; absence of deep-water submersions of the upper portions of the tub; and reinforcement structures where moisture and residue could collect.  (*Id.*)  There also were environmental factors in some consumers' homes, such as soft water, pre-existing mold colonies in a basement laundry area, and a relatively warm and humid climate.  (*Id.*)

As it acquired more information over time, Whirlpool made literally dozens of changes to increase customer satisfaction and reduce service costs by further reducing the service incident rate or "SIR" (the rate of service calls during the first year of ownership).  (*Id.* ¶ 35.)  These included design and literature changes to make the Washers more resistant to variation among consumers' use and care practices and reduce the chance of noticeable biofilm malodor.  (*Id.*) As a result, Washers owned by members of Plaintiffs' proposed class are spread across 3 platforms, 21 different engineering models, and 9 model years.  (Hardaway Decl. ¶¶ 5-14; Def.'s Evid. Subm. Ex. 1 at 2.)  Differences exist among Access models, among Horizon models, and

between every Access model and every Horizon model, including design and manufacturing

differences within the different platform generations.  (Hardaway Decl. ¶¶ 15-16, 35-36.)   The

changes include the following:

- Revised Use and Care Guides:  Whirlpool revised the Access and Horizon owner's manuals published after December 2004 to (i) require the use of HE detergent; (ii) warn against using more detergent than recommended by the detergent manufacturer; (iii) describe the increased risk of mold-mildew if HE detergents were not used; (iv) recommend leaving the door open between uses; (v) recommend running a monthly maintenance cycle; and (vi) recommend periodically cleaning the door seal.  (Conrad Decl. ¶¶ 25, 27.)

- Horizon Tub and Cross-Piece:  Before Whirlpool began producing the first Horizon models, it made the platform's tub design different from the early Access platform's design to improve water flow and drainage and to reduce the likelihood that residues would accumulate there.  (Zahrn Dep. at 211:25–212:25; Hardaway Decl. ¶ 35.b.)  Whirlpool also changed the Horizon platform's aluminum cross-piece that attaches to the wash drum to reduce the chance that the cross-piece would corrode and accumulate biofilm.  (Hardaway Decl. ¶ 35.b.)

- Access Cross-Piece:  In January 2005, Whirlpool changed the material of the Access platform's aluminum cross-piece to reduce the chance that the cross-piece would experience chemical corrosion and biofilm accumulation.  (Id. ¶ 35.c.)

- Access Maintenance Cycle:  In July 2005, Whirlpool added a pre-programmed "maintenance" cycle to the Access models to enable consumers to better and more conveniently clean the inside of their machines.  (Id. ¶ 35.d.)

- Access and Horizon Clean Washer Cycles:  In 2006, Whirlpool introduced Duet Sport washers and the next generation of Access models, all of which included a new "Clean Washer" cycle on the control panel.  (Id. ¶ 35.e.)  The Clean Washer cycle is functionally equivalent to the earlier maintenance cycle, but is selectable on the control dial.  (Id.)  The owner's manuals were changed to add instructions for the Clean Washer cycle.  (Id.)

- Sierra Tub and Cross-Piece:  In 2007, Whirlpool introduced a new design for the tub in Sierra models, moving the structural reinforcements to outside the tub to further limit the growth of biofilm and odor-causing residue by increasing water flow and rinsing over the rear tub surfaces.  (Hardaway Decl. ¶ 35.g.)  At the same time, Whirlpool introduced a new aluminum cross-piece design that was less likely to collect residues.  (Id.)

- Duet Steam Models:  In September 2007, Whirlpool launched its fourth-generation Access model, which included a steam-enhanced Clean Washer cycle to further control biofilm and residues.  (Id. ¶ 35.h.)  This model also has a Clean Washer Reminder light that illuminates every 30 cycles to remind the owner to run the Clean Washer cycle.  (Id.)

- <u>Access Tub</u>:  In February 2009, Whirlpool redesigned the German-built Access models by moving the tub's reinforcement structures to outside the tub, as it earlier had done for Sierra models, to further limit the growth of biofilm.  (*Id.* ¶ 35.)

- <u>Horizon Tub</u>:  In September 2009, Whirlpool similarly redesigned the Horizon models' tub. (*Id.* ¶ 35.l.)

Plaintiffs' sole engineering expert, Dr. Wilson, admits that some of these design changes reduced the buildup of biofilm.  (Wilson Dep. at 298:15-22, 299:25–300:8, 305:5–306:16.)  In particular, having opined that locating the support structure inside the tub "is a major design flaw that leads to excessive collection of residue and the eventual growth of odor producing bacteria and mold," (Pls.' App. Ex. 2 (Suppl. Rep. to "Expert Rep. on Whirlpool Front-Loading Washer," Dr. R. Gary Wilson, Jan. 4, 2010) at 10), he then admitted in his deposition that the change that moved the structure to outside the tub prevented it from collecting debris.  (Wilson Dep. at 291:5-292:13.)  Accordingly, the differing tub designs in various Access and Horizon models are alone sufficient to show nonuniformity of the putative class.

Dr. Wilson also admits that he has not conducted *any* test or experiment to evaluate the effectiveness of *any* of the multilple changes in limiting the biofilm that he admits exists in *all* washing machines.  (*Id*. at 128:12–129:2, 130:14-25, 134:13-16, 317:14–318:19; Pls.' App. Ex. 7 at 10.)  Nor has he examined any engineering drawing or change notice for any model.  (Wilson Dep. at 296:20–297:8.)  Nor has he inspected any washer, front-loading or conventional top-loading, to compare its biofilm-limiting capabilities to those of any Washer model.  (*Id*. at 83:6–84:1, 108:7-20, 167:5-7.)  Nor does he know what biofilm-limiting features or usage history the 13 used Washers he inspected had.  (*Id*. at 124:2–128:9; 314:12-24.)  Indeed, he admits that of the 13 used Washers he inspected, only one was a Whirlpool-brand Washer made after 2005.  (*Id*. at 313:19-23.)  Nor has he looked at any database or conducted any statistical analysis to determine whether the complaint rates of malodor for Access or Horizon washers

differ from the rate for any other washer, whether front-loading or conventional top-loading.  (*Id.* at 150:18-25, 161:20–162:1.)  Perhaps most importantly, he admits that the amount of biofilm that any given washer develops "depends on the use and habits . . . of the consumer" and on the "environment that the machine sits in."  (*Id.* at 114:8–115:6, 255:3-12.)

Thus, Plaintiffs' own expert has proved that all washers develop biofilm over time; that biofilm becomes a problem only if the amount is so substantial that it produces noticeable offensive odors; that the amount of biofilm a given unit develops depends on the owner's use and care habits and on the unit's environment; that the putative class members do not own washers with a common design because there are multiple design differences in the multiple models and generations of Access and Horizon washers; and that he has done absolutely nothing to test the biofilm-limiting effect of any of those differences or to determine whether any of those differences have any effect on owner satisfaction.  In short, Plaintiffs' sole engineering expert has proved that the putative class members do not own a common product, that they have not had common "Mold Problems," and that whether or not such "Mold Problems" develop in any given unit depends on the owner's use and habits, the unit's environment, and which of the multiple different design feature the unit has.

## II.  THE WASHERS' SERVICE HISTORY CONFIRMS THAT THERE IS NO COMMON "MOLD PROBLEM" AMONG THE WASHER OWNERS

The robust field data from 2002 through 2009 show that only a tiny fraction of Washer owners have complained of the "Mold Problems" alleged by Plaintiffs.  Only about

0.32% of U.S. owners experienced "Mold Problems" in the first year of service.[3]  For Washers made in 2001 through 2005, the percentage with "Mold Problems" in the first year was 0.44%, and for Washers produced in 2006-2008 it was 0.20%.  (Taylor Rebuttal ¶ 10 & Table 1.) These data confirm not only that "Mold Problems" are rare, rather than common, among the putative class members, but that Whirlpool's various changes have even further limited the chance of "Mold Problems" and have even further differentiated the members of the putative class.  (*Id.* ¶¶ 10, 13; Expert Rebuttal Report of Paul M. Taylor, Jan. 15, 2010 ("Taylor Sur-Rebuttal"), ¶ 9, Def.'s Evid. Subm. Ex. 7.)

Service data separately compiled by Sears—one of the largest retailers, and the largest service provider, of the Washers—confirm that the vast majority of owners have not experienced any "Mold Problems."  Approximately 96.7% of all U.S. Access owners who are known to Sears and who bought a Sears five-year extended service plan—*i.e.*, individuals who pre-paid Sears to address any problem with their Washers and who thus have no financial disincentive to call Sears for any problem, including "Mold Problems," in the first five years of use—have never told Sears of any biofilm or malodor.  (Taylor Rebuttal ¶ 13 & Table 2.)  Likewise, Sears' service data reveal that approximately 97.8% of Horizon owners with a Sears three- or five-year extended service plan have never told Sears of any biofilm or malodor.  (*Id.*)

External, publicly available service data also confirm that the vast majority of Washer owners have not experienced and will not experience the "Mold Problems" alleged by Plaintiffs. Year after year from 2005 and into 2010, *Consumer Reports* published repair histories that

_____

[3] A detailed explanation of these analyses of Whirlpool's and Sears' service records is included in Dr. Paul Taylor's December 16, 2009, rebuttal report.  (Expert Rebuttal Report of Paul M. Taylor, Dec. 16, 2009 ("Taylor Rebuttal"), ¶¶ 9, 13 & Ex. B, Def.'s Evid. Subm. Ex. 6.)

include the Washers and confirm that most owners of the Washers have not had *any* repairs or

"serious problems" and that the Washers were among the most reliable front-loading washer

brands.  (Hardaway Decl. ¶ 21 & Exs. D-F, H-J.)  Several of the *Consumer Reports* articles also

make it clear that Consumers Union's definition of "serious problems" includes reports of "mold

or a musty smell."  (*Id.* ¶ 21, Ex. D at 42, & Ex. J at 45.)  Thus, all available field data confirm

that the vast majority of Washer owners have not reported or experienced "Mold Problems,"

even after years of owning their Washers.

 Nevertheless, Plaintiffs argue that 35% to 50% of Washer owners reportedly have

"actual[ly] report[ed]" experiencing the alleged "Mold Problems."  (Pls.' Mem. at 17.)  Plaintiffs

are wrong and they have no evidence to support that assertion.  Plaintiffs' only engineering

expert admits he has done no survey or analysis of any kind to determine what percentage of

Washer owners have complained of biofilm or malodor in their machines.  (Wilson Dep. at 19:7-

15.)  He also admits he has never see *any* survey or data analysis supporting the 35% complaint

rate cited by Plaintiffs.  (*Id.* at 148:16–149:7.)  Similarly, Plaintiffs' microbiology expert admits

he cannot make a scientifically reliable estimate of either (i) the fraction of Washers that will

develop a noticeable biofilm problem or (ii) the average amount of biofilm that is likely to be

found in the Washers.  (Tr. of Dep. of Dr. Chin S. Yang, Ph.D., Feb. 23, 2010 ("Yang Dep."), at

258:11–260:3, Def.'s Evid. Subm. Ex. 8.)

 Plaintiffs rely solely on a January 2005 internal survey of Whirlpool employees to

support their 35% figure.  (Pls.' Mem. at 17 & App. Ex. 28.)  That survey, and two documents

that misstate its nature (Pls.' App. Exs. 3 & 27), are the cornerstone of Plaintiffs' argument that

the alleged "Mold Problems" are much more pervasive than all the field data reflect (Pls.' Mem.

at 17).  But that January 2005 survey included only Whirlpool employees; was not limited to

washing machines; was not, to the extent that it applied to washers, limited to Duet washers; was worded and interpreted not to be limited to the alleged defects in this case; and, by virtue of its date, plainly has nothing to do with any Access model after 2004 or any Horizon model.  (*See* Pls.' App. Ex. 28; Hardaway Decl. ¶ 38.)  Further, Plaintiffs have mischaracterized the document they cite for the proposition that up to "50% of Washing Machines experience Mold Problems." (Pls.' Mem. at 17; Pls.' App. Ex. 4.)  That document says nothing about the Washers' complaint rates, nor was it intended to.  (*See* Decl. of Charles A. Martin ("Martin Decl.") ¶¶ 19-21, Def. Evid. Subm. Ex. 9.)  Thus, there is literally ***no*** empirical analysis or data in the record that supports a mold and malodor complaint rate of 35% to 50% for any period or any Washer model, and there is massive evidence showing that the cumulative complaint rate over five years is substantially less than 5% for all Washer models.

## III.  OWNERS DID NOT RECEIVE ANY COMMON REPRESENTATION ABOUT RELIABILITY OR ABSENCE OF "MOLD PROBLEMS"

Plaintiffs Glazer and Allison, and Plaintiffs in the related actions, have admitted that they never saw or heard ***any*** representation from Whirlpool stating that Duet or Duet Sport washers would be reliable, durable, free from defects, or free from the need for a repair for any length of time.  (*See* Def.'s App. A § I.)  It is undisputed that Whirlpool never represented, advertised, or guaranteed that the Washers, or any percentage of them, would not require repair or would not develop malodors, mold, bacteria, or biofilm.  (*See id.*)  To the contrary, Whirlpool promised, depending on the specific Washer model, that "[f]or one year from the date of purchase, when this [Washer] is operated and maintained according to the instructions attached to or furnished with the product, Whirlpool Corporation . . . will pay for [Factory Specified Parts or FSP® replacement parts] and repair labor to correct defects in materials or workmanship."  (Hardaway Decl. ¶¶ 42-22.)

Plaintiffs erroneously assert that "Whirlpool did not provide any information to Plaintiffs regarding the potential for Mold Problems either prior to or at the time of purchase," and they refer to this as "Whirlpool's Uniform Concealment of the Mold Problems."  (Pls.' Mem. at 11, 14.)  This misleadingly ignores the huge amount of information Whirlpool provided to consumers, retailers, and service technicians regarding the potential for all HE washers, including the various Access and Horizon models, to develop biofilm and associated malodors if washer owners do not take simple steps to limit biofilm and residue buildup.  (*See* Conrad Decl. ¶¶ 20, 25, 28, 33-36.)  Members of the putative class who received one or more of the many Whirlpool-generated communications knew that front-loading HE washers, including Access and Horizon models, could develop biofilm and related odors and that buyers of these washers would have to take certain steps to prevent the growth from becoming a problem.  Thus, there was no "uniform concealment" of those facts.

## IV.  PLAINTIFFS' EXPERIENCES DIFFERED FROM THE EXPERIENCES OF OTHER OWNERS OF THE WASHERS

The evidence to date shows that each of the two Plaintiffs' buying decision, use and care of her washer, experiences with and repairs to her washer, and potential damages are unique among Washer owners whose facts are known to Whirlpool and the Court:

|  | Plaintiff Allison | Plaintiff Glazer |
|---|---|---|
| Different platforms, models, generations, and prices | Bought a 2005 model-year Duet HT washer (Access Matador 1 model) from HH Gregg for $1,028. | Bought a 2006 model-year Duet Sport washer (Horizon platform) from Best Buy for about $700. |
| Different purchase reasons and pre-sale information | Bought washer because it had a large capacity.<br><br>Saw commercials advertising the Duet washer's capacity, but did not conduct pre-sale information search. | Bought washer because it "was supposed to save money, save water, save detergent, save energy," was smaller, and was a Whirlpool-brand product.<br>Conducted no pre-sale information search. |

|  | **Plaintiff Allison** | **Plaintiff Glazer** |
|---|---|---|
| Different warranties | Bought a five-year extended warranty from HH Gregg. | Received only the Whirlpool one-year written warranty. |
| Different use and care of their washers | Has used HE detergent since she first bought her machine;<br><br>Uses liquid fabric softener on "[e]very one" of the 15 to 20 loads washed per week; and<br><br>Contrary to the owner's manual and service technician's instructions, refuses to leave the door ajar between uses. | Used regular detergent until January 2008, then switched to HE detergent.<br><br>Contrary to owner's manual and Whirlpool customer service's instructions, does not use, and has never used, the Clean Washer cycle with chlorine bleach or Affresh.<br><br>Does not clean the door seal as instructed in her Washer's Guide. |
| Different problems with their washers | Has noticed malodor in her laundry, mold growth in the machine, and malodor in the machine that does not extend outside the laundry room. | Has noticed a strong malodor from her machine that permeates "all the way upstairs," laundry malodor in a "few t-shirts," and mold growth in the machine. |
| Different actions taken to address the problems | Runs two maintenance cycles per month, once with Affresh and once with bleach, and wipes down the door seal with Clorox Wipes. | Does not use Affresh or bleach in her machine, and Dr. Taylor's washer inspection showed that she had not cleaned the door seal as instructed by Whirlpool. |
| Different repairs, if any | Had service technician go to her home to address mold and odor problems.  Then began running monthly maintenance cycles. Refused to leave the door open, despite technician's advice. | Refused to have a service technician inspect her machine, because her machine was out of warranty and she would have had to pay for the service call. |

|  | Plaintiff Allison | Plaintiff Glazer |
|---|---|---|
| Different alleged injuries | Has paid to replace "dozens" of towels and t-shirts, but continues to use her machine to clean laundry. | Had not incurred any out-of-pocket expense related to mold or odor problems, until she replaced her machine in February 2010. |

(*See* Def.'s App. A at 1-2, 15-16, 19-21, 36-37, 47-48, 58-59, 66.)   In addition, Mms. Glazer's and Allison's experiences differ dramatically from other Plaintiffs' and putative class members' experiences.  (*See id*. at 2-79 (describing facts underlying claims of all Plaintiffs and facts of putative class members who are satisfied with their Washers).)

## SUMMARY OF ARGUMENT

The fatal flaw in Plaintiffs' motion for class certification is that the ***vast*** majority of Washer owners have not experienced the "Mold Problems" alleged by Plaintiffs, and the potential claims of the tiny fraction of owners who have experienced any "Mold Problem" are so factually and legally individualized that they must be adjudicated on their own terms.  Rule 23 precludes a class action unless named plaintiffs prove that the action satisfies all four requirements of Rule 23(a) and the requirements of at least one of the categories in Rule 23(b). *Am. Med. Sys.*, 75 F.3d at 1079.  Plaintiffs' action fails to meet at least two of Rule 23(a)'s requirements: There are no "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), and Plaintiffs' claims are not "typical of the claims . . . of the class," Fed. R. Civ. P. 23(a)(3).  Further, the action does not fit any Rule 23(b) category.  Although Plaintiffs assert that common questions "predominate over any questions affecting only individual members, and that a class action is superior to other available methods" under Rule 23(b)(3), that is plainly wrong.

This case presents ***only*** individual issues.  The Washer owners bought different machines (different models of Access, Sierra, or Horizon platform washers, over numerous generations) with different features and different owner's manuals.  (Def.'s App. A § I; Conrad Decl. ¶¶ 20,

27, 31-32, 34.)  They received different information at or before the point of sale and made their purchase decisions for different reasons after receiving different representations from Whirlpool (if any) or third parties.  (Def.'s App. A § 1.)  They had different warranties and service plans. (*Id.* § II.)  They treated and maintained their machines differently and used different detergents in different amounts.  (*Id.* § III.)  They had either no problem or different alleged problems.  (*Id.* § IV.)  If they had a problem, they made no effort or different efforts at remediation and received different remedies from Whirlpool and third parties.  (*Id.* §§ V-VI.)  Each putative class member's claim must be evaluated on its own terms, because each is unique.

Therefore, the Court should deny Plaintiffs' attempt to amalgamate those markedly disparate claims into a single class action.

## ARGUMENT

## I.      STANDARDS FOR RULE 23 CLASS CERTIFICATION

As the parties seeking certification, Plaintiffs bear the burden of proof.  *Am. Med. Sys.,* 75 F.3d at 1079.  They must show that their claims are capable of proof at trial through evidence that is common to the class, rather than individual to its members.  *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397-98 (6th Cir. 1998) (reversing certification of class of early retirees on commonality and typicality grounds where the proposed class's theories of liability were not "susceptible to class-wide treatment" and "the issues that remained . . . were anything but common").

Class determination "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," and a court should "probe behind the pleadings before coming to rest on the certification question."  *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982).  This frequently requires a court to consider evidence relating to the maintainability of

the class action. *Am. Med. Sys.*, 75 F.3d at 1082 (holding that the district court needs to consider "evidence in the record presented by the nonmoving party"); *see also Rodney v. Nw. Airlines,* 146 Fed. App. 783, 788 (6th Cir. 2005) (the trial court should, when necessary, probe beyond the pleadings and evaluate the evidence in making Rule 23 determinations, even when such determinations overlap with merits issues).

Although a district court may not inquire into a lawsuit's probable outcome on the merits, the majority of courts hold that it is proper to inquire into the merits as "necessary to identify the nature of the issues that actually will be presented at trial" and to decide "those aspects relevant to making the certification decision on an informed basis." Fed. R. Evid. 23 Adv. Comm. Notes 2003; *see also Chesner v. Stewart Title Guar. Co.*, No. 1:06CV00476, 2009 WL 585821, at *2 (N.D. Ohio Feb. 24, 2009) ("It is a settled question that some inquiry into the merits at the class certification stage is not only permissible but appropriate to the extent that the merits overlap the Rule 23 criteria." (citation and quotation marks omitted)).[4]

## II.    PLAINTIFFS' PROPOSED CLASS IS OVER-INCLUSIVE

"The definition of a class should not be so broad so as to include individuals who are

---

[4] The Sixth Circuit's opinion in *Daffin* should not be read as refusing to evaluate the evidence and rule on disputed questions of law pursuant to Rule 23. *Eisen v. Carlisle & Jacquelin*, which the *Daffin* court was interpreting, held that the district court's preliminary hearing on the merits of the case unrelated to the Rule 23 requirements was inappropriate for determining whether a class action could be maintained. 417 U.S. 156, 177-78 (1974). "The Supreme Court was not faced with determination of any particular Rule 23 requirement or a requirement that overlapped with the merits." *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006). *Eisen* simply "restrict[s] a court from expanding the Rule 23 certification analysis to include consideration of whether the proposed class is likely to prevail ultimately on the merits." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004). Thus, *Daffin* should be read as preventing this Court from **deciding** Plaintiffs' claims on the merits, not as precluding the Court from probing behind Plaintiffs' sweeping factual allegations and considering record evidence and legal issues related to certification.

without standing to maintain the action on their own behalf." *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999); *accord Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, No. 1:08-cv-605, slip op. at 11-12 (N.D. Ohio Feb. 10, 2009) (Gwin, J.) (finding "Plaintiffs' proposed class is overbroad" because the proposed class definition individuals who "fall outside of the Plaintiffs' theory of the case").  A proposed class that includes members who have not suffered harm cannot be certified.  *See, e.g.*, *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005) (denying certification of proposed class of all fountain Diet Coke buyers in part because the class would necessarily include numerous persons who could not show damage).

Here, Plaintiffs' proposed Ohio class purports to include <u>all</u> Washer buyers on the theory that all buyers were damaged when they bought their Washers.  (3d Am. Compl. ¶ 60.)  The overwhelming majority of Washer buyers, however, have not experienced any "Mold Problems" with, or required repairs of, their Washers.  (Statement of Facts, Part II, *supra*.)  They have suffered no injury or actual damage at all, because they received what they bargained for.

Nearly every court that has considered the issue has denied recovery based on an alleged latent product defect that has not manifested itself or caused any problems.  *See Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 630 (8th Cir. 1999) ("An overwhelming majority of courts have dismissed these unmanifested defect claims and rejected the idea that the Plaintiffs can sue manufacturers for speculative damage."); *Gentek Building Prods., Inc. v. Sherwin-Williams Co.*, No. 1:02CV00013, slip op. at 19-20 (N.D. Ohio Feb. 22, 2005) (unpublished and attached as Def.'s Evid. Subm. Ex. 10) ("[T]he great weight of authority from other jurisdictions indicates that a plaintiff has not suffered a present injury compensable in contract, express warranty, implied warranty, or tort until the very product in question has caused some harm to person or

property, even if the product in question contains a latent defect that has manifested in other, identical products").[5]  These courts recognize that, absent any product failure, the plaintiffs cannot prove  the required element of damages.  *See, e.g.*, *Briehl*, 172 F.3d at 627-28.

Here, because the vast majority of Washers have not manifested the problems alleged in the complaint, the vast majority of putative class members have suffered no damage, which is an element of each of Plaintiffs' claims.  (*See* Argument, Part III, *infra*.)  Accordingly, the proposed class is fatally over-inclusive because it consists almost entirely of buyers who cannot maintain a claim.  *See Faralli v. Hair Today, Gone Tomorrow*, No. 1:06 CV 504, 2007 WL 120664, at *7 (N.D. Ohio Jan. 10, 2007) (denying certification because, *inter alia*, the proposed class included "an unascertainable number of customers who have no claim because they have not suffered any harm or damage since they are satisfied with their hair removal treatments").

Contrary to Plaintiffs' wish, *Daffin* does not help them.  There, the Sixth Circuit upheld certification of a class that included owners who had not experienced a defect manifestation because the question of whether those owners had an express-warranty claim required the court to decide whether the terms of Ford's written warranty permitted recovery for an unmanifested defect, which would have been a ruling on the merits of that claim.  *Daffin*, 458 F.3d at 553. Because that merits-based legal question could not be resolved at the certification stage, the Sixth Circuit affirmed the certification order, but noted: "If at a subsequent point in the litigation, the district court determines that the express warranty is limited to defects that manifest

---

[5]  *See also In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1017 (7th Cir. 2002) (reversing certification warranty and consumer fraud class and recognizing that "[n]o injury, no tort, is an ingredient of every state's law"); *Hoffer v. Cooper Wiring Devices, Inc.*, No. 1:06CV763, 2007 WL 1725317, at *6-8 (N.D. Ohio June 13, 2007 (dismissing the plaintiff's

themselves within the warranty period, the district court may consider at that point whether to modify or decertify the class." *Id.* at 554. Here, the parties are not asking the Court to decide whether Whirlpool's written warranty requires manifestation for recovery on an express-warranty theory.

### III.   PLAINTIFFS HAVE FAILED TO PROVE THE EXISTENCE OF COMMON QUESTIONS OF FACT OR LAW, AND INDIVIDUAL QUESTIONS DOMINATE

Plaintiffs can meet neither Rule 23(a)(2)'s requirement that they prove the existence of common questions of fact or law nor Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate over individual issues, because the individual facts of each owner's experience mean that each owner's claim will stand or fall on its own, not in lockstep with every other owner's claim. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Although Plaintiffs purport to identify several common questions of fact and law (Pls.' Mem. at 21), they fail to supply the Court with any evidence showing that the questions are in fact common—*i.e.*, that each question can be answered with uniform facts that can be fairly applied to resolve all putative class members' claims. *See Sprague*, 133 F.3d at 397-98.

Rule 23(a)(2) requires Plaintiffs to show "a common issue the resolution of which will advance the litigation." *Id.* at 397. They also must satisfy Rule 23(b)(3)'s predominance requirement by proving that the proposed classe is "sufficiently cohesive to warrant adjudication by representation.'" *Rodney*, 146 Fed. App. at 786 (quoting *Amchem Prods.*, 521 U.S. at 623). The predominance inquiry requires an examination of "the claims, defenses, relevant facts, and applicable substantive law, to assess the degree to which resolution of the classwide issues will

---

implied warranty in tort, negligent design, and failure to warn claims where the complaint failed to allege a "present injury" and asserted only the possibility of future injury).

further each individual class member's claim against the defendant." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004) (citation and internal quotation marks omitted). "Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) also requires us to consider how a trial on the merits would be conducted if a class were certified." *Rodney*, 146 Fed. Appx. at 786 (citation omitted).

Every Ohio claim in Plaintiffs' complaint—violation of the OCSPA, tortious breach of warranty, negligent design, and negligent failure to warn—requires Plaintiffs to plead and prove that all Washers suffer from a common design defect that causes "Mold Problems" and that all owners incurred actual damages that were proximately caused by the defect or Whirlpool's omissions. *See Temple v. Fleetwood Enter., Inc.*, 133 Fed. Appx. 254, 265 (6th Cir. 2005); *State Auto Mutual Ins. Co. v. Chrysler Corp.*, 304 N.E.2d 891, 895 (Ohio 1973); *Temple v. Wean United, Inc.*, 364 N.E.2d 267, 270 (Ohio 1977); *Glasstech, Inc. v. Chi. Blower Corp.*, No. 3:07 CV 1422, 2009 WL 5124986, at *6 (N.D. Ohio Nov. 24, 2009); *Floyd v. Pride Mobility Prods. Corp.*, No. 1:05-CV-00389, 2007 WL 4404049, at *10 n.2 (S.D. Ohio Dec. 12, 2007). Moreover, each element of Plaintiffs' claims, as well as Whirlpool's affirmative defenses of product misuse and statutes of limitations, raises individual questions of fact and law. Thus, when the Court inquires into the form that trial on these issues would take, there would have to be a class member-by-class member inquiry on each question.

First, Plaintiffs have failed to submit credible class-wide proof of any common defect that has caused all Washers to experience "Mold Problems." Significant design differences among the various models and model years of Access and Horizon washers preclude any finding that all Washers uniformly fail to "self-clean." (*See* Statement of Facts, Part I.D, *supra*.) Whether a particular owner's washer contains a defect that caused biofilm and malodors depends

on individual proof as to that owner's platform, engineering model, washer features, product installation, and use and care practices. *See In re Bridgestone/Firestone*, 288 F.3d at 1019 (denying certification because "it would not be possible to make a once-and-for-all decision about whether all 60 million tires were defective" where each of the six tire trade names at issue came in multiple versions with different tread designs, diameters, widths, safety features, and failure modes); *Faktor*, 2010 WL 271346, at *4.

Moreover, Plaintiffs cannot prove on a class-wide basis that any common defect actually causes alleged "Mold Problems."  All available empirical data reveal that only tiny percentages of Washer owners have complained of any "Mold Problems," including owners who have used their Washers for at least five years.  (*See* Statement of Facts, Part II, *supra*.)

Still further, even if Plaintiffs could show "Mold Problems" common to all members, the existence of such a defect alone would not prove a class-wide injury.  Any particular owner's "Mold Problems" may have been caused by a variety of factors unrelated to any product defect, including (i) failure to use the proper HE laundry detergent, (ii) use of too much detergent, (iii) failure to take appropriate preventative measures (*i.e.*, leaving the washer door open between uses, running a monthly maintenance or Clean Washer cycle, periodically cleaning the door seal). (*See* Statement of Facts, Part I.C, *supra*.)  Thus, the Court would need to conduct a class-member-by-class member inquiry to determine whether any "Mold Problems" were caused by the alleged design defect or, instead, by non-actionable factors.

Second, to succeed on their OCSPA claim, each putative class member would need to prove that Whirlpool had knowledge of the alleged defect and "Mold Problems," had a duty to disclose that knowledge, and failed to disclose it before the member's purchase.  This is impossible to prove on a class-wide basis because Whirlpool's knowledge was not static during

-22-

the proposed class period, and the information that Whirlpool knew and disclosed to consumers changed during the past nine years.  (*See* Statement of Facts, Parts I-II, *supra*.)

      This need for individualized inquiry is exemplified by the circumstances of Ms. Christine Piersol, a putative class member in one of the related actions.  (*See* Decl. of Christine Piersol ("C. Piersol Decl."), Def.'s Evid. Subm. Ex. 11.)  She states in her declaration that she was aware before her purchase—based on her communications with the Sears sales associate, a *Consumer Reports* article, or information she found on the Internet about mold and odors in front-loading washers—that she needed to run a monthly Clean Washer cycle to prevent odors in her Washer.  (*Id*. ¶¶ 11-12.)  She decided to buy her Washer anyway and has followed this instruction during the nearly two years she has owned the Washer.  (*Id.*)

      Third, whether the alleged defect and Whirlpool's omissions proximately caused each Washer owner's damages or harm requires an individual inquiry.  Plaintiffs' proximate cause allegations read: "If Plaintiffs and other members of the Class had known about the design defects affecting the Washing Machines, they would not have paid the significant sums that they paid for the Machines."  (3d Am. Compl. ¶ 47.)  Accordingly, proof of proximate causation will require individual fact determinations, including what statements were made to each member; whether each member heard, received, or relied on statements by Whirlpool or third parties; and whether each member had any knowledge of "Mold Problems" before buying a Washer.  The need for individual inquiry is especially important because some point-of-sale literature and owner's manuals contain statements regarding washer odor, mold, and preventative maintenance steps that owners should take, and because the fact that modern high-efficiency washers generally can promote noticeable mold and malodors more readily than older, less efficient machines has been well- publicized.  (*See* Statement of Facts, Part III, *supra*.)

Fourth, the threshold damages question of whether a putative class member incurred any injury (*e.g.*, due to a manifest defect or problem with the washer) and therefore has any right to recover would require thousands of individual mini-trials and overwhelm any common questions.  The Sixth Circuit has held that "[c]lass treatment . . . may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate." *Rodney*, 146 Fed. App. at 791.

Plaintiffs have failed to provide any reasonable or valid basis for concluding that the Washer owners' purported damages can be calculated on an aggregate basis without resort to individual inquiry.  They retained an economist, Dr. Allan Taub, to make an attempt, but his attempt was so unscientific and unreliable, (*see* Expert Report of M. Laurentius Marais, Ph.D., Dec. 16, 2009 ("Marais Report"), Def.'s Evid. Subm. Ex. 12; Sur-Rebuttal Expert Report of M. Laurentius Marais, Ph.D., Jan. 19, 2010 ("Marais Sur-Rebuttal"), Def.'s Evid. Subm. Ex. 13), that Plaintiffs did not cite his reports even once in their moving papers.  Indeed, Dr. Taub, in his rebuttal expert report, ***admitted*** that huge gaps exist in his first report, but he claimed he was not responsible for the gaps because Plaintiffs' counsel had effectively asked him to assume them away.  (*See* Marais Sur-Rebuttal ¶¶ 5, 7, 8, 9.)  Accordingly,each putative class member would need to prove (1) that the defect (if any) caused the owner to expend out-of-pocket monies for a replacement machine, a repair not covered by warranty, purchase of Affresh[6] or other washer cleaner products, replacement of clothing, towels, and other laundry, or a diminution of value, and (2) the extent of such alleged damage.  Thus, to determine whether any compensation is due

---

[6] Affresh is a tablet designed to clean residues from internal washer surfaces.  (Martin Decl. ¶ 3)

to putative class members would require individual factual determinations.

Fifth, whether the Washers, because of the alleged defect, are not of merchantable quality or fit for their ordinary intended use of cleaning clothes can be determined only on an individual basis. Each putative class member would need to show that his or her Washer no longer cleans laundry satisfactorily and that any "Mold Problem" cannot be corrected using the various available cleaning and maintenance steps. This cannot be accomplished on a class-wide basis, especially where the vast majority of owners have not experienced any problem at all. Further, at their depositions, Plaintiffs Allison and Glazer, like many Plaintiffs in the related actions, admitted they were still using their Washers. (Def.'s App. A § VII.)

Finally, individual inquiries would be needed to resolve the merits of Whirlpool's affirmative defenses to individual Washer owners' claims. The absence of uniformity among Washer owners in this regard is illustrated by Plaintiff Glazer's facts relevant to Whirlpool's defense of owner misuse. She has admitted that, contrary to the instructions provided in her owner's manual and the instructions of Whirlpool customer service, she has not used HE detergent for most of the time she has owned the Duet Sport washer, has never run a Clean Washer cycle, and has not cleaned the door seal or inspected it for foreign objects. (*See* Statement of Facts, § IV, *supra*.)

Whirlpool's statute-of-limitations defenses also would differ from owner to owner, depending on when each owner accepted delivery of the Washer. For example, because this lawsuit was filed on September 17, 2008, the OCSPA's two-year statute of limitations would bar the claims of putative class members who bought their Washers before September 17, 2006. *See* Ohio Rev. Code §§ 1345.10(C), 2305.10(A); *Hawley v. CertainTeed Corp.*, No. 99-CA-7350, 2000 WL 840508, at *2 (Ohio Ct. App. June 28, 2000). Thus, the individual affirmative

defenses further show Plaintiffs cannot satisfy the predominance requirement.  *See Rodney*, 146

Fed. App. at 786.

Given the numerous individual questions of liability, damages, and affirmative defenses,

Plaintiffs' claims cannot be tried on a class-wide basis without devolving into thousands of mini-

trials on class members' liability and damages claims.   It is precisely for this reason that the

Sixth Circuit in *In re American Medical Systems*, a case involving allegedly defective prostheses,

reversed the district court's certification order.  The Sixth Circuit held that the plaintiffs failed to

satisfy either the commonality or predominance requirement because the "complaint and class

certification motion simply allege in generic terms that there are common issues without

identifying any particular defect common to all plaintiffs."  *Am. Med. Sys.*, 75 F.3d at 1080-81.

In contrast to the plaintiffs' "failure of proof" and "absence of evidence," the defendant

submitted "uncontradicted evidence that since 1973 AMS produced at least ten different models,

. . . that these models have been modified over the years," that "there is no 'common cause' of

prostheses malfunction," that each plaintiff had a different complaint, and that each received

different information.  *Id*. at 1081, 1085.  Therefore, class certification was improper.  *Id*. at

1085.  This case is no different and merits the same result.

## IV.     PLAINTIFFS HAVE FAILED TO PROVE THAT THEIR CLAIMS ARE TYPICAL OF THE CLAIMS OF THE PROPOSED CLASS

Rule 23(a)(3) precludes class certification unless "the claims or defenses of the

representative part[y] are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

A class representative's claim is typical only "it arises from the same event or practice or course

of conduct that gives rise to the claims of other class members, and if his or her claims are based

on the same legal theory."  *Am. Med. Sys.*, 75 F.3d at 1082.  As this Court recently summarized,

typicality is satisfied where the plaintiff shows that "as goes the claim of the named plaintiff, so

go the claims of the class." *Faktor*, 2010 WL 271346, at *7.  To satisfy the typicality

requirement, Plaintiffs must show that all Washers suffer from a common defect (*i.e.*, a defect

shared by all Washers) that has caused class-wide injury (*e.g.*, a common malfunction that

allegedly caused all class members to incur the same loss).  Plaintiffs cannot do so.

Given the rarity of noticeable mold or malodor problems, there is no basis to assume that

all Washers suffer from a common defect and all putative class members have suffered harm as a

result of that alleged defect.  (*See* Statement of Facts, Part II, *supra*.)  Absent any evidence

supporting a reasonable inference that Plaintiffs share a judicially cognizable problem common

to the class they purport to represent, Plaintiffs cannot satisfy Rule 23(a)(3).

When the Court "probe[s] behind the pleadings," *Am. Med. Sys.*, 75 F.3d at 1082, it will

be clear that Plaintiffs' claims are not typical of the class.  Each Plaintiff's claims, and

Whirlpool's defenses thereto, arise out of events that affected that Plaintiff uniquely and

individually, not out of any common course of action by Whirlpool that affected all owners of

the Washers in the same manner.  These numerous factual and legal variables—*i.e.*, the Washer

platform, model, and model-year bought, the instructions given to each owner, the owner's

knowledge about potential "Mold Problems" before purchase, the "Mold Problems" experienced

by each owner (if any), the owner's ability to reduce or eliminate the problem by changing their

use habits, and how the owner's washer installation and use habits affected the temperature,

humidity, and ventilation of the Washer, and what damages and remedies are sought—can be

evaluated only individually.  (*See* Statement of Facts, Part IV, *supra*; Def.'s Evid. Subm. Ex. 1 at

2.)  It cannot be said that so go the claims of Plaintiffs, so go the claims of the class.  *See Am.

Med. Sys.*, 75 F.3d at 1082; *Faktor*, 2010 WL 271346, at *7.

## V.  PLAINTIFFS HAVE FAILED TO PROVE THAT A CLASS ACTION IS SUPERIOR TO OTHER AVAILABLE METHODS FOR THE FAIR AND

**EFFICIENT ADJUDICATION OF THEIR CONTROVERSY**

Rule 23(b)(3) requires Plaintiffs to prove that, under the circumstances, "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The class device must be the 'best' way, not merely one way, to resolve claims. *Taylor CSX Transp., Inc.,* Nos. 3:05cv7383 & 3:06cv1116, 2007 WL 2891085, at *12 (N.D. Ohio Sept. 28, 2007). Under this prong, the Court should address the difficulties likely to be encountered in managing the proposed class action and the interests of individual class members in controlling separate actions. *See* Fed. R. Civ. P. 23(b)(3).

Plaintiffs propose a single litigation on behalf of all Washer buyers in Ohio, regardless of whether the buyer experienced any "Mold Problems"; the engineering platform, model, or generation bought; the use and care instructions received; or the buyer's particular usage and maintenance habits. (Pls.' Mot. at 1.) The liability and damages elements of Plaintiffs' claims, as well as Whirlpool's affirmative defenses, will require individual evidence for each of the asserted claims for each putative class member. (*See* Argument, Part III, *supra*; Def.'s App. B: Summary of Individual Questions of Law and Fact That Must Be Individually Litigated by Each Putative Class Member).) Any attempt to try, in a single class action, the disparate claims of every owner would become unmanageable as the Court and a jury struggled to cope with these countless individual issues, thus overwhelming any benefit that might be derived from class-action treatment. *See Taylor*, 2007 WL 2891085, at *13; *cf. Faktor*, 2010 WL 271346, at *7.

On the other hand, dissatisfied owners can easily seek redress through the small-claim division of Ohio's municipal and county courts, which have jurisdiction to hear and determine civil claims if the amount in controversy does not exceed $3,000. *See* Ohio Rev. Code §§ 1925.01, 1925.02. Those courts employ simplified procedures so that smaller claims can be

adjudicated in an efficient, cost-effective manner without the need for lawyers.  Adjudication of these small claims would be relatively simple because the parties could focus on the owner's particular circumstances.  The availability of small-claims actions confirms that there are other reasonable and efficient means for consumers to exercise their rights against Whirlpool.

The Sixth Circuit's holding in *American Medical Systems* is instructive on this point. There, the Sixth Circuit held that Rule 23(b)(3)'s superiority requirement had not been satisfied because consolidated treatment of the claims would not "promote the just and efficient conduct of the entire litigation."  75 F.3d at 1085 (citation and quotation marks omitted).  The court explained that a "single litigation addressing every complication in every model of prosthesis, including changes in design, manufacturing, and representation over the course of twenty-two years, as well as the unique problems of each plaintiff, would present a nearly insurmountable burden on the district court."  *Id*.  By contrast, an individual case would be "relatively simple to litigate if narrowly focused on a claim regarding a specific model, a specific component, or specific statements made to a particular urologist during a particular period of time."  *Id*.

Still further, because they have never experienced any "Mold Problems," the vast majority of putative class members have no interest in being part of any class action against Whirlpool.[7]  These owners, who have no legitimate claims, have no need for and would not support such a class action.  *See, e.g.*, *Wilson v. Am. Cablevision of Kan. City, Inc.*, 133 F.R.D. 573, 579 (W.D. Mo. 1990) (denying certification, in part, because "[n]o member of the proposed class has evidenced any interest in this litigation").

---

[7] *See, e.g.*, Decl. of Megan Connell ¶ 15, Def.'s Evid. Subm. Ex. 14; Decl. of Chris Dow ¶ 8, Def.'s Evid. Subm. Ex. 15; Decl. of Sandy Perry ¶¶ 5, 16, Def.'s Evid. Subm. Ex. 16; Decl. of Mark L. Rodio ¶¶ 5, 15, Def.'s Evid. Subm. Ex. 17; Decl. of Phyllis Yates ¶ 15, Def.'s Evid. Subm. Ex. 18.

Although a class action may be superior in situations where many *injured* class members are likely to have little interest in prosecuting separate actions because their potential damage awards are too small, the general absence of other litigation among the more than 3,219,000 owners nationwide shows that class relief is unnecessary and undesirable and would not serve Rule 23's efficiency goals.  (Conrad Decl. ¶¶ 6, 9.)  Owners who have viable claims against Whirlpool have readily available methods for adjudication of their disputes that are fairer, more efficient, and less costly than Plaintiffs' proposed class action.  Accordingly, Plaintiffs cannot meet Rule 23(b)(3)'s superiority requirement.

## VI.  PLAINTIFFS CANNOT BRING AN OCSPA CLASS CLAIM BECAUSE THEY DO NOT PLEAD FACTS SHOWING THAT WHIRLPOOL'S CONDUCT PREVIOUSLY HAD BEEN DETERMINED TO BE DECEPTIVE

In Whirlpool's Partial Motion to Dismiss Plaintiffs' Master Class Action Complaint, Whirlpool argued that Plaintiffs' OCSPA class claim fails because Plaintiffs fail to identify (i) any rule adopted by the Ohio Attorney General declaring the alleged act or practice deceptive or unconscionable or (ii) any decision of an Ohio court holding the act or practice to be deceptive or unconscionable that the Ohio Attorney General has made available for public inspection, as required by Ohio Revised Code § 1345.09(B).  (*See* Mem. in Supp. of Def.'s Partial Mot. to Dismiss Pls.' Master Class Action Compl. at 15-17.)  For all the reasons previously set forth, certification of Plaintiffs' class OCSPA claim should be denied.[8]

---

[8] In its November 4, 2009 Order, this Court expressed concern that section 1345.09(B)'s class-action limitations may not apply in federal court.  (Nov. 4, 2009, Order at 6.)  The Northern District of Ohio, however, has consistently applied the OCSPA's limitation and dismissed similar putative class claims.  *See, e.g. St. Clair v. Kroger Co.*, 581 F. Supp. 2d 896, 901 & n.5 (N.D. Ohio 2008); *Faralli*, 2007 WL 120664, at *13-14; *Hoffer*, 2007 WL 1725317, at *3; *Pettrey v. Enter. Title Agency, Inc.*, 241 F.R.D. 268, 280 (N.D. Ohio 2006) (same); *Findlay v. Hotels.Com, L.P.*, 441 F. Supp. 2d 855, 863 (N.D. Ohio 2006) (same).

**<u>CONCLUSION</u>**

For all these reasons, the Court should deny Plaintiffs' Motion to Certify an Ohio Class.

Dated:  March 15, 2010                    Respectfully submitted,


                                               _____

                                               Michael T. Williams
                                               Malcolm E. Wheeler
                                               Galen D. Bellamy
                                               Allison R. Cohn

Michael T. Williams
Malcolm E. Wheeler
Galen D. Bellamy
Allison R. Cohn
Evan B. Stephenson
Joel S. Neckers
Theresa R. Wardon
Wheeler Trigg O'Donnell LLP
1801 California Street, Suite 3600
Denver, Colorado 80202
Telephone:  (303) 244-1800
Facsimile:  (303) 244-1879
E-mail: williams@wtotrial.com

and

F. Daniel Balmert (0013809)
Anthony J. O'Malley (0017506)
Heather M. Lutz (0082237)
Vorys, Sater, Seymour and Pease LLP
2100 One Cleveland Center
1375 East Ninth Street
Cleveland, Ohio 44114-1724
Telephone:  (216) 479-6159
Facsimile:  (216) 937-3735
E-mail: ajomalley@vorys.com

Attorneys for Defendant Whirlpool Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2010, a copy of the foregoing Defendant Whirlpool Corporation's Evidentiary Submission in Support of Opposition to Plaintiffs' Motion to Certify an Ohio Class was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

s/ Michael T. Williams
Michael T. Williams, Esq. (Colorado #33172)
Attorney for Defendant Whirlpool Corp.
Wheeler Trigg O'Donnell LLP
1801 California Street, Suite 3600
Telephone:  (303) 244-1800
Facsimile:   (303) 244-1879
Email:  williams@wtotrial.com