# Exhibit 12

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: WHIRLPOOL CORPORATION FRONTLOADING WASHER PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) | MDL NO. 2001<br><br>CIV. NO. 1:08-WP-65000 |

EXPERT REPORT OF M. LAURENTIUS MARAIS, Ph.D.

## I.  INTRODUCTION

1.    I am a Vice President and Principal Consultant at William E. Wecker Associates, Inc., a consulting firm that specializes in applied mathematical and statistical analysis, including the analysis of damages. I hold a Ph.D. degree and master's degrees in Business Administration, Mathematics, and Statistics from Stanford University. I have taught and conducted scholarly research while serving on the faculties of the University of Chicago and Stanford University. My qualifications and a list of my professional publications are shown in my curriculum vitae, which is attached to this declaration as Exhibit A.

2.    A list of cases in which I have testified as an expert since January 2005 is attached to this report as Exhibit B. The billing rate for my work in this matter is $625 per hour. A list of materials I have received and reviewed in preparing this report is attached as Exhibit C.

3.    Counsel for Whirlpool in this matter asked me to review and respond to the November 16, 2009, "Expert Report Concerning Class Damages" of Dr. Allan J. Taub ("Taub Report" or "Report").

1

## II.  SUMMARY OF OPINIONS

4.    Dr. Taub defines his assignment in this case as follows[1]:

> I have been asked by plaintiffs' counsel to determine if there is a reliable method
> with which to calculate the aggregate amount of class wide damages owed to
> class members as a result of the alleged misconduct without individual inquiry
> [i.e., a method "that may be applied in a formulaic manner"[2]],

where such damages are to be measured separately for each of three distinct claims:

> (1) that Whirlpool violated consumer protection statutes by selling defective
> washing machines while failing to disclose the defects,

> (2) that Whirlpool breached its express warranties by selling defective washing
> machines and failing to repair the defects, and

> (3) that Whirlpool was unjustly enriched through its sales of defective washing
> machines to members of the class to whom warranties do not apply.[3]

5.    Concerning this assignment Dr. Taub claims to have determined "that it is possible to
calculate class-wide damages without individual inquiry under each of the claims asserted by
plaintiffs."[4]

6.    My review of the Taub Report shows that this claim is unsupported by any substantial,
correct, expert analysis of the nature and magnitude of the economic effect of the conduct
complained of on individual members of the proposed class.  Dr. Taub has provided no valid
basis for his purported determination that aggregate class damages can be calculated
formulaically.  In essence he *assumes* without basis that this can be done, and then disguises his
assumption as an expert opinion.  His methodology is neither scientific nor reliable nor
consistent with any generally accepted method of determining economic damages caused by
allegedly tortious actions or actions that violate a warranty.

7.    The fundamental, pervasive flaw in the Taub Report is that it fails to articulate a coherent
theory of damage causation that isolates and measures specific, incremental consequences of the
Whirlpool conduct complained of in this case (the "alleged misconduct").  As a result, the Report
fails to address the central issues: (1) How can the amount of compensation required to restore

---

[1] Taub Report, p. 3.
[2] Taub Report, p. 2.
[3] Paraphrased from Taub Report, pp. 2-3.
[4] Taub Report, p. 3.

each member of the proposed class to an economic position equivalent to that they would have been in but for the alleged misconduct be calculated on an aggregate basis for the entire class without individual inquiry? And (2) how can Whirlpool's incremental enrichment due specifically to its alleged misconduct towards a specified subclass be calculated on an aggregate basis without individual inquiry?

8.     No purported expert conclusion concerning these issues can be scientifically valid unless its correctness can be tested by logical or empirical analysis of some kind. Accordingly, Dr. Taub cannot satisfy his obligations under his assignment in this case on a scientifically valid basis by proffering a superficially plausible formula and then simply asserting that this formula can be used to measure aggregate class damages. Rather, he must define and justify the specific concept of the alleged-misconduct-related harms to individual class members that he aims to quantify. He must then explain how his proposed formula can quantify *that* concept of harm on an aggregate basis, using available input data without resort to individual inquiry. He must do these things explicitly and precisely enough to allow other experts to assess whether his concept and calculations are well founded and correct.

9.     The Taub Report has virtually no scientific content of this kind. Instead, he expressly "assumes" that certain metrics can properly be used to quantify damages; assumes, sometimes expressly and sometimes tacitly, that the information needed to apply those metrics can readily be obtained without individualized inquiries; makes additional, tacit assumptions; and, based on combinations of these assumptions, "determines" that damages can be quantified using these metrics. This is tautology, not science.

## III. DR. TAUB PROVIDES NO RATIONAL BASIS FOR THE MEASURES OF DAMAGES PROPOSED IN HIS MODELS 1, 2, AND 3, AND NO PRACTICALLY FEASIBLE METHOD FOR CALCULATING THESE MEASURES OF DAMAGES ON AN AGGREGATE BASIS WITHOUT INDIVIDUAL INQUIRY.

10.    It is well established among experts in the analysis of damages that economic damages are an *incremental* concept: the economic harm attributed to the alleged misconduct must correspond to the *difference* between the plaintiffs' economic situation $Y$ as it would have been but for the alleged misconduct (i.e., the plaintiffs' "but-for" economic situation in the should-have-been ["SHB"] world), and the plaintiffs' economic situation $X$ as it actually was and will continue to

3

be in the "actual world" that includes the alleged misconduct. For a valid determination of damages specifically attributable to the alleged misconduct, it is important that the hypothetical SHB world $Y$ must differ from the actual world $X$ only with respect to the alleged misconduct. It is also important that the analyst's specification of $Y$ is coherent, in that it must reflect all of the logically necessary consequences of removing the alleged misconduct.

11. The "Reference Guide on Damages" of the Federal Judicial Center states these considerations as follows:

> The characterization of the harmful event begins with a clear statement of what it entailed. It must also include:
> - a statement about the economic situation absent the wrongdoing;
> - a characterization of the causal link between the wrongdoing and the harm the plaintiff suffered; and
> - a description of the defendant's proper behavior.[5]

12. The alleged misconduct in this case consists of selling washing machines with a defect and failing to inform purchasers of the alleged defect. A rational analysis of purchasers' damages resulting from this alleged  misconduct must, therefore, specify the nature of the assumed SHB world without the alleged misconduct, in order to measure in economic terms the difference in the purchasers' situations between the SHB world and the actual world.

13. Dr. Taub presents three distinct damages scenarios, which he calls "Models." These three Models differ with respect to the SHB world that he assumes implicitly. In none of the three Models does Dr. Taub actually describe the corresponding SHB world or even mention the concept of a SHB world. For each Model, however, one can infer from Dr. Taub's proposed measure of damages what he implicitly assumes to be the difference between the corresponding SHB and actual worlds. For each Model, Dr. Taub's implicit assumption fails to comport with basic facts about this case.

---

[5] Reference Guide on Damages, *Reference Manual on Scientific Evidence*, 2nd Ed., Federal Judicial Center, 2000, p. 286.

4

### A. *Dr. Taub's Model 1 fails to comport with basic facts about this case and does not permit a "formulaic" determination of damages without resort to individual inquiry.*

14.    Dr. Taub's "Model 1" for calculating the aggregate damages for the entire putative class consists of two basic components: (1) a specification of the amount of damages for each individual class member:

> [Model 1] *assumes* [italics added] that since the product purchased was defective, the damage to each member of the class is equal to the [all-inclusive[6]] purchase price of the machine,

and (2) a method for calculating aggregate damages for the class, i.e., the total amount of the individual damages (1) over the entire class:

> The aggregate amount of class wide damages would be the sum of the individual purchase prices across members of the class.[7]

As I explain below, both these components of Model 1 are fundamentally and fatally defective

### 1.    Dr. Taub's specification of component (1) of Model 1, the amount of damages for each individual member of the putative class, is fundamentally and fatally defective.

15.    Dr. Taub offers no rational basis for his Model 1 in the form of a coherent SHB world from which it can be derived.  Instead, his Report informs readers that Model 1 *assumes* that the damage to each member of the class is equal to the all-inclusive purchase price of the washing machine.  He makes no attempt to explain or justify this assumption, and he cites no authority—economic, forensic, judicial, or otherwise—endorsing such an assumption.  (Indeed, he doesn't even identify it as *his* assumption; rather, he indicates that *Model 1* makes this assumption—although, in reality, it is obviously *Dr. Taub's* assumption.)

16.    Dr. Taub's implicit assumption about the difference between the SHB and actual worlds can be "reverse-engineered" from his proposed measure of damages, however.  Suppose that class member $i$ (i.e., the $i$th of $N$ members of the class) paid an all-inclusive price of $P_i$ for a

---

[6] Initially Dr. Taub mentions only the "purchase price of the machine" (p. 3).  Later he indicates that his purported Model 1 formula can "readily" accommodate additional components of the cost of acquiring a washing machine: "[i]f there are shipping and installation charges to be included in the damage calculation, this can readily be included in the formula" (p. 4).  I refer to the gross cost of acquiring the machine, including both the purchase price and transactions costs, as the "all-inclusive" purchase price.

[7] Taub Report, p. 3.

washing machine with the alleged undisclosed defect. Model 1 holds that the proper amount of compensation for restoring class member $i$ to the position he or she would have been in but for the defect is $P_i$. In other words, Dr. Taub assumes that the situation of possessing a brand-new washing machine *without* the alleged defect—which, hence, is properly valued at $P_i$—is the economic equivalent of possessing a brand-new washing machine *with* the alleged hidden defect, plus an amount of $P_i$. It follows, therefore, that Dr. Taub implicitly values each brand-new washing machine with the hidden defect at exactly zero. That is, he tacitly assumes that each brand-new washing machine has zero value to its owner.

17.    Dr. Taub explicitly assumes that this holds for *each* member of the class.[8] Thus, on his Model 1 express and tacit assumptions, every single subject Whirlpool washer was literally worthless to its buyer, regardless of how long they owned and used the machine and regardless of their past, current, and expected future levels of satisfaction with the machine. This assumption would apply, for example, to a buyer who used a machine with complete satisfaction without ever detecting any symptom of mold or mildew until selling it several years later along with the house in which it was installed. It would apply even if the new owner replaced the laundry set to satisfy a color preference without ever experiencing or being made aware of any mold or mildew issue with the washer that was replaced. Dr. Taub's Model 1 assumption applies, in other words, even in this situation where the washer was available to each of its owners to perform problem-free as intended throughout its service life. Even in this situation, where no actual owner has suffered any actual harm from, or even knew of, the alleged defect, Dr. Taub's Model 1 absurdly assigns an increment to class damages equal to the washer's entire, all-inclusive purchase price.

18.    Even the named class representatives who complain of a problem with mold or mildew received substantial problem-free time in service. In other words, even these proposed class representatives actually received a non-negligible volume of problem-free washing machine services, contrary to Dr. Taub's counterfactual extreme assumption. For example Plaintiff Tracy Cloer bought a new Whirlpool Duet washer in November 2005, but first detected "Mold Problems" after "approximately three and one-half years from the purchase date," i.e., in mid-

---

[8] Taub Report, p. 3.

2009, in her fourth year of ownership.[9] Similarly, Plaintiff Pramila Gardner used her machine for approximately 1½ years before experiencing intermittent odor problems, and Plaintiff Andrea Strong used hers for 2½ years before noticing mold problems.[10]

19.     Dr. Taub appears to recognize that others—including the Court—may detect this flaw in Model 1. He observes, accordingly, that "[i]f it is the court's decision that when calculating damages a *time in service offset* to the purchase price is appropriate, this can be readily calculated with data on customer date of purchase."[11] For two related reasons, however, "data on customer date of purchase" is insufficient by itself for determining an appropriate offset for each machine's problem-free time in service. First, such a determination also requires data on when any mold- or mildew-related issue first became a "problem." Second, Dr. Taub tacitly assumes, but provides no support for his tacit assumption, that when the "problem" arises, and how much value the owner places on the service realized before then, are solely time-dependent and independent of *frequency* of use, for example. None of these essential data inputs, including the simplest time-in-use data, can be obtained without individual inquiry (as is illustrated by the testimony of the named plaintiffs identified in ¶ 18 above).

20.     The necessity of such individual inquiry (and its fatal consequences for Dr. Taub's simplistic damages formula) will likely involve still more individual factors beyond the duration or amount of each washer's problem-free service. The precise threshold at which the presence of mold or mildew becomes a "problem" that detracts from the value placed on the machine by a given owner, and the amount by which the "problem" actually detracts for a given owner at a

---

[9] Class Action Complaint, *Cloer et al. v. Whirlpool Corporation*, MDL No. 2001, 1:09-wp-65005-JG, U.S.D.C. Northern District of Ohio, Eastern Division, Filed October 13, 2009 ("MDL Complaint"), at ¶ 41. I understand that in the three related actions against Sears, Roebuck and Co. involving Kenmore-brand washing machines that were built by Whirlpool and share the same engineering designs as the subject Whirlpool-brand washers, the proposed class representatives similarly present diverse facts regarding their purchase, use, and maintenance of their machines, as well as the type of problems they experienced and the times during which they received problem-free service from their machines. Compare, for example, Deposition of Alfred R. Blair, Aug. 25, 2009, p. 199 (testifying that Mr. Blair first experienced a mold problem in late 2008, almost four years after buying his washer), and June 19, 2009 Deposition of Andrea Strong ("Strong Dep."), pp. 81, 174 (testifying that she used her washer for 2½ years before noticing "Mold Problems"). The experiences of the Kenmore washer owners in the related actions against Sears illustrate some of the factual variations that certainly exist among the more than 2,800,000 Whirlpool-brand washer owners in the United States who are not putative class representatives in this litigation.
[10] Plaintiff Pramila Gardner's Response To Whirlpool Corporation's First Set Of Interrogatories To Plaintiff Pramila Gardner, at Response to Interrogatory No. 2; Strong Dep., pp. 81, 174.
[11] Taub Report, p. 4.

given level of the "problem," may also vary among individual washing machine owners.[12] Whether an individual washing machine owner ever experiences what to him or her is an actual "problem" with mold or mildew will depend in part on the following: (1) whether there actually is or will be mold or mildew in that person's washer; (2) whether the mold or mildew is, or to a certainty will be, present in an amount sufficient to cause any odor "problem" before that person sells the residence with the washer,[13] and the price of the residence is not reduced because the buyer of the residence discounts the value of the washer; (3) whether the odor is or will be noticed by that person or someone else[14] (for example, there was not already an odor in the washer area caused by mold or mildew on the walls, floor, or ceiling because of some other source); (4) whether the odor is or will be offensive to that person or someone about whose odor opinion that person cared[15]; (5) whether the mold or mildew in the machine has contributed to odor perceived on laundry washed in the machine[16]; (6) whether, when buying the washer, that person did not, based on past experience with washers or based on any other information, think there was a reasonable likelihood of such an odor in the washer after the amount of use to which it would be subjected; and (7) whether that person would have paid less had he or she known that there was a reasonable likelihood of such an odor in the washer after the amount of use to which it would be subjected. (It is logically possible that the perceived benefits of this washer for some buyers[17] were such that they would have been willing to pay the same price even if alerted to the

---

[12] Compare, for example, July 1, 2009 Deposition of Victoria Poulsen, p. 172, with August 3, 2009 Deposition of Henrik Poulsen, pp. 27, 35, 85, and 87-88. Although Plaintiff Poulsen testified that she is seeking damages only for her allegedly defective electronic control board, not for her claimed "Mold Problems," her and her husband's experiences with their Duet HT washer also illustrate some of the factual variations that exist among the putative class members in this litigation.

[13] July 14, 2009 Deposition of Kevin Barnes, pp. 159 and 187; July 16, 2009 Deposition of Alan Jarashow, pp. 85, 134, and 212; August 31, 2009 Declaration of Ericka Englert; November 24, 2009 Declaration of Shirley Hand.

[14] June 11, 2009 Deposition of Sonja Sandholm-Pound, pp. 261-262; June 23, 2009 Deposition of Sylvia Bicknell ("Bicknell Dep."), p. 141.

[15] August 27, 2009 Deposition of Joseph Leonard, pp. 287-88 (testifying that he knew he could return his washer in 30 days, had noticed a "Mold Problem" by that point, but chose not to return his washer, stating that he was "happy" with the washer and that the smell was "minor").

[16] June 9, 2009 Deposition of Maggie O'Brien, p. 152 (no odor in laundry if it is removed "right away" from the machine); Strong Dep., pp. 152-153; Bicknell Dep., pp. 160-161 (reduction of odor problems when using the sanitary cycle).

[17] Englert Decl., at ¶ 3 (declaring that she chose her Duet washer because it was stackable with the dryer and would create additional space in her laundry room); July 23, 2009 Deposition of Beierschmitt, pp. 79-80 (testifying that she purchased a Duet washer because of its stackability and because of the door lock, as she had a two year old grandson at the time); June 10, 2009 Deposition of Rebecca Nordan ("Nordan Dep."), p. 93 (testifying that she "liked" the appearance of the Duet washer, which caused her to purchase the washer, in part).

possibility of a future "problem" with mold or mildew.) The extreme, one-size-fits-all assumption built into Dr. Taub's Model 1 accounts for none of these individual considerations.

**2. Dr. Taub's specification of component (2) of Model 1, the proposed method for calculating the total amount of damages for individual members of the putative class on an aggregate basis for the entire class, is fundamentally and fatally defective.**

21.   Dr. Taub's verbal formula for aggregate class damages under Model 1,

> The aggregate amount of class wide damages would be the sum of the individual purchase prices across members of the class,[18]

states, unhelpfully, that aggregation can be performed by summation. Expressed in symbols, it merely notes that the aggregate class damages $A$ is defined as the sum of individual damages $P_i$ for all class members:

$$A = \sum_{i \in C} P_i \, ,$$

where $C$ represents a complete list of the identifiers $i$ of the $N$ members of the class. Dr. Taub's verbal formulation gives no indication of how A can be calculated without individual inquiry concerning the $N$ individual values of $P_i$, however.

22.   Suppose, hypothetically, that all class members had paid the same, known, all-inclusive purchase price $P_0$, i.e., that $P_i$ was actually equal to a single value $P_0$ for each class member $i$, uniformly for all $i$ in $C$. Under that assumption the summation of the individual terms shown in ¶ 21 above could be avoided by simply multiplying $P_0$ by $N$:

$$A = \sum_{i \in C} P_i$$
$$= \sum_{i \in C} P_0 = N \times P_0$$

Thus, the calculation of aggregate class damages would then require only two distinct data inputs, $P_0$ and $N$, without any further individual inquiry. This ostensibly easy method is based on

---

[18] Taub Report, p. 3.

a false hypothetical, however: in fact, no two named plaintiffs appear to have paid identical purchase prices (even before considering other transactions costs).[19]

23.    The latter part of Dr. Taub's discussion of his "Model 1" implicitly admits the foregoing fundamental flaws. He states:

> *[A]ssume* [italics added] that within the class there are two subgroups of customers that differ on the basis of the amount they paid for their washers. The first group paid $1,000 and the second group paid $1,200.[20]

He thus recognizes that if any two members of the putative class members paid non-identical purchase prices, some individualized inquiry is required. Naturally, *if* there are only two distinct, known purchase prices, and *if* the numbers of class members who paid each price are also known, then the "method" illustrated in ¶ 22 above can easily be adapted to determine class damages: multiply each of the two prices by the number of class members who paid that price, and sum the two products. This is Dr. Taub's proposed "method" for determining class damages. But he provides no basis for assuming that the class consists—even approximately— of only two such groups, or of any other specific number of such groups, small or large, and he offers no method for learning how many "price groups" there really are or the extent of the variation within or among them. In other words, his method consists of *"assuming"* without basis that the problem is trivial and then demonstrating—circularly—the trivial solution to that trivial problem. As a basis for an expert opinion on the "formulaic" determination of aggregate class damages, this is unscientific, unreliable, and completely lacking in foundation.

24.    Upon considering the possibility of differences among class members in the amounts of transactions costs[21] they incurred in buying their washers, Dr. Taub changes his initial two-group

---

[19] Third Amended Class Action Complaint, *In re: Whirlpool Corp. Front-loading Washer Products Liability Litigation*, MDL No. 2001, 1:08-wp-6500, U.S.D.C. Northern District of Ohio, Eastern Division, Filed November 16, 2009 at pp. 18-31; Amended Consolidated Class Action Complaint, *Butler et al. v. Sears, Roebuck & Co.*, Nos. 06 C 7023, 07 C 412, 08 C 1832, U.S.D.C. Norther District of Illinois, Eastern Division, Filed August 11, 2009 at pp. 4-14. Bicknell Dep., at Ex. 8 (indicating that Ms. Bicknell received a rebate of up to $170); Beierschmitt Dep., p. 93 (testifying that her washer was on sale when she purchased it).

[20] Taub Report, p. 3.

[21] June 17, 2009 Deposition of Gina Glazer ("Glazer Dep."), p. 112 (Ms. Glazer paid "around $700" for her Duet Sport washer); O'Brien Dep., p. 85 (Ms. O'Brien paid $999 for her Duet washer); Nordan Dep., pp. 84-85 (Ms. Nordan paid $989.95 for her Duet washer); Bicknell Dep., p. 32 (Ms. Bicknell paid $1,352.48 for her Duet washer); June 17, 2009 Deposition of Karen Hollander ("Hollander Dep."), pp. 33-34 (Ms. Hollander paid $1,100 for her Duet washer); Strong Dep., p. 23 (Ms. Strong paid $659.95 for her Duet washer). Bicknell Dep. at Ex. 7 (indicating

method for determining aggregate class damages into a four-group method.[22]  Once again, however, he offers no basis for assuming that there are four groups, rather than 8 or 800 or 800,000, or any other number.  Indeed, his method is just as easily elaborated for a general, unspecified number $K$ of price groups as for four groups.  "Assume" that the class could be partitioned into a known number $K$ of subgroups—Dr. Taub assumes first that $K=2$, and later that $K=4$—where subgroup $k$ consists of all $N_k$ class members $i$ in a subset $C_k$ of $C$, and each member $i$ in $C_k$ had actually paid the same, uniform all-inclusive purchase price $P^{(k)}$, and the numbers $N_k$ and $P^{(k)}$ were known for each value of $k$ from 1 to $K$.  Then

$$A = \sum_{i \in C} P_i$$
$$= \sum_{k=1}^{K} \sum_{i \in C_k} P^{(k)} = \sum_{k=1}^{K} N_k \times P^{(k)}$$

This "method" "works" with equal facility for any value of $K$ at all, including Dr. Taub's values of $K=2$ or $K=4$, as well as $K=5,000,000$.  However, as an *operational* method for determining class damages on an aggregate basis, it is vacuous and useless for the same reason that Dr. Taub's purported method is vacuous and useless: both are mere restatements of a trivializing assumption without any apparent basis in the facts of this case, both assume without foundation that the values of the crucial variables are known, and both fail to provide any means for determining, or even estimating, the actual values for those variables.

### B. Dr. Taub's Model 2 fails to comport with basic facts about this case and does not permit a formulaic determination of damages without resort to individual inquiry.

25.  Dr. Taub's "Model 2" for calculating the aggregate damages for the entire putative class changes his Model 1 formula by the simple device of multiplying it by ½:

> [Model 2] *assumes* [italics added] that the loss is less than the price of the machine.  For example, one might *assume* [italics added] that the defective

---

Ms. Bicknell paid $35 for delivery of her washer); Beierschmitt Dep., pp. 60, 127-128 (Ms. Beierschmitt paid $65 for delivery of her Duet washer, and Lowe's installed and delivered it); Strong Dep., p. 23 (Ms. Strong paid $25 in "freight charges" for her Duet washer; Nordan Dep. at Ex. 6 (Ms. Nordan paid $70 to have her washer installed in her home); O'Brien Dep., p. 105 (Ms. O'Brien did not purchase an extended warranty for her Duet washer); Nordan Dep., pp. 113-114 (Ms. Nordan purchased an extended warranty for $140.71); Bicknell Dep., pp. 59-60 (Ms. Bicknell paid $99 for a five-year extended warranty); Beierschmitt Dep., pp. 121-23 (Ms. Beierschmitt paid $139.97 for a four-year extended warranty).
[22] Taub Report, p. 4.

machine is worth 1/2 the retail price.[23]

Thus, Model 2 adopts all the infirmities of Model 1, and then adds one additional infirmity: an *assumed* single, uniform fractional factor to be applied to Model 1. This is an additional infirmity because Dr. Taub not only offers no more rational basis for this assumption than he did for his other assumptions, but in this instance he states the assumption not as something that should be done, but only as something that hypothetically, and for no stated reason, could be assumed—"[f]or example, one might assume ...." Dr. Taub provides no methodology, scientific or otherwise, for determining the crucial coefficient of diminution. How would "1/2" or any other specific coefficient be determined on a scientific or otherwise rational basis? Dr. Taub's report provides no hint.

26.    By merely offering Model 2 and making no effort to show, or even claim, that it is any better or worse than Model 1, Dr. Taub implicitly acknowledges the vaporous foundations of both Models, i.e., that both Models' assumptions about the amount of damage to each class member have no scientific or other rational foundation.

27.    Dr. Taub's implicit assumption for Model 2 about the difference between the SHB and actual worlds can again be "reverse-engineered" from his proposed measure of damages. In this "Model" Dr. Taub implicitly values each brand-new washing machine with the alleged hidden defect at exactly half of a single, uniform "retail price" of a brand-new washing machine *without* the alleged hidden defect. Dr. Taub again assumes explicitly that this holds for *each* member of the class.[24] Thus, on the explicit and implicit assumptions of his Model 2, every single subject buyer of a Whirlpool washer was harmed to the extent of half a uniform retail price, regardless of what they actually paid for the washer, regardless of any rebates they received from governmental entities for the purchase of an energy- and water-efficient washer, regardless of differences in shipping and other transaction costs, regardless of how long they owned the machine, regardless of the rate at which they used the machine, and regardless of their past, current, and expected future levels of satisfaction with the machine.

---

[23] Taub Report, p. 4. Dr. Taub does not explain his concept of what a "machine is worth": each buyer's subjective valuation in terms of the maximum amount they would have been willing to pay, or a prevailing retail price. If "worth" is *subjective*, then individual inquiry into the circumstances of each machine and purchaser will obviously be necessary. Throughout the rest of my assessment of Model 2, I assume that Dr. Taub meant "worth" to refer to retail prices.

[24] Taub Report, p. 4.

28.   This assumption would again apply, in particular, to a buyer who used their machine with complete satisfaction without ever detecting any symptom of, or knowing about the existence of, any mold or mildew even after selling the machine along with the house. It again would apply even if the new owner replaced the laundry set to satisfy a color preference without ever experiencing or being made aware of any mold or mildew issue with the washer that was replaced. Dr. Taub's assumption applies, in other words, even in this Model 2 situation where the washer was available to each of its owners to perform problem-free as intended throughout its service life. Even in this situation, where no actual owner has suffered any actual harm from the alleged defect, Dr. Taub's Model 2 arbitrarily and irrationally assigns an increment to class damages equal to half of the washer's entire, all-inclusive purchase price. This methodology is neither scientific nor rational. It does not establish, as Dr. Taub was asked to establish, that there is a reliable method in accordance with the constraints of science and logic with which to calculate the aggregate amount of damages owed to class members without individual inquiry.

29.   In sum, the components of Dr. Taub's Model 2 are fundamentally and fatally defective.

### C.  Dr. Taub's Model 3 fails to comport with basic facts about this case and does not permit a "formulaic" determination of damages without resort to individual inquiry.

30.   Dr. Taub's "Model 3" for calculating the aggregate damages for the entire class consists of two basic components: (1) a specification of the amount of damages for each individual class member:

> [Model 3] *assumes* [italics added] that the remedy for the damage suffered by class members is to pay them an amount equal to the cost of using Affresh tablets and wipes (the kit) for the expected life of the washing machine. For example, *assuming* [italics added] that the cost of the kit is $11.00 and the kit is used once a month, damages to an individual customer would be: ... $11.00 x 12 x expected life of machine in years,

and (2) a method for calculating aggregate damages for the class, i.e., the total amount of the individual damages (1) over the entire class:

> [A]ggregate damages would be the lifetime cost of the kit multiplied by the size of the class.[25]

As I explain below, both these components of Model 1 are fundamentally and fatally defective

---

[25] Taub Report, p. 4.

13

1. **Dr. Taub's specification of component (1) of Model 3, the amount of damages for each individual member of the putative class during each month of the service life of each subject washing machine, is fundamentally and fatally defective.**

31.    Dr. Taub offers no rational basis for his Model 3 in the form of a coherent SHB world from which it can be derived. His implicit assumption about the difference between the SHB and actual worlds can be partially "reverse-engineered" from his proposed measure of damages, however. He implicitly assumes that throughout the class period the situation of acquiring a brand-new washing machine *without* the alleged defect is the economic equivalent of possessing a brand-new washing machine *with* the alleged hidden defect plus an annuity in the amount of $11 per month during the service life of the machine. Dr. Taub fails to explain why this assumption is rational.

32.    Readers of the Taub Report are invited to conjecture that a washing machine buyer could use each monthly payment of $11 during the life of the machine to purchase a month's supply of Affresh, thereby offsetting the alleged hidden defect. Refuting this conjecture, however, is the fact that distribution of Affresh began only in September 2007, long after the beginning of the class period in this case.[26] Moreover, the "Washer Maintenance Procedure" set forth in the current "Use and Care Guide" recommends either Affresh *or* liquid chlorine bleach for routine monthly cleaning.[27] For those owners who choose to use Affresh, the recommended monthly unit of Affresh is a single tablet at an estimated cost of $2.33, rather than the $11 kit cost assumed by Dr. Taub for his Model 3.[28] Thus, even making the counterfactual assumption that some level of monthly cleaning of every single machine with Affresh or bleach is necessary to prevent the emergence of the alleged hidden defect, Dr. Taub's figure of $11 per month has no valid basis. Dr. Taub offers no suggestion for arriving at an alternative, well-founded figure or for estimating the expected life of a washer and its association with different patterns of utilization and maintenance. Dr. Taub offers no basis for assuming that this can be done on an

---

[26] September 20, 2007, Memorandum from Whirlpool Affresh Washer Cleaner Team to All Field Sales, p. 1 (W0168428).
[27] 2008 "Whirlpool Duet Front-Loading Automatic Washer – Use & Care Guide," p. 19 (W0450733).
[28] The initial MSRP for Affresh was $6.99 for a package of three tablets (W0168428), for an average price of $2.33 per tablet. The initial MSRP for the Affresh Washer Cleaner Kit was $10.99 (W0086100), but the kit includes three tablets and six wipes and was intended to provide a three-month supply, for an average price of $3.66 per month.

aggregate basis[29] without individual inquiry about owners' individual utilization levels, maintenance habits, and experience with issues related to mold or mildew.

33.    Available data establish, in fact, that most owners do *not* use Affresh at the rate of one tablet per month and yet do *not* encounter problems resulting from the alleged hidden defect. Specifically, a conservative approximation indicates that the subject washers, including washers that had been in use for years, accumulated more than 3,500,000 machine years of service between January 2008 and June 2009,[30] and that fewer than 512,000 twelve-tablet sets of Affresh were used during that period, far below the 3,500,000 sets that would have been needed if all owners of subject washers had used one tablet per month.[31] These estimates imply a usage rate of less than 15% of Dr. Taub's assumed rate of one tablet per month.[32] Thus, it appears that the overwhelming majority of class members do *not* use Affresh at the rate of one tablet per month and yet have no substantial problem with mold or mildew or have been able to control the alleged problem in other ways, contrary to the implicit assumption reflected in Dr. Taub's Model 3..

34.    In sum, Dr. Taub has provided no substantial support for his exemplar value of $11 per month for component (1) of his Model 3, and it does not comport with basic facts in this case. Dr. Taub has, moreover, given no indication of how an improved value might be obtained without individual inquiry or, indeed, a basis for supposing that *any* single value can meaningfully characterize the entire class in this case.

---

[29] Based on my analysis of customer complaints associated with free Preventive Maintenance procedures provided under Sears extended service plans, fewer than 2% of customers who pre-paid for service coverage identified any mold or mildew-related issues requiring maintenance attention. It is extremely unlikely that these issues are pervasive among class members generally but rate less than 2% in the subset of putative class members who bought an extended service plan.

[30] See, for example, "Production Summary for Access & Horizon Washers: Whirlpool Shipments by Year of Production," 2001-2008 (showing that Whirlpool shipped approximately 1,926,325 Whirlpool Access units and approximately 424,572 Whirlpool Horizon units during the period 2001-2007).

[31] "Affresh Brand Shipment Dashboard," September 12, 2009 (W0437724).

[32] 512,000 / 3,500,000 = 14.6%. This calculation produces an overestimate because it assumes, conservatively, that all of the 512,000 twelve-tablet sets of Affresh were used in the Whirlpool-brand subject washers alone, rather than distributed among both the Whirlpool washers and competitive machines. Because Whirlpool marketed Affresh for use in any brand of washer, however, and because any washer owner could buy the product, much of the Affresh product would have been used in competitive machines. In fact, if I included the Kenmore-brand front-loading washer shipments from 2001 through 2007 in this calculation, the resulting fraction—still an overestimate—is less than 10% (512,000 / 6,400,000 = 8%).

**2. Dr. Taub's specification of component (2) of Model 3, the proposed method for calculating the total amount of damages for individual members of the putative class on an aggregate basis for the entire class, is fundamentally and fatally defective.**

35.   In his description of Model 3—as in his description of Model 1—Dr. Taub assumes that a *single* estimated value of damage can be applied meaningfully to each individual member of the class. In effect, therefore, he assumes for Model 3 the simple type of calculation set forth in ¶ 22 above. As I have explained above concerning Models 1 and 2, however, Dr. Taub's assumption that a single, uniform value of damage applicable to each individual class member can easily be determined is incorrect. Thus, any meaningful attempt to correct and implement a calculation along the lines of Model 3 will inevitably encounter the seemingly elaborate but practically useless calculation that I set forth in ¶ 24 above, on which Models 1 and 2 foundered. Model 3 founders for the same reason: the calculation and data that Dr. Taub proposes are tractable on an aggregate basis only in the trivial hypothetical that he assumes, but which does not comport with the facts in this case.

**IV. Dr. Taub provides no rational basis for the measure of unjust enrichment proposed in his Model 4, and no practically feasible method for calculating this measure of unjust enrichment on an aggregate basis without individual inquiry.**

36.   I understand that the proper measure of compensation under an unjust enrichment claim is the precise amount of Whirlpool's net enrichment due solely to the specified "unjust" circumstances, compared to a SHB world without the unjust circumstances. (For purposes of my analysis of Dr. Taub's Model 4, I provisionally assume with him that the relevant unjust circumstances in this case consisted of Whirlpool's failure to disclose appropriately to washing machine buyers the risk of mold and mildew growth in their washers unless they applied specified precautions and maintenance procedures.) It is necessary, therefore, to measure Whirlpool's incremental profit in the actual world over Whirlpool's but-for profit in the world as it would have been had Whirlpool made these allegedly requisite disclosures to buyers. To perform such a measurement, it is necessary, in turn, to make a coherent assumption about exactly what would have happened differently in the SHB world and how it would have affected Whirlpool's profit.

37.   For this measurement Dr. Taub proposes his "Model 4," which aims to measure:

> the benefit conferred on Whirlpool from the sale of washing machines to … [a specified subclass]. *Assuming* [italics added] that data is available on the size of this subclass of individuals and *assuming* [italics added] that data is available on Whirlpool benefits from the sale of washing machines, the estimate of benefits conferred on Whirlpool from the sale of washing machines to this subclass would be [({the total "benefit conferred on Whirlpool from the sale of washing machines"} / {the total number "Whirlpool washing machine customers"}) × {the number of subclass members}].[33]

In other words, Dr. Taub proposes to prorate the total "benefit conferred on Whirlpool from the sale of washing machines" to the number of subclass members, where the subclass is "members of the class to the extent that warranties do not govern all the plaintiffs' claims."

38.   Dr. Taub's proposed Model 4 formula has several peculiar features, none of which his Report attempts to justify, or even explain. First, it refers specifically to "Whirlpool washing machine customers"—as opposed to sales of individual washing machines—but does not specify that these are to be individual retail customers as opposed to large institutional customers at retail or at wholesale (e.g., Sears). Even if Dr. Taub meant to include only ultimate retail customers, that still leaves unclear whether he meant to treat each distinct purchaser as a single "customer," regardless of the number of washers purchased (i.e., whether the owner of an apartment complex or some other institution making multiple purchases at retail is a single "customer").

39.   Second, it also seems unlikely that Dr. Taub really meant, and it certainly would be improper, to base his proposed formula on a single, simple average over all Whirlpool washing machines of all models and all vintages over all time, as his formula does on its face. The depositions of the named plaintiffs in this litigation show that they paid a wide variety of prices for a variety of different machines, and Dr. Taub has provided no logical or empirical basis for assuming that Whirlpool realized the same overall enrichment, much less the same "unjust enrichment," from each such purchase.

40.   More fundamentally and problematically, Dr. Taub does not define how he proposed to measure Whirlpool's "benefits from the sale of washing machines" or the "benefits conferred on Whirlpool from the sale of washing machines to this subclass." Even assuming that Dr. Taub

---

[33] Taub Report, p. 5.

17

meant "benefit" to refer to "profit," there remain a host of important, but unspecified, details: Did he mean *accounting* profit or some alternative concept of *economic* profit? Did he mean profit before or after taxes? Did he mean the gross amount of whatever concept of profit he had in mind or only—correctly—the incremental component of profit, if any, due to Whirlpool's alleged failure to inform? If only the incremental component, how did he propose to measure that?

41.   Before stating the most fundamental reason why Dr. Taub's Model 4 fails to serve the purpose of his Report, it is worth stating again that the purported purpose of his Report is to show "a reliable method with which to calculate the aggregate amount of class wide damages owed to class members as a result of the alleged misconduct *without individual inquiry*." In describing his "Model 4," Dr. Taub admits that he is simply "assuming that data is available on Whirlpool benefits from the sale of washing machines." He does not assert that the data establishing those "benefits" (plural) are anything other than benefits that must be determined on a transaction-by-transaction basis, regardless of which of the possible meanings of "benefits" that I have identified in paragraph 40 above he has in mind. In short, nowhere in his description of his Model 4 does Dr. Taub even contend, much less show, that Model 4 can be implemented without individualized inquiries.

42.   In sum, Dr. Taub has failed even to articulate any proposal for implementing Model 4. Instead, he has simply assumed that undefined data are available from unspecified sources and can be used to perform an arithmetic calculation that will yield a number that may or may not have any economic, accounting, or legal significance. He has most certainly failed to demonstrate through his Model 4 that a meaningful, defensible concept of "unjust enrichment" relevant to this case can be calculated on an aggregate basis without recourse to individual inquiry.

43.   The opinions I have reached in this case are based on information, data, and analyses of types typically and reasonably relied upon by experts in my areas of expertise. In particular, my opinions are based on my review of the materials listed in Attachment C and on my background, knowledge and experience in applied mathematics, statistics, and accounting. I hold each of the opinions expressed in this report to a reasonable degree of scientific certainty. I may do

additional work.  In particular, I understand that I may be asked to assess and respond to opinions offered by other witnesses, and to review and respond, from the perspective of my areas of expertise, to testimony and exhibits presented by the parties at trial and to any additional pretrial reports that may be submitted by the plaintiffs' experts.


M. L. Marais

M. Laurentius Marais

Exhibit A

December 2009

# M. LAURENTIUS MARAIS

**505 San Marin Drive**
**Novato, California 94945**

**Tel: (415) 898-2255**
**Fax: (415) 898-2260**

**Web: www.wecker.com**

## EDUCATION:

| | |
|---|---|
| Ph.D. | Stanford University (Business Administration, Mathematics), 1985 |
| M.S. | Stanford University (Statistics), 1983 |
| M.S. | Stanford University (Mathematics), 1976 |
| B.Sc. | Stellenbosch University (Mathematics, Applied Mathematics, Computer Science), 1973 |

## EMPLOYMENT:

| | |
|---|---|
| 1993 to date | Vice President, William E. Wecker Associates, Inc. |
| 1994-1998 | Stanford University, Consulting Professor, School of Law |
| 1992 to date | Senior Consultant, now Principal Consultant, William E. Wecker Associates, Inc. |
| 1982-1991 | University of Chicago, Instructor, later Assistant and Associate Professor, Graduate School of Business. |

## ACTIVITIES:

Editorial Board, Journal of Accounting Research, 1987-1992

Refereed for:  The Accounting Review
Contemporary Accounting Research
Journal of Accounting and Economics
Journal of Accounting Research
Journal of Business and Economic Statistics
Journal of Financial Research
Journal of Money, Credit and Banking

Member of:  American Accounting Association
American Economic Association
American Statistical Association
Royal Statistical Society
Mathematical Association of America
Society for Industrial and Applied Mathematics

PUBLICATIONS and WORKING PAPERS:

"The experimental design of classification models: an application of recursive partitioning and bootstrapping to commercial bank loan classifications," (with James M. Patell and Mark A. Wolfson), Journal of Accounting Research, 1984.

"An application of the bootstrap method to the distribution of squared, standardized market model prediction errors," Journal of Accounting Research, 1984.

"An analysis of a multivariate regression model in the context of a regulatory event study by computer intensive resampling," Working Paper, Institute of Professional Accounting, University of Chicago, July 1986.

"A note on the algebraic and statistical properties of the multivariate market model," Working Paper, Institute of Professional Accounting, University of Chicago, September 1986.

"On drawing inferences about market reactions to the regulation of accounting for oil and gas exploration: An application of computer intensive resampling methods," Working Paper, Institute of Professional Accounting, University of Chicago, September 1986.

"On detecting abnormal returns to a portfolio of nonsynchronously traded securities," Working Paper, Institute of Professional Accounting, University of Chicago, October 1986.

"Reduced demands on recovery room resources with Diprivan compared to thiopental-isoflurane," (with Michael W. Maher et al.), Anesthesiology Review, January/February 1989.

"Wealth effects of going private for senior securities," (with Katherine Schipper and Abbie J. Smith), Journal of Financial Economics, 1989.

"Consequences of going-private buyouts for public debt and preferred stock: 1974 to 1985," (with Katherine Schipper and Abbie J. Smith), in Proceedings of the 25th Annual Conference on Bank Structure and Competition: Banking System Risk - Charting a New Course, Federal Reserve Bank of Chicago, 1989.

"Discussion of 'Post-earnings-announcement drift: Delayed price response or risk premium?'," Journal of Accounting Research, 1989.

"Using relative productivity assessments for allocating housestaff to departments," (with Michael W. Maher, Michael F. Roizen, et al.), Medical Care, 1990.

"An adaptable computer model of the economic effects of alternative anesthetic regimens in outpatient surgery," (abstract; with Michael W. Maher et al.), Anesthesiology (Supplement), September 1990.

2

"On the finite sample performance of estimated generalized least squares in seemingly unrelated regressions: nonnormal disturbances and alternative standard error estimators," Working Paper, Institute of Professional Accounting, University of Chicago, January 1991.

"Exploiting tax attributes of spinoffs to structure takeovers and takeover-related defenses," (with Katherine Schipper), Working Paper, Institute of Professional Accounting, University of Chicago, August 1991.

"Technological innovation and firm decision-making: accounting, finance and strategy," (with Paul J. H. Schoemaker), Working Paper, Institute of Professional Accounting, University of Chicago, September 1991.

"Process-oriented activity-based costing," (with Michael W. Maher), Working Paper, Institute of Professional Accounting, University of Chicago, June 1992.

"A field study on the limitations of activity-based costing when resources are provided on a joint and indivisible basis" (with Michael W. Maher), Journal of Accounting Research, 1998.

"Correcting for omitted-variables and measurement-error bias in regression with an application to the effect of lead on IQ" (with William E. Wecker), Journal of the American Statistical Association, June 1998.

"Event study methods: detecting and measuring the security price effects of disclosures and interventions" (with Katherine Schipper), in Litigation Services Handbook: The Role of the Financial Expert, 2005 Cumulative Supplement, 3rd Ed., John Wiley & Sons.

"Estimating Cost Behavior" (with Michael W. Maher), in Handbook of Cost Management, 2005, 2nd Ed., John Wiley & Sons.

"Statistical Estimation of Incremental Cost from Accounting Data" (with Michael W. Maher, William E. Wecker, and Roman L. Weil), in Litigation Services Handbook: The Role of the Financial Expert, 2006, 4th Ed., John Wiley & Sons.

"Audit Committee Financial Literacy: A Work in Progress" (with Douglas J. Coates and Roman L. Weil), Journal of Accounting Auditing and Finance, March 2007.

# Exhibit B

M. Laurentius Marais
Deposition and Trial Testimony
January 2005 – December 2009

1.   In Re Meridia Products Liability Litigation. United States District Court for the
     Northern District of Ohio, Eastern Division. No. 5:2002CY0800 (JSG/PH).

2.   Ampac JV Group v. General Motors. Superior Court of Los Angeles County,
     California. No. BC 206274.

3.   Kerr v. Aerojet-General. United States District Court for the Central District of
     California, Eastern Division. No. ED VC 01-19 VAP (SGLx).

4.   Claybrooks v. Primus Automotive Financial Services. United States District Court for
     the Middle District of Tennessee, Nashville Division. No. 3-02-0382.

5.   Crowe v. Crown Equipment. Commonwealth of Kentucky, 50th Judicial Circuit, Boyle
     Circuit Court. No. 97-CI-00134.

6.   Du Pont v. Cardinal Health 200. United States District Court for the Middle District of
     Tennessee, Nashville Division. No. 3:03-0848.

7.   Brown v. N.L. Industries. Circuit Court of Cook County, Illinois. No. 03L 012425.

8.   DAG Petroleum Suppliers v. BP P.L.C. United States District Court for the Eastern
     District of Virginia, Alexandria Division. No. 1:05 CV1323.

9.   Nursing Home Pension Fund, Local 144, v. Oracle. United States District Court for the
     Northern District of California, San Francisco Division. No. CV-01-00988-MJJ.

10.  Central Valley Chrysler-Jeep v. Witherspoon. United States District Court for the
     Eastern District of California, Fresno. No. CIV-F-04-06663-REC-LJO.

11.  Sprint Services v. SBC Telecommunications. Circuit Court of Cook County, Illinois.
     No. 03 L 00711.

12.  Green Mountain Chrysler-Plymouth-Dodge v. Crombie. United States District Court for
     the District of Vermont. No. 05-302 & 304.

13.  Grays Harbor v. Carrier. United States District Court for the Western District of
     Washington. No. 05-05437 RBL.

14.  Ford Explorer Cases. Superior Court of Sacramento County, California. JCCP Nos.
     4266 & 4270.

15. Mahon v. Crown Equipment. United States District Court for the Eastern District of California. No. S-03-1763MCE DAD.

16. In re W.R. Grace & Co., Debtor. United States Bankruptcy Court for the District of Delaware. No. 01-01139 (JFK).

17. Robinson v. Crown Equipment. United States District Court for the Eastern District of Arkansas, Helena Division. No. CV-00211WRW.

18. Sogbesan v. Crown Equipment. United States District Court for the Central District of California. No. CV06-05607 GAF (RZx).

19. Porter v. Crown Equipment. Circuit Court of Jackson County, Missouri, at Kansas City. No. 02CV211824.

20. Gary v. Crown Equipment. United States District Court for the Northern District of Georgia, Atlanta Division. No. 1:05 CV-2424-CC.

21. Baldwin v. PricewaterhouseCoopers. Circuit Court of Cook County, Illinois. No. 03 L 11042.

22. Amos v. GEICO. United States District Court for the District of Minnesota. No. 06-cv-01281 (PJS/RLE).

23. Martin v. Crown Equipment. United States District Court for the Western District of Missouri, Southern Division. No. 05-3407-CV-S-GAF.

24. Credit Suisse-AOL Securities Litigation. United States District Court for the District of Massachusetts. No. 02-cv-12146.

25. Hutchinson v. Crown Equipment. Supreme Court of the State of New York, County of Suffolk. No. 31921/02.

26. In Re Mercedes-Benz Tele Aid Contract Litigation. United States District Court for the District of New Jersey. MDL No. 1914. Civ. No. 07-2720

27. Morris v. Crown Equipment. Circuit Court of Kanawha County, West Virginia. No. 04-C-1174.

28. Canaan v. Crown Equipment. Superior Court of New Jersey, Law Division: Hudson County. No. HUD-L-5823-09.

29. Craig v. Crown Equipment. Circuit Court of the City of St. Louis, Missouri. No. 052-09861.

30. Gay v. Butler Lift Truck Service and Crown Equipment. Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida. No. 50 2004 CA6588.

31.  Santos v. Crown Equipment. United States District Court for the Southern District of
     Florida, West Palm Beach Division. No. 08-80161-CIV-DTKH.

32.  Giron v. Crown Equipment. Superior Court of the State Of Arizona in and for the
     County of Maricopa. No. CV2006-015365.

Exhibit C

## Exhibit C – Documents Received and Reviewed

| | |
|---|---|
| 1. | MDL_Second Amended Master Class Action Complaint (9-25-09) |
| 2. | Access MDL - Order Rescheduling Class Certification Hearing (10-21-09) |
| 3. | MDL_ Marginal Entry Order (8-28-09) |
| 4. | Memorandum of Law in Opposition to Defendant's Motion to Strike -(9-30-08) |
| 5. | Reply in Support of Defendants Motion to Strike - (10-17-08) |
| 6. | Poulsen Complaint - (03-24-09) |
| 7. | Memorandum of Law in Opposition to Defendant's Motion to Strike - (9-30-08) |
| 8. | Gardner_ Motion to Strike Class Allegations from the Class Action Complaint (8-22-08) |
| 9. | Gardner_ Memorandum in Support of Motion to Strike Class Allegations (8-22-08) |
| 10. | Gardner_ Exhibits to Memorandum in Support of Motion to Strike Class Allegations (8-22-08) |
| 11. | Gardner_ Executed Affidavit of Anthony Hardaway (8-19-08) |
| 12. | Dijols_ Class Action Complaint - 8-28-09 |
| 13. | Butler v. Sears_ Amended Consolidated Class Action Complaint - 8-11-09 |
| 14. | Amended Notice of Motion to Strike Class Allegations - 8-25-08 |
| 15. | Plaintiffs Expert Report of Allen J. Taub |
| 16. | Binder Containing the following documents listed below |
| 17. | Whirlpool - Third Amended Master Class Action Complaint |
| 18. | Sears - Amended Consolidated Class Action Complaint |
| 19. | Declaration of Ericka Englert |
| 20. | Declaration of Shirley Hand |
| 21. | Affidavit of Anthony Hardaway |
| 22. | Declaration of Karl Lache |
| 23. | Declaration of Zachary J. Rosenthal |
| 24. | Declaration of Janisa Tharp |
| 25. | Declaration of Scott Vanderleek |
| 26. | Production Summary for Access & Horizon Washers |
| 27. | Affresh Sales Report (W0437724 - W0437725) |

1

## Exhibit C – Documents Received and Reviewed

| 28. | Memo to All Field Sales Personnel re Affresh Washer Cleaner 9-20-07 (W0168428 - W0168430) |
|---|---|
| 29. | Energystar Clothes Washer Tips from Website |
| 30. | Whirlpool Duet Use & Care Guide (W0450715 - W0450766) |
| 31. | Consumer Reports Article Dated June 2004 |
| 32. | Consumer Reports Article Dated October 2005 |
| 33. | Notebook of Access MDL Plaintiffs' Materials (deposition excerpts, interrogatory response excerpts and expense materials) |
| 34. | Notebook of Sears Plaintiffs' Materials deposition excerpts, interrogatory response excerpts and expense materials) |
| 35. | PM Check file |
| 36. | Consumer Reports 2007 |
| 37. | Selling Rules Aftermarket_S0038404 - S0038413 |
| 38. | Pricing Philosophy_S0038403 |
| 39. | Dr Taylor Memorandum on Coding of WP & Sears Databases |
| 40. | AHAM Consumer Information on Clothes Washers and Odor, Mold and Mildew |
| 41. | Draft of Dr. Taylors Rebuttal Expert Report |
| 42. | REVISED Technical Memorandum on Coding of WP & Sears Databases (Exhibit B to Dr. Tyalors rebuttal report) |
| 43. | Ford_s Opposition to Plaintiffs_ MIL to Exclude Evidence of Explorer_s Safety Record 03-09-07 (2) |
| 44. | Hoyer & MacInnis Consumer Behavior 389-391 (2004) |
| 45. | Cloer Class Action Complaint |
| 46. | Nordon Deposition Exhibit No. 6 - ABC Appliance Sales and Service - Receipt |
| 47. | Affresh Washer Cleaner _Powerpoint  W0086090 - W0086102 |