# Exhibit 13

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: WHIRLPOOL CORPORATION FRONTLOADING WASHER PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) | MDL NO. 2001 CIV. NO. 1:08-WP-65000 |

**SUR-REBUTTAL EXPERT REPORT OF M. LAURENTIUS MARAIS, Ph.D.**

## I. INTRODUCTION

1. I am the same M. Laurentius Marais who submitted a previous expert report in this matter ("Marais Report," dated December 16, 2009), in response to the initial expert report of Dr. Allan J. Taub ("Taub Report," dated November 16, 2009). My qualifications and a list of my professional publications are shown in my curriculum vitae, which was attached to that previous report as Exhibit A.

2. Counsel for Whirlpool in this matter asked me to review and respond to the January 8, 2010, "Response to Dr. Marais's Report" of Dr. Allan J. Taub ("Taub Rebuttal").

## II. SUMMARY

3. The Taub Report described four distinct, alternative "Models" for calculating "damages" to the proposed class in this case. On the basis of these four models, Dr. Taub claimed to have determined "that it is possible to calculate class-wide damages without individual inquiry under each of the claims asserted by plaintiffs."[1]

---

[1] Taub Report, p. 3.

4. In paragraphs 7 and 9 of the Marais Report I summarized my opinions concerning Dr. Taub's claim as follows:

> The fundamental, pervasive flaw in the Taub Report is that it fails to articulate a coherent theory of damage causation that isolates and measures specific, incremental consequences of the Whirlpool conduct complained of in this case (the "alleged misconduct"). As a result, the Report fails to address the central issues: (1) How can the amount of compensation required to restore each member of the proposed class to an economic position equivalent to that they would have been in but for the alleged misconduct be calculated on an aggregate basis for the entire class without individual inquiry? …
>
> [Dr Taub] expressly "assumes" that certain metrics can properly be used to quantify damages; assumes, sometimes expressly and sometimes tacitly, that the information needed to apply those metrics can readily be obtained without individualized inquiries; makes additional, tacit assumptions; and, based on combinations of these assumptions, "determines" that damages can be quantified using these metrics. This is tautology, not science.

5. My review of the Taub Rebuttal reveals no reason to modify my previous opinions. In fact, Dr. Taub attempts no actual rebuttal of the bases for my opinions. Rather, Dr. Taub *admits* the huge logical gaps in his previous work, but claims that he was not responsible for the gaps because plaintiffs' counsel effectively asked him to assume them away, and because—remarkably—he does not think it necessary for plaintiffs' expert on damages to fill these gaps. Nevertheless, they remain huge logical gaps. For these and all the other reasons set forth in my previous report, it remains my opinion that Dr. Taub has *failed* to provide any reasonable basis for concluding that plaintiffs' purported damages in this case can be calculated on an aggregate basis without resort to individual inquiry.

## III. ASSESSMENT OF THE TAUB REBUTTAL

6. In the Marais Report I explained that each of Dr. Taub's four Models was fatally defective—in at least two respects—for purposes of establishing that damages to the proposed class in this case could be calculated on an aggregate basis: (1) Dr. Taub had merely assumed, without a substantial, logically coherent basis, and had assumed *incorrectly*, that his

2

corresponding, proposed measure of damages might represent a correct measure of plaintiff damages traceable to Whirlpool's supposed misconduct; and (2) Dr. Taub's claim that this corresponding, proposed measure of damages could be calculated on an aggregate basis without individual inquiry is unfounded and incorrect.

7. In his Rebuttal Dr. Taub now denies a responsibility for providing any conceptual basis for his Models 1, 2, and 3, asserting that these are simply what he was *asked to assume* by plaintiffs' counsel:

> The theories of damages I described were not my conclusions. Rather, they were the parameters provided to me by Plaintiffs' counsel and formed the basis of my opinion.[2]

That these purported damages formulas were dictated to Dr. Taub by plaintiffs' counsel changes neither of the fatal defects that I pointed out previously: the proposed Models lack a conceptual foundation in the facts of this case, whether or not they could be calculated on an aggregate basis; and, contrary to Dr. Taub's claims, they anyway cannot be calculated on an aggregate basis.

8. Dr. Taub's clarification of the intellectual authorship of his Models does, however, reveal that the summary conclusion stated in his initial Report is overbroad and hence misleading. Specifically, his Report stated his assignment and his conclusion concerning this assignment as follows, without qualification:[3]

> I have been asked by plaintiffs' counsel to determine if there is a reliable method with which to calculate the aggregate amount of class wide damages owed to class members as a result of the alleged misconduct without individual inquiry [i.e., a method "that may be applied in a formulaic manner"[4]].
> . . .
>
> [. . . ] I have determined that it is possible to calculate class-wide damages without individual inquiry under each of the claims asserted by plaintiffs.[5]

---

[2] Taub Rebuttal, p. 1. The Taub Rebuttal does not mention Model 4, or contest my assessment in the Marais Report of its defects.
[3] Taub Report, p. 3.
[4] Taub Report, p. 2.
[5] Taub Report, p. 3.

3

Dr. Taub's clarification in rebuttal, however, now reveals that he *himself* is not opining—as an expert on damages—that plaintiffs' counsel's three Models represent valid measures of damages associated with plaintiffs' claims in this case, nor that they are *the only* valid measures of damages, nor that *every* valid measure of damages in this case can be calculated on an aggregate basis without individual inquiry. Rather, he has "determined" only that three formulas provided to him by plaintiffs' counsel, on whose validity as measures of damages he proffers no expert opinion, can be so calculated. (This "determination" is in any case incorrect, as I explained in the Marais Report.)

      9. Dr. Taub explains his unconcern about any conceptual basis for the formulas, which he dignifies by calling them "theories," provided to him by plaintiffs' counsel, as follows:[6]

> [Dr. Marais] criticizes my model of the different damage theories that I addressed [in the Taub Report] because I did not justify why those theories are appropriate to the case. That was not what I was asked to do. What damage theory is appropriate to this case is a matter to be decided by the court or jury. In my report, I described and modeled theories of damages that Plaintiffs' counsel presented to me as ones that the court or jury may ultimately choose to apply.[7]

Dr. Taub's explanation does not elucidate any likely source of the logic or testimony on which the Court or jury might rely for its choice of a specific "damage theory" in this case. The obvious, primary source of a Court or jury's information on this issue is testimony from experts on damages. But Dr. Taub, the plaintiffs' expert on damages in this case, now disavows this core function of serving as an expert on damages. On Dr. Taub's interpretation of his role in this case his only function appears to be to "assume" several alternative damages formulas hypothesized by plaintiffs' counsel and then to opine, without reference to any facts in the record, that each alternative formula could be used to calculate damages on an aggregate basis without resort to individual inquiry.[8] This is an absurd concept of "expert testimony."

      10.   The term "damage theory" ordinarily refers to an explicit description of the specific harms allegedly inflicted on a plaintiff by the defendant's conduct being complained of. The

---

[6] Taub Report, p. 3.
[7] Taub Report, p. 3.
[8] This role does not appear to utilize any specialized knowledge, skill, or experience, training, or education to assist the Court or the jury to understand the evidence or to determine a fact in issue in the case.

4

typical roles of an expert on damages in litigation include consulting with counsel on the formulation of a damage theory, and the translation of a specified damage theory into a calculation of damages.[9] In his Rebuttal Report Dr. Taub has now adopted the term of art "theories of damage" to describe Models 1-3 of his initial Report.[10,11]

11. Dr. Taub's "Models" in this case do not rise to the level of "damage theories," however. For example, his specification of Model 1 consists of a single sentence: "The first approach to calculating damages assumes that since the product purchased was defective, the damage to each member of the class is equal to the purchase price of the machine."[12] This single-sentence "model" articulates no rational connection between any explicit, fact-based description of a harm suffered by "each member of the class" and the proposition that the amount of damages required to compensate each member of the class is the full purchase price of the machine. Model 1 is *not* a properly specified "damage theory"; it is a mere unsupported hypothesis—without apparent foundation—of an arbitrarily specified amount of damages per class member. The same holds for Models 2 and 3. Dignifying these "Models" with the nomenclature "damage theories" does nothing to cure their fundamental defect: they are devoid of rational connection to what is complained of in this case; they are vacuous.

12. In his Rebuttal Report Dr. Taub comments as follows concerning the "'but-for'/SHB" approach to the analysis of damages that I set forth in the Marais Report:

> Dr. Marais suggests that experts in the calculation of damages agree on the same theory of damages, namely, the "but-for"/SHB model. That is not true. There are multiple theories of damages that the court or jury can choose to apply in this

---

[9] "The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event. In most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position. The damages study restates the plaintiff's position 'but for' the harmful event; this part is often called the but-for analysis. Damages are the difference between the but-for value and the actual value." Reference Guide on Damages, *Reference Manual on Scientific Evidence*, 2nd Ed., Federal Judicial Center, 2000, p. 284.

[10] The Taub Report itself does not use the term "damage theory"; it states merely that "we have considered several alternative *models* [italics added] of damage." Taub Report, p. 3.

[11] It is a common practice to calculate and to present the results of alternative possible damage theories in a single case. Doing so creates no necessary logical contradiction as long as each theory comports rationally with the underlying facts of the case.

[12] Taub Report, p. 3.

5

case. My initial report addressed three such theories.[13] This statement displays a fundamental muddling of two basic concepts: on the one hand the generally accepted "'but-for'/SHB" approach to the analysis of damages, and on the other hand the concept of a "damage theory." As I set forth at length in the Marais Report, the "'but-for'/SHB" approach to the analysis of damages is not a damage theory in itself, or an alternative to some other damage theory lacking this ingredient, but, rather, an *essential* ingredient of *any* logically coherent damage theory.[14] Dr. Taub's "Models" lack this essential ingredient; they are not logically coherent damage theories.

13. In response to my comments about the unrecorded, diverse variety of all-inclusive purchase prices in the proposed class, the Taub Rebuttal introduces the concept of an "average" amount of damages per class member.[15] In connection with Model 1, for example, the Taub Report stated, correctly if unsurprisingly, that "[t]he aggregate amount of class wide damages would be the sum of the individual purchase prices across members of the class."[16] Concerning the same issue the Taub Rebuttal now states that "[a]ggregate damages are the average price times the number of class members."[17] This reformulation in terms of an "average price" appears on its face to avoid the formidable difficulty of accounting for an unrecorded, diverse variety of all-inclusive purchase prices in the proposed calculation of aggregate damages. The reformulation in terms of an average price does not genuinely resolve the difficulty, however, but

---

[13] Taub Rebuttal, p. 3.

[14] "In the standard format [for a damages study], the but-for analysis differs from the actual environment only by hypothesizing the absence of the harmful act committed by the defendant. The comparison of but-for to actual automatically isolates the causal effects of the harmful act on the plaintiff." Reference Guide on Damages, op. cit., p. 307.

[15] The initial Taub Report uses the term "average" only twice, in both instances in connection with shipping costs.

[16] Taub Report, p. 3. The Taub Rebuttal contains a peculiar (and incorrect) contradiction of this definitional statement: "Aggregate damages are *not* a summation of individual damages." Taub Rebuttal, p. 6 (italics added).

[17] Taub Rebuttal, p. 4. I understand that numerous factors affect the actual purchase price of a subject washer, including, but not limited to, the following: (a) the specific model and model-year washer; (b) the trade customer's sales practices, including any promotions or discounts offered by the trade customer; (c) the local sales taxes charged by a trade customer; (d) any delivery or installation fees charged to the purchaser; (e) any rebate offered by Whirlpool or a local utility company; and (f) whether the washer was new, used and refurbished (*e.g.*, sold by a Sears outlet store), damaged in delivery, or a sales floor display unit sold at a discount when the model was discontinued. Dr. Taub has not proposed any procedure for obtaining a statistically reliable sample of sales data, either from consumers or from retailers and other distributors, that might be used to calculate the "average" purchase price, nor any other reliable methodology for performing such a calculation.

6

merely disguises it. In reality, the difficulty of determining the "average" value of an unrecorded, diverse variety of all-inclusive purchase prices is essentially identical to the formidable difficulty of determining the actual total value of the same unrecorded, diverse variety of all-inclusive purchase prices, because determining the total value is the first step of determining the average value.[18,19]

14. The opinions I have reached in this case are based on information, data, and analyses of types typically and reasonably relied upon by experts in my areas of expertise. In particular, my opinions are based on my background, knowledge and experience in applied mathematics, statistics, and accounting. I hold each of the opinions expressed in this report to a reasonable degree of scientific certainty. I may do additional work. In particular, I understand that I may be asked to assess and respond to opinions offered by other witnesses, and to review and respond, from the perspective of my areas of expertise, to testimony and exhibits presented by the parties at trial and to any additional pretrial reports that may be submitted by the plaintiffs' experts.

*M. L. Marais*

M. Laurentius Marais

---

[18] The second step in the determination of an average price is, of course, to divide the result of the first step by the number of individual prices included in the calculation.

[19] Data provided to me in this case indicate that the subject washing machines have been sold at wholesale to thousands of distinct resellers, and that at least hundreds of these resellers have bought at least a hundred machines. In principle, a precise tabulation of the ultimate retail prices paid for these machines would require data from all of these resellers, if not from the individual purchasers. I understand that Whirlpool does not possess data of this kind. Dr. Taub states in this connection that "[t]he individual damages also are not likely to vary substantially, at least within the same time period," and that "[t]here is reason to believe that Whirlpool knows the average sale price of the defective machines. Also, the average price of the defective washing machines likely is available from consumer or distributor data." (Taub Rebuttal, p. 4.) Characteristically, however, he does not support these assertions with any specific evidence.

7