**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: WHIRLPOOL CORP. FRONT-LOADING WASHER PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) | CASE NO. 1:08-WP-65000 (MDL 2001) <br><br> **JUDGE CHRISTOPHER A. BOYKO** <br><br> <u>**OPINION AND ORDER**</u> |

**CHRISTOPHER A. BOYKO, J.:**

On July 12, 2010, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), this Court certified a liability-only class of Ohio Plaintiffs.  Plaintiffs move to modify the class definition (docket no. 330), while Defendant Whirlpool objects and moves to decertify the Ohio class entirely (docket no. 327).  For the reasons stated below, Plaintiffs' motion is **GRANTED in part** and Whirlpool's motion is **DENIED**.  The Court hereby modifies the class definition and certifies the following liability-only class of Ohio Plaintiffs:[1]

> All persons who are current residents of Ohio and who purchased certain models (listed below) of the "Whirlpool Duet® Washing Machine" for primarily personal, family or household purposes, and not for resale, in Ohio.

---

[1]  The Court leaves unchanged its denial of certification of the Plaintiffs' OCSPA claim; the Court certifies for class treatment only the Ohio Plaintiffs' claims for "negligent design, negligent failure to warn, and tortious breach of warranty."  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 2010 WL 2756947 at *2 (N.D. Ohio July 12, 2010).

"Whirlpool Duet® Washing Machine" is defined to include Whirlpool Duet®, Duet HT®, and Duet Sport® Front-Loading Automatic Washers only, with the following model numbers and manufacture dates:

| Model No. | Manufacture Dates |
|-----------|-------------------|
| GHW9100 | All |
| GHW9200 | All |
| GHW9150 | All |
| GHW9250 | All |
| GHW9400 | All |
| GHW9160 | All |
| GHW9300 | All |
| GHW9460 | All |
| WFW8500 | All |
| WFW9200 | All |
| WFW8300 | All on or before 09/30/09 |
| WFW9400 | All on or before 02/28/09 |
| WFW8410 | All on or before 09/30/09 |
| WFW8400 | All on or before 09/30/09 |
| WFW9600 | All |
| WFW9500 | All on or before 02/28/09 |
| WFW8200 | All |
| WFW9300 | All |
| WFW9250 | All on or before 09/30/09 |
| WFW9150 | All on or before 09/30/09 |

(See also chart at page 11 of this Order.)

Excluded from the class are: (1) Whirlpool Duet® Washing Machines with model numbers and manufacture dates not listed above; (2) Washing Machines purchased through Whirlpool's Employee Purchase Program; (3) Whirlpool, any entity in which Whirlpool has a controlling interest, its legal

2

representatives, officers, directors, employees, assigns, and successors; (4) the Judge to whom this case is assigned, any member of the Judge's staff (including the Special Master and his staff) and any member of the Judge's or the Special Master's immediate family; (5) persons or entities who distribute or resell the Washing Machines; (6) government entities; and (7) claims for personal injury, wrongful death and/or emotional distress.

## I.      Background.

### A.      Procedural History.

In the Third Amended Master Class Action Complaint (docket no. 80), Ohio Plaintiffs Gina Glazer and Trina Allison each allege they bought a front-loading, high-efficiency washing machine manufactured by Whirlpool under the "Duet" brand-name and the machine subsequently developed serious mold problems.  Glazer and Allison assert four state-law claims: (1) violation of the Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code §1345.01 *et seq.*; (2) tortious breach of warranty; (3) negligent design; and (4) negligent failure to warn.

In January of 2010, Glazer and Allison moved the Court to certify a class of plaintiffs who, like them, lived in Ohio and had purchased a Duet front-load washer.  On July 12, 2010, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), the Court granted Glazer's and Allison's request in part and certified the following class of Ohio Plaintiffs:

> All persons who are current residents of Ohio and purchased a Washing Machine (defined as Whirlpool Duet®, Duet HT®, and Duet Sport® Front-Loading Automatic Washers) for primarily personal, family or household purposes, and not for resale, in Ohio . . . .

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 2010 WL 2756947 at *4 (N.D.

Ohio July 12, 2010) ("*Class Cert. Order*").[2]

The Court declined to certify the OCSPA claim for class action treatment, but did certify the other claims of breach of warranty, negligent design and negligent failure to warn.  *Id.* Further, the Court certified class-action treatment of only the question of liability, "leaving . . . the damages issue[s] for individual determination."  *Id.* at *3.

Also, the Court did not include in its class definition any explicit "cut-off date" limiting the class to persons who bought their Duet washing machines before a certain juncture; rather, the Court merely implied a temporal limitation when it defined the class to include only "persons who are *current* residents of Ohio and [who have] *purchased* a Washing Machine."  *Id.* at *4. That is, the *Class Cert. Order* can be read to define the class to include only Ohio residents who purchased a Duet washing machine on or before July 12, 2010 – the date the Court entered the *Order* – but the *Class Cert. Order* does not actually say this.  As discussed below, the *Class Cert. Order* can also be read to define the class to include Ohio residents who purchased a Duet washing machine at any point in time, including today and tomorrow.

Whirlpool appealed the *Class Cert. Order* and the Sixth Circuit Court of Appeals affirmed.  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 678 F.3d 409 (6th Cir. 2012) ("*Whirlpool I*").  Whirlpool then filed a Petition for Writ of Certiorari to the Supreme Court, which "granted Whirlpool's petition, vacated [the Sixth Circuit's] prior judgment, and remanded the case to [the Court of Appeals] for further consideration."  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 845 (6th Cir. 2013) ("*Whirlpool II*")

---

[2]  This *Class-Cert. Order* was entered by the Honorable James S. Gwin.  The case was subsequently transferred to the undersigned.

(referring to the Supreme Court's Order, *Whirlpool Corp. v. Glazer*, 133 S.Ct. 1722 (2013), as a "grant, vacate, and remand order (GVR)").

On remand, and upon further consideration, the Sixth Circuit again affirmed this Court's *Class Cert. Order*. *Id.*  Whirlpool again petitioned the Supreme Court for a Writ of Certiorari; this time, it was denied.  *Whirlpool Corp. v. Glazer*, 134 S. Ct. 1277 (2014).[3]  Accordingly, this Court is now bound by the Sixth Circuit's mandate, including its conclusion that, even though "Whirlpool claims that commonality is defeated because the Duets were built over a period of years on two different platforms, resulting in the production of twenty-one different models during the relevant time frame," class certification is appropriate because there exists a "common question of whether design defects cause mold growth . . . across the manufacturing spectrum Whirlpool describes."  *Whirlpool II*, 722 F.3d at 854.

### B.      Related History – *Butler*.

Related to the instant case is another product liability action known as *Butler*.  Counsel for both sides in the instant case are also counsel for the parties in *Butler*; and *Butler* involves the same washing machines as this case.

Specifically, in addition to manufacturing front-loading washing machines for sale under its own "Duet" brand name, Whirlpool also manufactured the same machines for sale by Sears,

---

[3]  The full appellate history of this Court's class certification ruling is displayed in the following citation: *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 2010 WL 2756947 (N.D. Ohio July 12, 2010), *affirmed*, 678 F.3d 409 (6th Cir. 2012), *rehearing and rehearing en banc denied* (6th Cir. 2012),  *cert. granted, judgment vacated sub nom. Whirlpool Corp. v. Glazer*, 133 S. Ct. 1722 ( 2013), and *affirmed*, 722 F.3d 838 (6th Cir. 2013), *cert denied*, 134 S. Ct. 1277 (2014).

under the "Kenmore" brand name.  From a mechanical design standpoint, the Duet and Kenmore

machines are essentially identical. Like the Duet-branded machines, the Kenmore-branded

machines also developed mold problems, leading to "many thousands of complaints of bad odors

by the [Kenmore] machines' owners."  *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th

Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014).

Various purchasers of the Kenmore machines filed a Complaint in Illinois federal district

court, seeking certification of a multi-state class of owners of Kenmore machines that suffer the

mold problem.  *See Butler v. Sears, Roebuck & Co.*, case no. 06-CV-7023 (N.D. Ill.).  The *Butler*

Plaintiffs proposed their class should be defined to include "[a]ll persons or entities who

purchased, not for resale, any [Kenmore] front-load washing machine *manufactured through*

*2008, without a steam feature*, in the States of California, Indiana, Illinois, Kentucky, Minnesota

and Texas."  *See Butler* Plaintiffs' Motion for Reconsideration at 2 (docket no. 289) (Oct. 24,

2011) (emphasis added); *see also Butler* Plaintiffs' Renewed Motion for Certification at 1

(docket no. 378) (July 23, 2014) (amending the proposed class definition slightly but still

seeking to exclude Duets with the steam feature).  As the italicized language shows, the

proposed class definition in *Butler* differed from the one in this case by excluding washing

machines: (a) with a steam feature, and (b) manufactured after December 31, 2008.  The *Butler*

district court, however, denied the motion for class certification.

Thereafter, the procedural history of *Butler* essentially mirrors the procedural history in

this case.  The *Butler* Plaintiffs appealed the denial of class certification and the Seventh Circuit

Court of Appeals reversed, holding the class should have been certified.  *Butler v. Sears,*

*Roebuck and Co.*, 702 F.3d 359 (7th Cir. 2012) ("*Butler I*").  The Seventh Circuit noted the

"Sixth Circuit recently upheld the certification of a . . . mold class in a case, identical to this one
. . . , against Whirlpool," and stated, "we agree with the Sixth Circuit's decision." *Id.* at 363
(citing *Whirlpool I*, 678 F.3d 409).[4]

As Whirlpool did in this case, Sears filed a Petition for Writ of Certiorari, seeking a
ruling from the Supreme Court that class certification was inappropriate.  As in this case, the
Supreme Court entered a GVR order, vacating the Seventh Circuit's prior judgment and
remanding the case for further consideration. *Sears, Roebuck and Co. v. Butler*, 133 S.Ct. 1722
(2013).  On remand, the Seventh Circuit again concluded the district court should have certified
the class, agreeing once more with the Sixth Circuit (which, in *Whirlpool II*, had reinstated its
conclusion). *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013) ("*Butler II*")
(citing *Whirlpool II*, 722 F.3d 838, 845, 859–61).  Sears again petitioned the Supreme Court for
a Writ of Certiorari; this time, it was denied. *Sears, Roebuck and Co. v. Butler*, 134 S. Ct. 1277
(2014).[5]

Accordingly, the district court in *Butler* must now follow the Seventh Circuit's mandate,
including its conclusions that: (1) "[t]here is a single, central, common issue of liability: whether
the Sears washing machine was defective;" and (2) any "complications" caused by design

_____

[4] *See id.* at 361 (the "basic question in the litigation – were the machines defective in
permitting mold to accumulate and generate noxious odors? – is common to the entire mold
class").

[5] The full appellate history of the *Butler* court's class certification ruling is displayed in
the following citation: *Butler v. Sears, Roebuck & Co.,* slip op., case no. 06-CV-7023 (N.D. Ill.
July 20, 2012) (docket nos. 285 & 327), *reversed in relevant part*, 702 F.3d 359 (7th Cir. 2012),
*rehearing and rehearing en banc denied* (7th Cir. 2012), *cert. granted, judgment vacated*, 133 S.
Ct. 1722 (2013), and *reversed in relevant part*, 727 F.3d 796 (7th Cir. 2013), *cert denied*, 134 S.
Ct. 1277 (2014).

7

differences in various washing machine models "can be handled by the creation of subclasses," if necessary.  *Butler II*, 727 F.3d at 801-02.  As of this writing, the district court in *Butler* has not yet ruled on Plaintiffs' Renewed Motion for Class Certification, which is still being briefed.

       **C.**      **The Washing Machines at Issue.**

As noted by both the Sixth Circuit in this case and the Seventh Circuit in *Butler*, there are numerous models of washing machines at issue.  *See Whirlpool II*, 722 F.3d at 849 ("the Duets were built on different [engineering] platforms, representing twenty-one different models over a period of nine model years"); *Butler I*, 702 F.3d at 361 ("Sears contends that during the period covered by the complaint it sold 27 different Kenmore-brand models").  *See also* docket 357 at 2 (Whirlpool currently contends the class, as defined in the *Class Cert. Order*, contains 35 different models of Duet washer).

Whirlpool began manufacturing Duet washing machines in 2001 and continues to produce them today.  For several reasons, including the fact that it began receiving numerous complaints about mold and odor, Whirlpool made several design changes to various Duet machines over time.  These changes included both structural modifications to the machines and the addition of optional laundry cycles.  Some of these changes are listed here:

- Modifications to the plastic tub, which holds the sudsy wash-water and within which the metal laundry-basket revolves.  Whirlpool redesigned the plastic tub several times to remove water-side structural ribs, which tended to gather mold.  See example photographs on the following page.  There are at least six different plastic tub designs in various Duet models.

- Modifications to the metal bracket (also called the "crosspiece"), which sits inside the plastic tub and connects the metal laundry-basket to the revolving motor spindle.

8

Whirlpool redesigned the bracket several times to remove structural crevices,[6] which tended to gather mold.  See example photographs below.  There are at least six different bracket designs in various Duet models.  Whirlpool also modified the mostly-aluminum bracket to contain less copper, which tended to corrode and cause pitting, allowing mold accumulation.



**Access 2001 Design**                              **Sierra 2007 Design**

**Whirlpool Duet Washing Machines – Plastic Tub and Metal Bracket**

**(The bracket fits into the back of the metal clothes basket, which is not shown;
all surfaces inside the tub - including the entire bracket - get wet during a wash cycle.)**

•     Addition of an internal fan that turns on after the wash cycle is over.  The fan increases air flow inside the plastic tub and helps prevent mold.

•     Addition of a "sanitary cycle."  This is an optional cycle the user may choose to run where the wash-water is super-heated to about 160°, thereby sanitizing the laundry and also reducing accumulation of bacteria and mold.

---

[6] The Court uses the terms "crevices" and "cavities" interchangeably in this memorandum, although Whirlpool has suggested there is a difference depending on the size and shape of the indentation.

•      Addition of a "maintenance cycle" or "clean washer cycle."  This is an optional cycle the user may choose to run with no laundry inside the machine.  The tub fills with water, the user adds bleach or other machine-cleaning additives, and the water is agitated to "scrub" the interior of the otherwise-empty tub, reducing bacteria and mold.

•      Addition of a "steam feature."  This is an optional cycle that helps sanitize the machine's interior and prevent accumulation of bacteria and mold.  A user may add steam to either a laundry cycle or a no-laundry maintenance cycle.

In addition to these structural design changes, Whirlpool also made several amendments over time to the washers' "Use and Care Guides" ("UCGs").  These amendments instructed the user to perform various actions in order to minimize mold formation, such as leaving the washer door ajar between uses, removing mildew stains on the rubber door seal by cleaning it with bleach and using high-efficiency laundry detergent.

Because Whirlpool built its Duet washing machines using different engineering "platforms," it did not introduce the above-mentioned structural design changes to all of its Duet models at the same time.  For example, Whirlpool has manufactured Duets using: (1) the "ACCESS" platform, in Germany; (2) the "HORIZON" platform, in Mexico; (3) the "SIERRA" platform, in Mexico; and (4) the "ALPHA" platform, in Ohio.  Whirlpool first incorporated plastic tubs with a rib-free inside on its SIERRA Duets in 2007, but did not incorporate similar "smooth-inside" plastic tubs on its ACCESS Duets until February of 2009, nor on its HORIZON Duets until September of 2009.  Further, Whirlpool added the optional cycles to different models at different times.  A chart of the 35 different Duet models and some of the design changes is set out on the following page.  The models are listed in order of when their production began (column 2).  The models highlighted in yellow are the ones included in the new class definition.

10

## Whirlpool Front-Loading Washer Models 2001 - 2012

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Model No. | Production Begins | Production Ends | Platform | Crosspiece Has Crevices? | Tub Has Crevices? | Crosspiece Materially Changed During Production? | Tub Materially Changed During Production? | Steam Feature? | Sanitary Cycle? | Maintenance (M) or Clean Washer (CW) Cycle? |
| 1 | GHW9100 | 2/13/2001 | 6/29/2004 | Access | Yes | Yes | No | No | No | No | No |
| 2 | GHW9200 | 3/5/2001 | 7/23/2003 | Access | Yes | Yes | No | No | No | No | No |
| 3 | GHW9150 | 12/31/2002 | 10/13/2006 | Access & Matador 1 | Yes | Yes | No | No | No | No | Yes if built after 7/05 (M) |
| 4 | GHW9250 | 1/6/2003 | 9/30/2004 | Access | Yes | Yes | No | No | No | Yes | No |
| 5 | GHW9400 | 2/18/2003 | 11/22/2006 | Access & Matador 1 | Yes | Yes | No | No | No | Yes | Yes if built after 7/05 (M) |
| 6 | GHW9160 | 5/25/2004 | 10/9/2006 | Matador 1 | Yes | Yes | No | No | No | No | Yes if built after 7/05 (M) |
| 7 | GHW9300 | 5/25/2004 | 11/1/2006 | Matador 1 | Yes | Yes | No | No | No | No | Yes if built after 7/05 (M) |
| 8 | GHW9460 | 5/25/2004 | 10/6/2006 | Matador 1 | Yes | Yes | No | No | No | Yes | Yes if built after 7/05 (M) |
| 9 | WFW8500 | 1/4/2006 | 7/2/2009 | Horizon | No | Yes | No | No | No | Yes | Yes (CW) |
| 10 | WFW9200 | 1/9/2006 | 5/1/2009 | Matador 2 | Yes | Yes | No | No | No | No | Yes (CW) |
| 11 | WFW8300 (GLAZER) | 1/12/2006 | 1/8/2010 | Horizon & Horizon Next Gen | No | Yes but Wave Structure after 9/09 | No | Yes (9/09) | No | No | Yes (CW) |
| 12 | WFW9400 | 2/6/2006 | 8/27/2010 | Matador 2 & Matador 3 | Yes | Yes if manufactured before 2/09 | Yes (2/09) | Yes (2/09) | No | Yes | Yes (CW) |
| 13 | WFW8410 | 7/14/2006 | 3/7/2011 | Horizon & Horizon Next Gen | No | Yes but Wave Structure after 9/09 | No | Yes (9/09) | No | No | Yes (CW) |
| 14 | WFW8400 | 9/11/2006 | 11/27/2009 | Horizon & Horizon Next Gen | No | Yes but Wave Structure after 9/09 | No | Yes (9/09) | No | Yes | Yes (CW) |
| 15 | WFW9600 | 11/20/2006 | 8/25/2008 | Matador 2B | Yes | Yes | No | No | Yes | Yes | Yes (CW) |
| 16 | WFW9200 | 1/23/2007 | 7/15/2009 | Sierra & Sierra Next Gen | No | No | No | No | No | Yes | Yes (CW) |
| 17 | WFW9500 | 1/23/2007 | 12/14/2009 | Matador 2B & Matador 3 | Yes | Yes if manufactured before 2/09 | Yes (2/09) | Yes (2/09) | Yes | Yes | Yes (CW) |
| 18 | WFW8200 | 10/18/2007 | 11/30/2007 | Horizon | No | Yes | No | No | No | No | Yes (CW) |
| 19 | WFW9300 (ALLISON) | 4/21/2008 | 2/13/2009 | Matador 2 | Yes | Yes | No | No | No | No | Yes (CW) |
| 20 | WFW9700 | 6/9/2008 | 12/16/2009 | Sierra Next Gen | No | No | No | No | No | Yes | Yes (CW) |
| 21 | WFW9250 | 1/1/2009 | 11/21/2011 | Horizon & Horizon Next Gen | No | Yes but Wave Structure after 9/09 | No | Yes (9/09) | No | Yes | Yes (CW) |
| 22 | WFW9150 | 1/5/2009 | 12/12/2011 | Horizon & Horizon Next Gen | No | Yes but Wave Structure after 9/09 | No | Yes (9/09) | No | Yes | Yes (CW) |
| 23 | WFW9450 | 2/18/2009 | 6/11/2010 | Sierra Next Gen | No | No | No | No | No | Yes | Yes (CW) |
| 24 | WFW9550 | 3/30/2009 | 11/21/2011 | Sierra Next Gen | No | No | No | No | Yes | Yes | Yes (CW) |
| 25 | WFW9750 | 6/8/2009 | 8/27/2012 | Matador 3 | Yes | No | No | No | No | Yes | Yes (CW) |
| 26 | WFW9050 | 7/2/2009 | 5/7/2012 | Horizon Next Gen | No | Wave Structure | No | No | No | No | Yes (CW) |
| 27 | WFW9470 | 7/27/2009 | 1/10/2011 | Matador 3 | Yes | No | No | No | No | Yes | Yes (CW) |
| 28 | WFW9640 | 4/26/2010 | 5/7/2012 | Matador 3 | Yes | No | No | No | Yes | Yes | Yes (CW) |
| 29 | WFW9451 | 6/7/2010 | 5/21/2012 | Matador 3 | Yes | No | No | No | No | Yes | Yes (CW) |
| 30 | WFW94HE | 7/1/2010 | 7/4/2013 | Alpha | No | No | No | No | No | Yes | Yes (CW) |
| 31 | WFW9151 | 8/9/2010 | 10/15/2012 | Horizon Next Gen | No | Wave Structure | No | No | No | Yes | Yes (CW) |
| 32 | WFW95HE | 9/1/2010 | 7/4/2013 | Alpha | No | No | No | No | Yes | Yes | Yes (CW) |
| 33 | WFW97HE | 10/1/2010 | 7/4/2013 | Alpha | No | No | No | No | Yes | Yes | Yes (CW) |
| 34 | WFW9550 | 2/7/2011 | 5/21/2012 | Matador 3 | Yes | No | No | No | No | Yes | Yes (CW) |
| 35 | WFW9351 | 5/16/2011 | 2/20/2012 | Horizon Next Gen | No | Wave Structure | No | No | No | Yes | Yes (CW) |

Included in Class

SIERRA Platform

Wave Structure Tub

During the thirteen-month period between the time this MDL was assigned to this Court (December 2, 2008) and the time Plaintiffs filed their Motion for Class Certification (January 29, 2010), Plaintiffs pursued discovery regarding the extent to which the various Duet models suffered mold problems – or, put differently, the extent to which Whirlpool's ongoing design changes fixed the mold problems.  Accordingly, on November 16, 2009, Plaintiffs' engineering expert, Gary Wilson – who is Whirlpool's former Director of Laundry Technology – submitted a report evaluating various Duet machines.  Wilson concluded: "The ACCESS and HORIZON models that were evaluated from the 2002-2008 time period uniformly failed to self-clean which often [led] to a severe odor from the machine and the clothes that were washed."  Report at 10 (docket no. 93, exh. 7a).  He added that "Newer models of the ACCESS and HORIZON have some design modifications, such as the ribs and cavities on the ACCESS tub which have been moved to the back side of the tub out of contact with the wash water.  The basket brackets of the ACCESS and HORIZON have been redesigned to reduce [crevices as mold] collection points." *Id.*  However, he stressed he had not evaluated these "newer models," and his conclusions that all of the Duets had design defects pertained only to the pre-2009 machines.  *See id.* ("The effectiveness of these changes [in the newer models] have not been evaluated.  Consumers with ACCESS or HORIZON models from the time period that was evaluated (2002-2008) do not have solutions available to resolve or eliminate the containments [sic, contaminants] and the

resulting odor.").[7]

Notably, Wilson's November 16, 2009 report addressed only the 2002-2008 Duet machines manufactured on the German ACCESS platform and the Mexican HORIZON platform.  Wilson did not separately discuss the Duet machines manufactured on the Ohio ALPHA platform, for the simple reason that Whirlpool had not yet begun to produce them. Wilson also did not separately discuss the Duet machines manufactured on the Mexican SIERRA platform, which were first produced in 2007.  It is important to examine why this is so.

Whirlpool began manufacturing Duets using the ACCESS platform in Germany in 2001. Whirlpool then began to also use the ACCESS platform in Mexico, beginning in 2007.  To distinguish between the German and Mexican ACCESS Duets, Whirlpool began calling the Mexican platform by the name SIERRA, and the German platform by the name MATADOR. Yet Whirlpool also continued to refer to both of the platforms by the name ACCESS.  Thus, for example, Whirlpool's expert, Anthony Hardaway – who is Whirlpool's Lead Engineer, Advance Chemistry Technology – averred in August of 2008 that "[t]he Access, Matador, and Sierra names are often used interchangeably."  Report at 2 n.1 (docket no. 93, exh. 6).  Indeed, as recently as September of 2013,  Hardaway testified that "Access – Sierra, Access, Duet are all essentially the same, just where they're made [is different]."  Depo. at 350 (docket no. 330, exh. 3); *see also* Wilson Report at 4 n.1 (docket no. 276, exh. 2) (statement from Wilson dated Jan.

---

[7]  Wilson also submitted a supplemental Report on January 4, 2010, where he observed that "Whirlpool eventually made design changes to it's [sic] [Duet] washers to mitigate the inherent propensity of its front load washers to grow mold and bacteria, though these changes did not solve the underlying defect or eliminate the growth of mold and bacteria."  Report at 5 (docket no. 93, exh. 2).  The changes Wilson was referring to, however, were still those made before 2009.  *See id.* at 6 (addressing only modifications made during the 2004-07 time frame).

23, 2013 that "Whirlpool also internally uses the names MATADOR and SIERRA to represent ACCESS platform machines made in Germany and Mexico respectively.").  Thus, when Wilson referred in 2009 to the "ACCESS or HORIZON models from the [2002-2008] time period that [he] evaluated," he apparently believed the Mexican ACCESS (a/k/a SIERRA) washing machines shared the same design as the German ACCESS machines.  As such, Wilson believed there was no reason to mention the SIERRA machines separately.

In fact, however, at least some of the ACCESS machines manufactured in Mexico (a/k/a SIERRA machines) were designed differently than the ACCESS machines manufactured in Germany (a/k/a MATADOR machines).  Hardaway later submitted another report, stating that SIERRA machines had a plastic tub with a smooth inside, beginning in 2007.  Report ¶35.g at 15 (docket no. 103, exh. 4).  In contrast, no German ACCESS machine had a smooth plastic tub until 2009.  Hardaway submitted this other report addressing SIERRA machines on March 16, 2010 – after Wilson had filed his Report, and after Plaintiffs had moved for class certification, but before the Court entered its *Class Cert. Order*.

What all of this means is that Wilson's conclusion in 2009 – that is, that "The ACCESS and HORIZON models that were evaluated from the 2002-2008 time period uniformly failed to self-clean[,] which often [led] to a severe odor" – cannot fairly be attributed to the SIERRA machines, even though the SIERRA machines were arguably also ACCESS machines and had been manufactured for over two years.  To the extent the SIERRA machines were different from the German ACCESS machines, Wilson simply never addressed them.  By way of their Motion to Modify the Class Definition, Plaintiffs now seek to *exclude* the SIERRA machines from the class.  *See* Renewed Motion to Modify the Class Definition at 1 (docket no. 330) ("Plaintiffs

14

move to modify the Class definition by . . . excluding owners of Duets built on the Sierra platform starting in 2007").[8]

Separate from the SIERRA machines there is now a newer manufacturing architecture used by Whirlpool, which it calls the ALPHA platform.  Whirlpool did not begin to manufacture ALPHA machines until July 1, 2010, well after the parties had submitted their class certification briefs.  In 2013, after the lengthy appellate process regarding this Court's *Class Cert. Order* came to an end, Wilson submitted another expert report.  In this report, Wilson addressed for the first time the machines built on the ALPHA engineering platform, stating: "the ALPHA machines that were inspected have significant design changes compared to the Whirlpool ACCESS and HORIZON platform washers. * * *  Indeed, the design changes in the ALPHA machines address many of the design defects I previously identified in the Whirlpool ACCESS and HORIZON platform washing machines and will reduce the accumulation of wash process byproducts which allow the growth of odor-producing bacteria and mold."  Report at 4 (docket no. 276, exh. 2).   Wilson went on to list the design changes Whirlpool made to the ALPHA machines that corrected the mold problem: (1) "removal of the cavities from the interior of the tub back wall and the smoothing out of all corners and edges," *id.* at 8; (2) "redesign of the basket bracket so that all corners and edges are smoothed out," *id.* at 9; and (3) "a fan has been added to the system which pushes ambient air into the tub . . . [so that] the evaporation rate of the water remaining in the tub will be accelerated," *id.*

---

[8]  Plaintiffs in *Butler* have also sought to exclude SIERRA machines by proposing a class definition including only "any Kenmore® front-load washing machine manufactured by Whirlpool *in Germany* through 2008."  *Butler* Plaintiffs' Renewed Motion for Certification at 1 (docket no. 378) (July 23, 2014) (emphasis added).  The SIERRA machines were all produced in Mexico.

In light of these design changes, and by way of their motion to modify the class definition, Plaintiffs now seek to *exclude* the ALPHA machines from the class.  Plaintiffs do so by proposing "an end date to the Class period by limiting it to owners of washers manufactured prior to January 1, 2009."  Renewed Motion to Modify the Class Definition at 1 (docket no. 330).  Because Whirlpool began manufacturing ALPHA machines in July of 2010, this end date would exclude all ALPHA machines.  Plaintiffs explain they never meant for the class to include ALPHA machines – indeed, at the time they moved for class certification, ALPHA machines did not exist – so the proposed end date would simply clarify that these machines are not and never were included in the class.

Finally, the Court addresses the presence in some Duet machines of the "steam feature."  The "steam feature" is an optional cycle that, like the "extra rinse" cycle, the user of the washing machine may choose to run, or not; the steam feature does not normally operate unless added by the user for a particular load of wash or to a "maintenance cycle."  Whirlpool first made available the steam feature option on some ACCESS machines in January of 2006, and later on some SIERRA and ALPHA machines.

Wilson's November 16, 2009 expert report, issued in support of Plaintiffs' original Motion for Class Certification, did not mention the steam feature explicitly, even though three ACCESS and two SIERRA models included the option at that time.[9]  Rather, Wilson observed only that "Newer models of the ACCESS and HORIZON have some design modifications,"

---

[9]  Specifically, Whirlpool had produced the following Duet models with the steam feature as of the date Wilson submitted his November 16, 2009 Report: (1) MATADOR model WFW9600, (2) MATADOR model WFW9500, (3) SIERRA model WFW9700, (4) SIERRA model WFW9550, and (5) MATADOR model WFW9750.  See column 9 in the chart at page 11 of this Order.

including the addition of "special cleaning cycles."  Report at 10 (docket no. 93, exh. 7a).

Wilson stated he had not yet evaluated the effectiveness of the addition of the "special cleaning

cycles," just as he had not yet evaluated the then-recent removal of the internal ribs from the

ACCESS plastic tubs.  *Id.*

As noted above, after the *Class Cert. Order* appellate process ended, Wilson issued his

2013 expert report, wherein he concluded that several of the newer Duet design features

appeared to correct the mold problem.  But Wilson's 2013 report still did not explicitly address

the steam feature – even though, by that time, another two ACCESS models and two ALPHA

models also included the optional steam feature.[10]

Despite Wilson's silence on the steam feature, Plaintiffs now seek to *exclude* from the

class all machines that have the steam feature.  Plaintiffs do so by proposing a class definition

limited "to owners of washers manufactured prior to January 1, 2009 [and] without a steam

feature."  Renewed Motion to Modify the Class Definition at 1 (docket no. 330).  This proposed

definition is similar to the one the *Butler* Plaintiffs proposed in October 24, 2011.  This Court's

review of the *Butler* docket, and the expert reports submitted by Wilson in that case, also reveals

no clear explanation for why Plaintiffs now seek to exclude from the class definition Duet

washing machines that have the steam feature.

---

[10]  Specifically, Whirlpool had produced the following *additional* Duet model numbers
with the steam feature as of the date Wilson submitted his January 23, 2013 Report: (1)
MATADOR model WFW9640, (2) ALPHA model WFW95HE, (3) ALPHA model WFW97HE,
and (4) SIERRA model WFW9550.

II.     **Legal Standard.**

"[A] district court's order denying or granting class status is inherently tentative."

*Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978).  District courts have the

discretion and even the obligation "to reassess their class rulings as the case develops."

*McNamara v. Felderhof*, 410 F.3d 277, 281 n.8 (5th Cir. 2005) (citing Fed. R. Civ. P.

23(c)(1)(C) and quoting *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2nd Cir.1999)).   The

Court's "discretion extends to defining the scope of the class."  *Shapiro v. Midwest Rubber*

*Reclaiming Co.*, 626 F.2d 63, 71 (8th Cir. 1980).  Thus, a class may be redefined or decertified

entirely at any time prior to final judgment.  *See General Tel. Co. of SW v. Falcon*, 457 U.S. 147,

160 (1982) ("Even after a [class] certification order is entered, the judge remains free to modify

it in light of subsequent developments in the litigation."); *McNamara*, 410 F.3d at 280 n.8 ("a

trial court overseeing a class action retains the ability to monitor the appropriateness of class

certification throughout the proceedings and to modify or decertify a class at any time before

final judgment") (quoting *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1261 (10th Cir. 2004)).

Indeed, "changes in proposed class definitions are commonplace in litigation under Rule 23."

*Ammons v. La Z-Boy Inc.*, 2009 WL 3460306 at *5 (D. Utah Oct. 20, 2009).

Still, "decertification is a 'drastic step,' not to be taken lightly."  H. Newberg & A. Conte,

2 *Newberg on Class Actions* §7:37 at 190 (3rd ed. 1992).  Thus, if possible, modification of the

class definition, or use of subclasses, is generally preferred.  *Id.*  "[I]t is an extreme step to

dismiss a suit simply by decertifying a class, where a 'potentially proper class' exists and can

easily be created."  *In re Urethane Antitrust Litig.*, 2013 WL 2097346 at *2 (D. Kan. May 15,

2013) (quoting *Woe v. Cuomo*, 729 F.2d 96, 107 (2nd Cir. 1984)).  "Prior to decertification, the

18

Court must consider all options available to render the case manageable." *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 554 (E.D. Va. 2000).

A district court "retains significant discretion to make decertification and modification decisions and its decision is reviewed only for abuse of discretion." *Newberg,* §7:38 at 191; *see Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("district courts have broad discretion to modify class definitions"). Courts are not in complete agreement regarding "who bears the burden of proof" on a motion to decertify a class. *Newberg,* §7:39 at 195. Many courts hold that, on a motion for decertification, as at the certification stage, the burden to demonstrate that the requirements of Rule 23 are met lies with the party advocating certification. *Marlo v. United Parcel Serv. Inc*., 639 F.3d 942, 947-48 (9th Cir. 2011). At the same time, "[o]nce a class is certified, the parties can be expected to rely on it and conduct discovery, prepare for trial, and engage in settlement discussions on the assumption that in the normal course of events it will not be altered except for good cause." *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 477 (D. Colo. 1998) (quoting Manual for Complex Litigation Third §30.18 at 223 (1995)). "Sometimes, however, developments in the litigation, such as the discovery of new facts or changes in parties or in the substantive or procedural law, will necessitate reconsideration of the earlier order and the granting or denial of certification or redefinition of the class." *Id.*; *Foster v. D.B.S. Collection Agency*, No. 01-CV-514, 2003 U.S. Dist. LEXIS 25459 (S.D. Ohio Dec. 16, 2003) (same).

**III.    Analysis.**

The essence of the question presented by the parties' two class certification motions is: Is

the current class definition appropriate?  Plaintiffs assert that, for various reasons, the current class definition includes too many Duet models and is thus overbroad; accordingly, the Court should re-define the class more narrowly by excluding certain Duet models, leaving a redefined class that even more clearly meets all the requirements of Fed. R. Civ. P. 23.  Whirlpool contends Plaintiffs should not be allowed to redefine the class, having secured class certification from this Court and on appeal based on the premise that inclusion of *all* Duet models was *not* overbroad; and Whirlpool further asserts that, despite the Sixth Circuit's approval of the *Class Cert. Order*, the Court should now decertify the class because neither the current class nor the proposed redefined class meet all the requirements of Fed. R. Civ. P. 23.

The Court concludes Plaintiffs are partly correct – the Court must assure commonality by re-defining the class to better reflect new evidence regarding exactly which Duet washer models have the alleged design defect.  But, as explained further below, the proper re-definition is not the one Plaintiffs propose.  Further, the Court concludes Whirlpool is incorrect – the re-defined class does meet all of the requirements of Rule 23, redefinition is a better choice than decertification, and the fact that the original class definition is overbroad does not show Plaintiffs obtained certification improperly in the first instance.

### A.    Class Definition.

The Court originally defined the class to include "All persons who are current residents of Ohio and purchased a Washing Machine (defined as Whirlpool Duet®, Duet HT®, and Duet Sport® Front-Loading Automatic Washers) for primarily personal, family or household purposes, and not for resale, in Ohio . . . ."  *Class Cert. Order* at *4.  Plaintiffs now seek to

20

modify the existing class definition by adding four exclusions: (1) all machines manufactured

after December 31, 2008, including all ALPHA machines; (2) all SIERRA machines; (3) all

machines that have a steam feature; and (4) all machines that have a plastic tub with only

longitudinal reinforcing ribs.[11]

### 1.    Machines Manufactured after December 31, 2008.

This Court's *Class Cert. Order* did not include any explicit temporal limitation – that is,

the Court simply defined the class to include all Ohio residents who purchased Duet washing

machines, and not (for example) all Ohio residents who purchased Duet washing machines

*manufactured before a certain date*.  Whirlpool asserts the Court's certification was intentionally

"open-ended" and thus applies to every purchaser of a Duet washing machine, including those

who made their purchases after the Court entered the *Class Cert. Order*.  Response Brief at 2,

11-13 (docket no. 351).  This definition would encompass purchasers of ALPHA washing

machines, even though: (1) Whirlpool did not begin to manufacture ALPHA models until just

two weeks before the Court entered its *Class Cert. Order*, and months after class certification

discovery and briefing was over; and (2) after the appellate process finished, Plaintiffs' expert

(Wilson) submitted an expert report addressing the ALPHA machines *for the first time*,

concluding Whirlpool's ALPHA washers incorporated "significant design changes" that

appeared to correct the mold problem.

Whirlpool wants the ALPHA models to be included in the class definition because, to

---

[11]  Plaintiffs sought the first three exclusions in their original motion, and added the fourth exclusion in their reply brief.  *See* Renewed Motion to Modify at 1 (docket no. 330); Reply Brief at 5 (docket no. 358).

prevail at trial, Plaintiffs must prove *all* Duet washing machine models in the class have a *common* design defect that causes mold buildup, and Plaintiffs have essentially conceded the ALPHA machines do not have such a defect.  Thus, including the ALPHA machines in the class definition makes it dramatically less likely Whirlpool will be found liable to the class. Whirlpool insists Plaintiffs obtained class certification only by convincing this Court (and the Sixth Circuit) that Plaintiffs could prove a design defect common to "*all* Duet models," and the Court should now hold Plaintiffs to their word.  *See* Whirlpool response at 5 (docket no. 266) ("The class definition contained no platform or model limitation, was not limited by date of manufacture or purchase, and did not exclude any particular Washer design or feature" because Plaintiffs' theory was that "none of Whirlpool's design changes fixed the defect").

Whirlpool's argument, however, is unpersuasive.  First, as Plaintiffs note, Whirlpool's position raises fundamental due process concerns.  In the *Class Cert. Order*, the Court directed Plaintiffs' counsel to issue class notice, *see* 2010 WL 2756947 at *4; this task was completed on roughly November 7, 2012, *see* docket no. 242, exh. 1.  Any Ohio resident who purchased a Duet after that date is extremely unlikely to have received notice that he is a class member. Construing the class period to have no "cut-off date" means there will be class members who purchase a Duet tomorrow, wholly unaware their rights will be decided in this litigation.  This is not permissible.  *See Engle v. Liggett Group, Inc.*, 945 So. 2d 1246, 1274-75 (Fla. 2006) ("an open-ended class would not allow for notice and an opportunity to opt out"); *Amchem Prods. v. Windsor*, 521 U.S. 591, 628 (1997) (expressing grave doubt "whether class action notice sufficient under the Constitution and Rule 23 could ever be given" to persons who would only become class members in the future).

22

Second, Plaintiffs' statements to the Court in late 2009 and early 2010 – that none of Whirlpool's design changes had fixed the mold problem in any of the Duet machines – cannot reasonably be construed to mean that no changes Whirlpool might make in the future would fix the problem. The Court's class certification decision was necessarily based only upon evidence of what Whirlpool had done up to that point in time. To adopt Whirlpool's argument would be to allow a product manufacturer to "design its way forward" out of commonality and predominance, regardless of the propriety of class treatment for past purchasers. This Court does not believe Judge Gwin meant to or did adopt an open-ended class definition in the *Class Cert. Order*.[12]

It is fair to say, however, that the Court's original class definition was incomplete. "The relevant time should be included in the class definition." *Manual for Complex Litigation, Fourth* §21.222 at 271 (2004). The remaining issue is the appropriate time limitation. One option is the date that class notice was completed, November 7, 2012. This choice would avoid the due process concerns mentioned above. But this date would include at least six Duet models that Whirlpool did not even begin to sell until after the Court entered its *Class Cert. Order*, including

---

[12] Indeed, Judge Gwin expressed concern about this issue at oral argument on the class certification motion, asking: "I in some ways understood you to be arguing for kind of an open-ended class, so someone buys a washing machine tomorrow, they could be a member of the class. * * * [D]oesn't that cause problems?" Tr. at 11 (May 27, 2010) (docket no. 134). Plaintiffs' counsel responded: "I think your Honor can certainly select a date certain, whether it be the date of the order your Honor enters, the date judgment is entered in the case is sometimes done. You obviously could select the – a date earlier than that." *Id.* Nonetheless, the *Class Cert. Order* contained no explicit end date.

all of the ALPHA machines.[13]  At oral argument, Whirlpool also suggested October 31, 2012, or

January 7, 2013 – dates corresponding to class members' opt-out opportunities, *see* transcript at

21, 29 (docket no. 286) – but these two dates would also include the same six Duet models that

Whirlpool did not sell until after the Court entered its *Class Cert. Order*.  Another option is July

12, 2010, the date the Court entered its *Class Cert. Order*.  This choice would not only avoid due

process concerns but would also align more closely (although not precisely) with the evidence

the parties' experts and the Court considered.  As discussed below, however, there is a better

option.

Plaintiffs move to limit the class period to cover only machines manufactured before

January 1, 2009, which is eighteen months before the Court entered its *Class Cert. Order*.

Whirlpool, however, observes this date is not connected to any relevant event; for example, the

date is not tied to a design change to any Duet model, nor any modification to the language in the

"Use and Care Guides" packaged with the washing machines.  Further, as Whirlpool notes, if the

Court uses Plaintiffs' proposed date, "some class members who bought Washers that Plaintiffs

claim are defective would inexplicably be excluded from the class. * * * Their proposal is

illogical and would exclude some class members identically situated to others who would be

included based only on an arbitrary date of manufacture."  Response at 5 (docket no. 351).

Plaintiffs acknowledge their proposed date is imprecise, such that "some washers that share the

---

[13]  These models are: (1) ALPHA model WFW94HE, manufactured beginning July 1,
2010; (2) HORIZON model WFW9151, manufactured beginning Aug. 9, 2010; (3) ALPHA
model WFW95HE, manufactured beginning Sept. 1, 2010; (4) ALPHA model WFW97HE,
manufactured beginning Oct. 1, 2010; (5) MATADOR model WFW9550, manufactured
beginning Feb. 7, 2011; and (6) HORIZON model WFW9351, manufactured beginning May 16,
2011.

design defect will not be included" in the class, but assert that "using [an end] date certain is routine [in class definitions], and it is not arbitrary to establish *a cut-off [date] in close proximity to when the material shifts in design occurred*."  Reply at 7 (docket no. 358) (emphasis added).

The problem with using any single date certain as a cut-off in this case, however, is that it will be either under- or over-inclusive, or both.  Not only did different models of Duet washers have different designs, but there were also design changes *within* certain models.  For example, beginning in February of 2006, when MATADOR model WFW9400 was first produced, its plastic tub and metal bracket both had crevices; in February of 2009, however, it was redesigned so that the tub and bracket did not have crevices, which remained the case until the model was discontinued in August of 2010.  Choosing a cut-off date of February 28, 2009, then, would make sense concerning this MATADOR model WFW9400.  But that same date would exclude some, but not all, purchasers of HORIZON model WFW8500, which had a plastic tub with crevices during its entire manufacturing run of January 4, 2006 through July 2, 2009. Individuals who purchased this HORIZON model in March through July of 2009 have exactly the same claims as earlier purchasers, but would be excluded from the class by a February 28, 2009 cut-off date.  And conversely, using a cut-off date of July 2, 2009, which would make sense for HORIZON model WFW8500, would include purchasers of the redesigned MATADOR model WFW9400, which Plaintiffs do not claim is defective.

Put simply, Plaintiffs' theory is that all models of Duet washers that had plastic tubs or metal brackets with crevices were defective, because the crevices caused the machines to suffer

mold problems.[14]  Rather than choosing a single cut-off date approximating when *most* such Duet models no longer had tubs or brackets with crevices – or, as Plaintiffs put it, "a cut-off [date] in close proximity to when the material shifts in design occurred" –  the better approach is to identify precisely those model numbers and their manufacture dates that *did* have plastic tubs or metal brackets with crevices, and include only those Duets within the class.  This new definition adds factual and legal clarity and fairness to the scope of the class, allowing both sides to better focus on the remaining issues.

Ultimately, this Court's duty is to ensure the proper exercise of Rule 23.  That duty includes the obligation to create a new definition *sua sponte* if the parties' own proposals are not adequate or accurate.  *See Metropolitan Area Hous. Alliance v. U.S. Dep't of Hous. & Urban Dev.*, 69 F.R.D. 633, 637 (N.D. Ill. 1976) (rejecting both parties' proposed class definitions and creating a new definition *sua sponte*, because "the definitions proposed by both parties are inadequate;" the court chose a definition "similar to the one originally proposed by the Plaintiffs and narrower than the second [one proposed by Plaintiffs]," and also "much broader than the one suggested by the defendants"); *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 64 (D. Nev. 1985) ("Many circuits have held that the court itself may construct a definition of the class.").  *See also Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207 (6th Cir. 1997) (affirming the district court, after it certified a class and then dismissed the class's claims, but modifying *sua sponte* the trial court's class definition); *Godec v. Bayer Corp.*, 2011 WL 5513202 (N.D. Ohio, Nov. 11, 2011)

---

[14]  As Plaintiffs put: it at the time of the original class certification hearing, their expert (Wilson) "found that the core design defect in the Duets is their inability to clean themselves, which results from cavities on the water side of the back-tub wall and crevices in the aluminum [bracket]."  Reply at 1-2 (docket no. 358).

(granting a motion for class certification, but with a narrower class definition than requested).

Indeed, the Sixth Circuit has commended a district court's "repeated modification of the class definition," because "courts must be vigilant to ensure that a certified class is properly constituted" and the "district court's multiple amendments merely showed that the court took seriously its obligation to make appropriate adjustments to the class definition as the litigation progressed."  *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (modifying the class definition even further on appeal).

Accordingly, the Court's class definition sets out precisely those Duet model numbers and manufacture dates that are appropriately included in the class.  The earliest Duet that is included, ACCESS model GHW9100, was first manufactured on February 13, 2001; the latest Duet models that are included (five different ones) were manufactured through September 30, 2009; and the class includes a total of 20 different models manufactured during this eight-and-one-half year span.  The definition excludes all ALPHA models, as well as later versions of other models that: (a) do not have crevices in either the plastic tub or the metal bracket, and/or (b) Plaintiffs' expert never examined.


### 2. SIERRA Machines.

The SIERRA models of the Duet washer were first manufactured on January 23, 2007, and the last SIERRA machine was produced on November 21, 2011.  (See column 4 in the chart at page 11 of this Order.) None of the four SIERRA models had a plastic tub or a metal bracket with crevices.

Whirlpool insists the SIERRA models should be included in the class definition because

Plaintiffs stated repeatedly in briefing and at oral argument on the original Motion for Class

Certification that: (1) "*All* [Duet] washers manufactured by Whirlpool have an inherent

propensity to grow mold and bacteria on the interior surfaces of the machines," Motion to

Certify at 2 (docket no. 93-1) (emphasis added); (2) "*None* of Whirlpool's belated attempts at

corrective measures worked," *id.* at 10 (emphasis added); and (3) "differences in the [Duet]

platforms, models, and model years . . . are *immaterial* to the Defect and Mold Problems," Reply

Brief at 4 (docket no. 110) (emphasis added).  Plaintiffs made these statements in 2009 and 2010,

at least two years *after* the SIERRA machines were first produced.  Yet Plaintiffs now seek to

exclude the SIERRA machines from the class because these SIERRA models are, in fact,

different from other Duets – the SIERRA machines were designed with no crevices in the tub or

bracket.  Whirlpool argues Plaintiffs committed to a position when they moved for class

certification and must now stick to it.

Indeed, Whirlpool characterizes Plaintiffs' former statements that *all* Duets "share a

uniform defect" as a "false assertion," foisted upon and relied upon by this Court and the Sixth

Circuit when deciding whether to certify the existing class.  Response Brief at 13 (docket no.

351).  Whirlpool argues it will be unfairly prejudiced if SIERRA models are now excluded from

the class because: (1) it spent great time and expense litigating the propriety of class certification

based on Plaintiffs' (false) premise, so Plaintiffs should now have to adhere to that premise at

trial; and (2) if SIERRA models are now excluded, a SIERRA purchaser may file a new lawsuit

(and claim tolling of any limitations period), even though Plaintiffs' experts in this case have

essentially conceded the SIERRA does not share the common design defect.  *See* Whirlpool's

Supplemental Brief at 7 (docket no. 276) (because "[SIERRA-owners] would, if excluded, not be

bound by any holding of this Court, Whirlpool (and this Court) could [later] face one or more copycat suits for the same alleged defects and warnings from these excluded buyers"). Whirlpool argues that, at the least, instead of redefining the class to exclude purchasers of SIERRA machines, the Court should continue to include SIERRA purchasers and grant summary judgment against them.

The Court agrees that Whirlpool's grievances have some validity, but ultimately concludes SIERRA machines should be excluded from the class definition.  A careful review of the state of the record at the time the Court entered the *Class Cert. Order* shows there was real confusion regarding what the SIERRA machines actually were.  As described earlier, Whirlpool's own expert, Hardaway, confirmed that the terms ACCESS, MATADOR and SIERRA "were often used interchangeably."  Plaintiffs' expert, Wilson, has since credibly explained that, when he referred to "all" ACCESS models, he did not mean to include SIERRA models, which he had never examined, did not know were a subset of ACCESS machines that had been produced since 2007, and believed were examples of the much newer, "smooth-tub" models that had only been recently designed.  Further, the distinction between SIERRA and other ACCESS models was never made clear to this Court before class certification.  And, in affirming this Court, the Sixth Circuit referred repeatedly to "the 'Access' and 'Horizon' platforms" as the machines with the mold problem, *Whirlpool II*, 722 F.3d at 847, never

mentioning the Sierra platform.[15]

Furthermore, Whirlpool itself has been inconsistent regarding the number of Duet models at issue.  Whirlpool represented on appeal that there were 21 different models of Duet washer, *id.* at 849, but just weeks ago submitted a chart listing 35 different models of Duet washer, *see* docket 357 at 2 & exh. 4, only three of which were first manufactured after appeal was allowed.[16]  The 35-model chart is the first time the Court (and, apparently, opposing counsel) has been presented with evidence that clearly and concisely sets out all of the different Duet model numbers and their manufacturing platforms, manufacture dates, whether the plastic tub and metal bracket for each model had crevices (with photos) and dates of tub and bracket redesign.[17]  This chart reveals to the Court fully the extent to which there are "questions of law or fact common to the class," depending on which models are included.  Fed. R. Civ. P. 23(a)(2).  Before this, the

---

[15]  Indeed, the Sixth Circuit observed that: (1) "[a]ccording to the evidence presented in support of the motion for class certification, [all of] the Duet . . . machines . . . built on the 'Access' platform[] shar[e] nearly identical engineering" and "most model differences are aesthetic;" (2) "[w]ith a few differences in function or styling, all Duet models built on the 'Horizon' engineering platform are nearly identical;" and (3) "[i]n addition, the 'Access' and 'Horizon' engineering platforms are also nearly identical to each other."  *Whirlpool II*, 722 F.3d at 847.  This description clearly does not encompass SIERRA machines, which had meaningful and obvious engineering design differences.

[16]  It is primarily for this reason that the Court grants Plaintiffs' Renewed Motion to Modify the Class Definition, even though the Court denied Plaintiffs' Original Motion to Modify.  As the Court explained in its earlier Order, when it denied the Motion to Modify "at this time," the Court wanted to "re-visit this issue when it considers dispositive motions and the motion for decertification."  Order at 4 (docket no. 289).  The newly clarified evidence regarding the details of all of the Duet models, together with the more thorough setting out of all of the parties' arguments, leads to the final result set out in this Order.

[17]  The plastic tub was substantially redesigned in seven of the 35 Duet models, but the model numbers remained the same.  (See, e.g., lines 13 and 17 in the chart at page 11 of this Order.)  Arguably, then, Whirlpool produced 42 different Duet models, even if some shared the same model number.  Similarly, Whirlpool added a "clean washer cycle" to five models in 2005, but the model numbers remained the same.

30

Court's class definition was premised on far-less-exact descriptions from the parties.

The Court fully understands Whirlpool's frustration – Plaintiffs said in 2009 "all Duet washers," but they now explain they did not mean "all (then-existing) Duet washers." But the evidence is far from clear that Plaintiffs ever intended to include in the class definition the SIERRA machines – which, after all, do not have the essential alleged common defect of crevices in the tub and/or bracket that promote mold growth. Moreover, as Plaintiffs point out, Whirlpool has not identified any case where a court rejected a plaintiff's request to *narrow* a class definition after certification – which, of course, can only serve to decrease the number of successful Plaintiffs. *See Garcia v. Tyson Foods, Inc*., 890 F. Supp. 2d 1273, 1297 (D. Kan. 2012) ("The defendant has failed to cite any case in which a trial court was held to have abused its discretion by reducing the size of a class prior to a decision on the merits where all members of the recertified class were also members of the original class.") (quoting *Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1148 (11th Cir. 1983)). Defining the class in this case not to include SIERRA machines serves to increase commonality and predominance, and still leaves Plaintiffs with the burden at trial of proving that 20 different Duet models, with at least two different tub designs, two different bracket designs, and a variety of optional self-cleaning cycles, share a common defect.

The Court adds that it did consider, as Whirlpool requested, including the SIERRA machines in the class and then granting summary judgment as to those machines because there is no evidence of design defect.[18] This would certainly cure any prejudice Whirlpool might suffer

---

[18] The Court considered this option regarding the ALPHA machines as well, but in any event the due process concerns of including Duet models manufactured after issuance of class notice trumps the option.

from exclusion of SIERRA machines after they were originally included in the class definition.[19]

However, the Court perceives that the two questions – the propriety of class definition and of summary judgment – depend on different factors and should be addressed separately.  The Court has found no suggestion in cases discussing Rule 23 that a factor affecting class definition should be whether judgment can then be entered against some or all of the class members as a matter of law.  Rather, only after the class is defined properly should the Court consider whether the class's claims fail as a matter of law and undisputed fact.[20]

Finally, although the Court agrees it is not negligible, "[t]he prejudice . . . suffered by [Whirlpool] as a result of the recertification of the plaintiff class [is] not severe enough to . . . interfere[] with the . . . duty to facilitate the fair and expeditious utilization of the class action mechanism."  *Perryman*, 698 F.2d at 1148.

Accordingly, the redefined class definition will not include SIERRA machines.

---

[19]  Whirlpool certainly has a strong argument that SIERRA machines are not defective, given that Plaintiffs' essential theory is that mold problems are caused principally by crevices in the plastic tub and metal bracket, and SIERRA machines do not have that design.  But, as noted, even the parties' two experts were unclear regarding precisely which Duets were SIERRA models, and Plaintiffs' expert Wilson did not examine a SIERRA model before submitting his pre-certification expert reports.

[20]  *See Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S.Ct. 1184, 1194–95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent – *but only to the extent* – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.") (emphasis added); *see also id.* at 1197 (an alleged "failure of proof as to an element of the plaintiffs' cause of action" is "properly addressed at trial or in a ruling on a summary-judgment motion.  The allegation should not be resolved in deciding whether to certify a proposed class."). Although Whirlpool cites cases where the court granted summary judgment against a portion of the class, the court had earlier defined the class blind to possible implications of Rule 56.

### 3.     Machines with the Steam Feature.

Within two years of producing its first Duet washer, Whirlpool began adding various optional laundry cycles designed to alleviate accumulation of mold and mildew.  These optional cycles included: (1) a "sanitary cycle," first introduced in July of 2003, which super-heats the wash-water to about 160°; (2) a "clean washer cycle," also referred to as a "maintenance cycle," first introduced in July of 2005, which uses high water levels and a cleaning agent (with no laundry in the tub) to scrub the machine; and (3) a "steam cycle," first introduced in November of 2006, which injects hot steam into the tub.  Plaintiffs do not now seek to exclude Duets with either the sanitary cycle or the clean washer cycle; however, they want to exclude Duets with the steam cycle.  Because Plaintiffs have not sufficiently explained why they seek this exclusion, and because Duet washers with the steam cycle otherwise share the alleged essential common design defect (that is, plastic tubs and/or metal brackets with crevices), the Court rejects Plaintiffs' request.[21]

Whirlpool's introduction of all three of the optional laundry cycles listed above occurred well before the parties began discovery regarding the different Duet models.  Further, all of these cycles, including the steam feature, were *not* limited to the SIERRA models, so Plaintiffs cannot plead confusion in 2009-2010 (when class certification briefing and argument occurred) regarding whether these cycles were features added only recently to the newer models.  In other

---

[21]  Of the 35 Duet models listed in Whirlpool's chart, nine of them have the steam feature.  In light of the Court's earlier conclusions regarding the appropriate model-specific cut-off dates and exclusion of SIERRA models, however, only two Duet models with the steam feature are at issue:  MATADOR models WFW9600 and WFW9500, which were first produced on November 20, 2006 and January 23, 2007, respectively.

words, when Plaintiffs stated that "None of Whirlpool's belated attempts at corrective measures worked"  and "differences in the [Duet] platforms, models, and model years . . . are immaterial to the Defect and Mold Problems," the only fair reading is that Plaintiffs were referring to and including all three of these optional laundry cycles.  The Court can find no factual basis to suggest Plaintiffs were unaware of the steam feature when class certification was first argued. This includes a review of the material submitted in *Butler*, where Plaintiffs asked the Court to define the class to exclude Duets with the steam feature over two years ago.

Plaintiffs state their expert, Wilson, evaluated Duets "with all of the *other* pre-2009 design features that Whirlpool contends made a material difference – [including the] . . . maintenance cycle, sanitary cycle, clean washer cycle – and [he] . . . concluded that none of them, standing alone, remedied the defect.  The steam feature, by contrast, was not a focus of Dr. Wilson's analysis or reports."  Reply brief at 5 (docket no. 358).  But this is not accurate – Wilson testified in 2010 that, "as far as the collection of debris and what causes that to be so severe, you know, and then it turns into the biofilm[22] and all that and it starts to smell, the mechanism that causes that to happen *whether you've got the steam feature on there or not* is still there.  So from that point of view, the machines are still identical."  Wilson depo. at 302 (docket no. 351-6) (emphasis and footnote added); *see id.* at 306 (conceding the steam feature might "[h]elp reduce the [mold, mildew, and bacteria] organism count," but it "isn't going to help the collection of the debris that eventually supports the organisms. Okay? That's still going to happen whether you have that steam feature in there or not.").  Plaintiffs even concede they

---

[22]  "In public statements about mold complaints, Whirlpool adopted the term "biofilm" to avoid alarming consumers with words like 'mold,' 'mildew,' 'fungi,' and 'bacteria.'"  *Whirlpool II*, 722 F.3d at 848.

"do not believe that [the] steam feature cured the defective design that causes the Mold

Problem," Reply Brief at 6 (docket no. 358), but suggest class definition and trial might be easier

if these models are excluded.  The Court disagrees.[23]

In sum: as with the sanitary cycle and clean washer cycle, Plaintiffs' expert assessed the

steam feature during class certification discovery and concluded it did not cure the mold

problem; Plaintiffs have supplied the Court with no good reason to exclude Duet washers with

the steam feature; and Whirlpool objects to this exclusion.  Accordingly, the class will be

defined to include Duet machines with the steam feature, to the extent they are not otherwise

excluded because they are SIERRA machines or have more-recent redesigns of the tub and

bracket.


### 4.      Machines That Have a Plastic Tub with Only Longitudinal Reinforcing Ribs.

In their initial Motion to Modify the Class Definition, Plaintiffs asked the Court to

exclude: (a) SIERRA machines, (b) all Duet models with a steam feature, and (c) all Duet

models manufactured after December 31, 2008.  In their Reply Brief, Plaintiffs explain further

that, if the Court chooses a different cut-off date – as it has – the Court should still exclude Duet

---

[23]  The Court also disagrees with Whirlpool's assertion that Plaintiffs clearly "concede[d] that . . . all Washers with the steam feature . . . are not defective."  Reply Brief at 1 (docket no. 357).  Plaintiffs did make statements suggesting the steam feature may mitigate the mold problem, but Plaintiffs have not gone so far as to concede non-defectiveness.  Ultimately, this remains a jury question.

models that have a plastic tub design known as the "Wave Structure."[24]  The Wave Structure tub

is similar to the earliest ACCESS tub, in that both tub interiors have six cavities, each of which

contains structural ribs; however, the older ACCESS tub has both longitudinal and latitudinal

ribs within these cavities, while the Wave Structure tub does not have latitudinal ribs.  Wave

Structure tubs are "smoother" than the original ACCESS tubs, but they are not the newer, fully

"smooth-walled" tubs.  See example photographs below.


Original ACCESS Tub


"Wave Structure" Tub


ALPHA Tub

---

[24]  This Court will not normally consider issues raised for the first time in a reply brief. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("reply briefs *reply* to arguments made in the response brief – they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration") (emphasis in original) (quoting *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)); *Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.*, 436 F.3d 662, 676 (6th Cir. 2006) ("[i]t is impermissible to mention an issue for the first time in a reply brief because the [opponent] then has no opportunity to respond") (quoting *Knighten v. Commissioner*, 702 F.2d 59, 60 n.1 (5th Cir. 1983).  In this case, however, Plaintiffs asserted from the beginning that all Duets with Wave Structure tubs should be excluded, as they were all manufactured after December 31, 2008.

Plaintiffs' request presents a close question.  Whirlpool's chart shows there are eight models of Duet washer with Wave Structure tubs – three relatively recent models that have always had these tubs and five models that were redesigned in September of 2009.  (See column 6 in the chart at page 11 of this Order.)  The first time Whirlpool produced a Duet model with a Wave Structure tub was July 2, 2009, which was shortly before the experts' reports were due and the class certification briefing process began.  Thus, on the one hand, Plaintiffs' expert, Wilson, never examined a Wave Structure tub and never opined on the impact of removing the latitudinal ribs.  On the other hand, Plaintiffs' essential theory is that the cavities in the tub wall are a principal cause of mold accumulation and Wave Structure tubs have these crevices, though with fewer internal ribs.

For two reasons, the Court concludes the better course is to exclude Wave Structure tubs from the Ohio class.  First, after applying all of the other class definition rulings set out above to all of the 35 Duet models, the class includes no Duet model manufactured after September 30, 2009.  By this date, every *other* Duet had a tub and a bracket with no crevices.  If the Court were to include Wave Structure tubs, however, the class would include some Duet models that were not produced for the first time until almost two years later, May 16, 2011, and some machines that were manufactured as late as October 15, 2012 – well after the Court entered its *Class Cert. Order*.  Excluding the Wave Structure tubs makes the class period more consistent across all Duet models.

Second, because Wilson never examined the Wave Structure tub nor discussed it in his expert reports, there is a concern whether he would be allowed to offer opinions on them at trial, even though they share many similarities with other Duet tubs in the class.  Ultimately, if a jury

37

decides with prejudice the claims of Ohio purchasers of Duets with Wave Structure tubs, that decision should be made on a full record.

Accordingly, the class will be defined to exclude Duet washers with Wave Structure tubs.

**B.      Whirlpool's Motion for Decertification.**

As noted earlier, "modification is far superior to decertification."  *In re Urethane Antitrust Litig.*, 2013 WL 2097346 at *2 (D. Kan. May 15, 2013), *amended*, 2013 WL 3879264 (D. Kan. July 26, 2013); *see Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 826 n.15 (7th Cir. 2012) ("In circumstances . . . involving minor overbreadth problems that do not call into question the validity of the class as a whole, the better course is not to deny class certification entirely but to amend the class definition as needed to correct for the overbreadth.").[25]  Still, the modified class must meet all requirements of Rule 23.  In its Motion to Decertify, Whirlpool insists new evidence shows Plaintiffs' modified class does not meet all of the Rule's requirements.  The Court concludes, however, that every argument Whirlpool makes in support of this assertion falls into one of two categories: (1) issues cured by redefinition of the class; or (2) positions already rejected by the Sixth Circuit.

The argument Whirlpool relies on most heavily in its Motion for Decertification is that, because it made critical design changes to later-model Duets, such as the ALPHA machines, the

_____

[25]  Whirlpool asserts the redefinition requested by Plaintiffs does not address a "minor overbreadth problem," as it would have the effect of excluding from the existing Ohio class several tens of thousands of Duet machines.  But this measure is attributable primarily to exclusion of ALPHA and other machines the manufacture of which post-dates the *Class Cert. Order*.  Ultimately, this Order recertifies a class involving 20 Duet models, as compared with the Sixth Circuit's affirmance of a class covering "production of twenty-one different models during the relevant time frame."  *Whirlpool II*, 722 F.3d at 854.

class is no longer cohesive by any measure.  *See, e.g.*, motion at 15 (docket no. 327-1) (arguing that, because Plaintiffs have "conceded that Whirlpool's changes render later Washer models materially different from the earlier models," Plaintiffs "cannot prove that <u>all</u> Washer models suffer from the <u>same</u> defect;" thus, there is "no truly 'common' question") (emphasis in original).  In its briefing, Whirlpool insists the diversity of Duet model designs – especially differences between early and later models – variously undermines commonality, predominance, typicality and even adequacy.  *See, e.g., id.* at 28-29 ("the claims of [named Plaintiffs] Allison and Glazer – who own 2005 and 2006 model-year Washers, respectively – are not aligned with the claims of class members who bought differently designed Washers (including [later] models Plaintiffs concede are not defective) or that came with materially different instructions. * * * Plaintiffs' decision to use the [ALPHA] tub and crosspiece changes as feasible alternative designs to prove their claims shows that Plaintiffs cannot advocate the interests of the entire class.").

The Court's modification of the class definition, however, undercuts this argument entirely.  The Sixth Circuit affirmed that "[t]he basic question in th[is] litigation – were the machines defective in permitting mold to accumulate and generate noxious odors? – is common to the entire . . . class, although the answer may vary with the differences in design."  *Whirlpool II*, 722 F.3d at 854 (quoting *Butler*, 702 F.3d at 361).  This circumstance remains true, and the Court's modification of the class definition has only increased the precision with which trial of all class members' claims together "will generate common answers that are likely to drive resolution of the lawsuit."  *Id.* at 852.  The essence of Whirlpool's position is that the Court should include in the class definition Duets that are materially different, and then decertify the

class because it includes Duets that are materially different.  Through class redefinition, the Court rejects both prongs of this theme and all of its variations in Whirlpool's briefs.

Whirlpool also makes several other arguments in support of decertification and its briefs are logical and articulate.  Ordinarily, the Court would undertake a careful and thorough analysis of all of Whirlpool's contentions, documenting its consideration with a lengthy opinion.  In this case, however, the Sixth Circuit has already twice examined the propriety of class certification and twice concluded it is appropriate, and those analyses address and reject virtually all of Whirlpool's current  arguments.  Some examples:

• Whirlpool argues the class should be decertified because individual issues overwhelm common issues.  As an example, Whirlpool asserts "the <u>amount</u> of biofilm inside any Washer depends on the owner's individual use and care practices, including (1) whether the owner uses HE [high efficiency] detergent; (2) whether the owner leaves the Washer door open between uses; and (3) whether the owner runs the Clean Washer cycle." Motion at 8-9 (docket no. 327-1) (emphasis in original, footnote omitted).  But the Sixth Circuit already rejected this as a basis not to certify the class:

> Whirlpool next asserts that consumer laundry habits vary widely by household; therefore, proof of proximate cause must be determined individually for each plaintiff in the class. The record indicates otherwise. Whirlpool's own documents confirmed that its design engineers knew the mold problem occurred despite variations in consumer laundry habits and despite remedial efforts undertaken by consumers and service technicians to ameliorate the mold problem. * * *
> * * * [P]roof in this case will produce a common answer about whether the alleged design defects in the Duets proximately caused mold or mildew to grow in the machines.

*Whirlpool II*, 722 F.3d at 854-55.

• Whirlpool argues the class should be decertified because there are many "class members

[who] received Washers that clean[ed] laundry without any odor issue and are

uninjured;" thus, there is no "common injury" that can be shown with "classwide proof."

Motion at 21-22 (docket no. 327-1).  The Sixth Circuit found this precise argument

unpersuasive:

> Whirlpool next contends that the certified class is too broad because it
> includes Duet owners who allegedly have not experienced a mold problem and
> are pleased with the performance of their Duets. Satisfied consumers lack
> anything in common with consumers who may have misused their machines and
> complain of a mold problem, Whirlpool argues; furthermore, Glazer and Allison
> are atypical of satisfied consumers and cannot represent them. Our precedent
> indicates otherwise.
> The existence of currently satisfied Duet owners in Ohio did not preclude
> the district court from certifying the Ohio class.  In *Daffin* [*v. Ford Motor Co.*,
> 458 F.3d 549 (6th Cir.2006)] – also an Ohio defective product case – we affirmed
> class certification, holding: "Although the class includes those owners who never
> actually experienced a manifestation of the alleged defect, the class certification
> was not an abuse of discretion because the class and the named plaintiff meet the
> elements of Federal Rule of Civil Procedure 23(a) and 23(b)(3)."  *Daffin*, 458
> F.3d at 550.

*Whirlpool II*, 722 F.3d at 855.

• As other examples of individual issues that "overwhelm" common issues, Whirlpool

notes: (1) its "defenses against members of the class may include statute of limitations,

comparative negligence, and assumption of the risk, each of which is individualized and

not capable of classwide resolution," and (2) whether Whirlpool breached a duty to warn

"is individualized because it depends on what each class member knew or did not know

at the time of <u>use</u>" of the machine.  Motion at 19-20 (docket no. 327-1) (emphasis in

original).  But the Sixth Circuit answered these arguments when it observed:

> "[T]here need be only one common question to certify a class. * * * Here
> the district court identified two primary questions that will produce in one stroke
> answers that are central to the validity of the plaintiffs' legal claims: (1) whether
> the alleged design defects in the Duets proximately cause mold or mildew to

41

develop in the machines and (2) whether Whirlpool adequately warned consumers who purchased Duets about the propensity for mold growth in the machines. * * *

The claims for tortious breach of warranty and negligent design rise or fall on whether a design defect proximately causes mold or mildew to develop in the Duets. Success on the negligent failure-to-warn claim depends on whether Whirlpool had a duty to warn consumers about the propensity for mold growth in Duets and breached that duty. The district court correctly ruled that these two central questions are common to the entire liability class. * * *

[W]e uphold the district court's determination that liability questions common to the Ohio class – whether the alleged design defects in the Duets proximately caused mold to grow in the machines and whether Whirlpool adequately warned consumers about the propensity for mold growth – predominate over any individual questions.

*Whirlpool II*, 722 F.3d at 853, 859.[26]

• Whirlpool also argues class certification is not appropriate because Plaintiffs "cannot

---

[26] Relatedly, Whirlpool asserts: "Plaintiffs cannot establish that common questions predominate over individual ones because the evidence shows that (i) there are potential causes of odors apart from the alleged defect, (ii) buyers' knowledge of mold, odors, and Washer care varied by individual buyer and changed over time; (iii) Whirlpool's disclosures about the potential for odors and Washer care changed over time; (iv) some buyers followed use and care instructions and others did not; and (v) some class members' claims are untimely and others are not." Motion at ix (docket no. 327-1). But the presence of all of these same "individualized issues" (many of which are obvious) was the known state of affairs when this Court first certified the class and when the Sixth Circuit twice affirmed.

In addition, regarding Whirlpool's argument that each class member will require an individualized statute of limitations analysis, another court recently rejected this same argument in a class action against another manufacturer of front-load washers that allegedly suffer mold problems: "Predominance is not defeated because the doctrines used by plaintiffs for tolling the statute of limitations, such as the doctrine of fraudulent concealment, involve proof common to the defendants, namely, the act of concealing defendant's wrong. Indeed, courts have been nearly unanimous . . . in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action. * * * [*See*] 2 *Newberg on Class Actions* §4:57 (5th ed.) ("Statute of limitations defenses – like damage calculations, affirmative defenses, and counterclaims – rarely defeat class certification."). *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 486 (C.D. Cal. 2012), *leave to appeal denied*, 2013 WL 1395690 (9th Cir. Apr. 1, 2013), *cert. denied*, 134 S. Ct. 1273 (2014) (internal quotation marks and citations omitted).

prove [there was] a common injury for any claim" – indeed, "[t]hose class members

[who] received Washers that clean laundry without any odor issue . . . are uninjured."

Motion at 21-22 (docket no. 327-1).  But the Sixth Circuit has already rejected this

argument, too:

> If defective design is ultimately proved, all class members have
> experienced injury as a result of the decreased value of the product purchased.
> The remedy for class members who purchased Duets at a premium price but have
> not experienced a mold problem can be resolved through the individual
> determination of damages as the district court determined.

*Whirlpool II*, 722 F.3d at 856.[27]

• Finally, Whirlpool points to various categories of "new evidence," asserting this recent

information undermines the propriety of class certification.  In addition to pointing again

to newly-designed models like the ALPHA machines, this "new evidence" includes: (1)

"most washers do not build up excessive biofilm and most buyers never noticed mold or

odors," Motion at 1 (docket no. 327-1); (2) "many [Duet purchasers] knew about the care

instructions at purchase, many are not opposed to conducting Washer care, and most are

satisfied with their purchase," *id* at 2; (3) "most class members are satisfied with their

Washers, would buy another front-loader, and are not bothered by Washer care," *id.* at

29; (4) "all top-loading washers, regardless of manufacturer or design, can build up

biofilm, sometimes in large quantities, depending on how the owner used and cared for

---

[27] *See also id.* at 857 ("Because all Duet owners were injured at the point of sale upon
paying a premium price for the Duets as designed, even those owners who have not experienced
a mold problem are properly included within the certified class. Moreover, under the negligent
failure-to-warn theory of liability, the plaintiffs need not prove that mold manifested in every
Duet owned by class members because the injury to all Duet owners occurred when Whirlpool
failed to disclose the Duets' propensity to develop biofilm and mold growth.")

the washer, *id.* at 4 (emphasis added); (5) "different Washer buyers possessed different levels of pre-sale knowledge about Washer care: some did not know about Washer care, some knew something, and others knew everything that Plaintiffs claim buyers should have been told," *id.* at 11; and (6) a survey conducted by Whirlpool's expert showed "Washer buyers are overwhelmingly satisfied with their Washers; biofilm, odors, and Washer care are not significant factors influencing satisfaction or purchase decisions; the vast majority of Washer buyers would buy a front-loading washer again; and the disclosure of user instructions has no effect on consumers' interest in purchasing a Washer, *id.* at 12.  The Sixth Circuit answered these assertions succinctly:

> A plaintiff class need not prove that each element of a claim can be established by classwide proof: "What the rule does require is that common questions 'predominate over any questions affecting only individual [class] members."

*Whirlpool II*, 722 F.3d at 859 (quoting *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S.Ct. 1184, 1196 (2013)).[28]

In sum, this Court has weighed all of Whirlpool's arguments for decertification in light of the Sixth Circuit's prior pronouncements.  The Court concludes the Sixth Circuit's ultimate reasons for affirming this Court's decision to certify a class remain unchanged: "Evidence will either prove or disprove as to all class members whether the alleged design defects caused the collection of biofilm, promoting mold growth, and whether Whirlpool failed to warn consumers adequately of the propensity for mold growth in the Duets."  *Id.*  Further, "common questions predominate over any individual ones."  *Id.*  To the extent post-certification events eroded these

---

[28]  Furthermore, many of Whirlpool's "new evidence" arguments address the merits of plaintiffs' claims, not whether certification is appropriate.  "[D]istrict courts may not 'turn the class certification proceedings into a dress rehearsal for the trial on the merits.'"  *Whirlpool II*, 722 F.3d at 851-52 (quoting *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012)).

conclusions, the Court's present modification of the class definition restores their foundation.

The Supreme stated two months ago that "plaintiffs wishing to proceed through a class action must actually *prove* – not simply plead – that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014). Plaintiffs have carried this burden. Accordingly, the Court denies Whirlpool's Motion to Decertify.


**IV.     Notice to the Class.**

Whirlpool asserts that any modification by the Court of the class definition requires issuance of new notice to the class. *See* Whirlpool response at 12-13 (docket no. 266) (citing *In re Cardizem CD Antitrust Litig.*, 2000 WL 33180833 at *4-5 (E.D. Mich. Sept. 21, 2000), which observes that Rule 23(e) is implicated when newly-excluded "class members may have relied on the class action in refraining from filing individual actions"). Plaintiffs agree, adding correctly that "the only effect of the revised class definition is that some individuals who would have been bound by a trial verdict now will not be, and they must be notified that their rights will no longer be adjudicated in (and protected by) the class in this case, such that they should file their own lawsuits if they want." Plaintiffs' opposition at 9 (docket no. 277). Plaintiffs state they will bear the cost of issuing this notice. *Id.* at 9 n.4.

Accordingly, within 14 days of the date of this Order, Class Counsel shall submit to the Court a proposed Plan of Notice, including methods of service and approximate time for completion of service. The proposed Plan shall provide the best notice practicable to all persons who were arguably members of the original class, but are newly excluded, as required by Rule

45

23(c)(2)(B).  This includes all persons who bought a Duet front-load washer through the date of issuance of notice, but who are not currently included in the class definition.  Notice shall include warnings to these persons of their right to sue and of issues related to statutes of limitations and tolling.  Class Counsel shall carry out the Plan of Notice only after approval by the Court.

**IT IS SO ORDERED.**

**/s/ Christopher A. Boyko**
**CHRISTOPHER A. BOYKO**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 2, 2014**