UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: WHIRLPOOL CORP. FRONT-LOADING WASHER PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) | CASE NO. 1:08-WP-65000 (MDL 2001) JUDGE CHRISTOPHER A. BOYKO MEMORANDUM AND ORDER |

**CHRISTOPHER A. BOYKO, J.:**

Currently pending before the Court are: (1) the parties' Joint Motion for Final Approval of Class Action Settlement (docket no. 640); and (2) Class Counsel's Motion for an Award of Attorney's Fees and Costs, and For Class Representative Service Awards (docket no. 583).  For the reasons stated below, both motions are **GRANTED**.

**I.      General Overview.**

In 2001, Whirlpool began manufacturing front-load washing machines and selling them under its own brand.  In 2005, Sears began to sell the same Whirlpool-manufactured machines under the Sears brand.  Unfortunately, some buyers of these machines began to experience problems.  The buyers began to file lawsuits against both Whirlpool and Sears, asserting the washing machines suffered two types of defects: (1) the "Biofilm defect," which caused mold and mildew to grow inside the machines; and (2) the "CCU defect," which caused the machines'

Central Control Unit to malfunction.  The cases against Whirlpool were joined through multidistrict litigation and are all pending in this Court.  The cases against Sears were consolidated and are all pending in the Northern District of Illinois.  *See In re Sears, Roebuck and Co. Front-loading Washer Products Liab. Litig.*, 2016 WL 4765679 (N.D. Ill. Sept. 13, 2016).

Several months ago, the parties in both the *Sears* and *Whirlpool* cases announced they had settled all claims.  Rather than agree to a "Sears Settlement" and a "Whirlpool Settlement," however, it proved easier to agree to a "CCU Settlement" and a "Biofilm Settlement."  The parties chose to file their CCU Settlement papers (resolving CCU claims against both Sears and Whirlpool) in the Illinois district court, and to file their Biofilm Settlement papers (resolving Biofilm claims against both Sears and Whirlpool) in this MDL Court.

Recently, the Illinois district court granted final approval to the CCU Settlement and also awarded attorney fees.  *Id.*  The Illinois court's fee award related only to time that counsel spent litigating the CCU claims.  With their current motions, Plaintiffs similarly ask this Court to approve the Biofilm Settlement, and to award fees related only to time counsel spent litigating the Biofilm claims.

As discussed further below, the Court concludes that: (i) the Biofilm Settlement is fair, reasonable, and adequate; (ii) counsel's request for an award of attorney fees and expenses, and for service payments to the class-representative Plaintiffs, is well-taken; and (iii) the objections filed by class-members have no merit.

# I.    Procedural History.

## A.    The *Whirlpool* Multidistrict Litigation in Ohio.

In June of 2008, plaintiff Gina Glazer filed a lawsuit in Ohio state court against

Defendant Whirlpool Corporation, alleging the "Duet" front-load washer she had purchased

from Whirlpool had a design defect that caused accumulation of mold inside the machine.

Whirlpool removed the case to this Court.  After numerous other plaintiffs filed similar cases

against Whirlpool in other federal courts, the Judicial Panel on Multidistrict Litigation

consolidated the cases in this Court for pretrial purposes.  *See* docket no. 1.

In January of 2010, plaintiff Glazer moved to certify a class of plaintiffs who, like her,

lived in Ohio and had purchased a Duet front-load washer.  On July 12, 2010, pursuant to Fed. R.

Civ. P. 23(a) and 23(b)(3), the Court granted the request in part and certified the following class

of Ohio Plaintiffs:

> All persons who are current residents of Ohio and purchased a Washing Machine
> (defined as Whirlpool Duet®, Duet HT®, and Duet Sport® Front-Loading Automatic Washers)
> for primarily personal, family or household purposes, and not for resale, in Ohio . . . .

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 2010 WL 2756947 at *4 (N.D.

Ohio July 12, 2010).  Whirlpool appealed, but the Sixth Circuit twice affirmed that class

certification was appropriate.  *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab.*

*Litig.*, 678 F.3d 409 (6th Cir. 2012), *vacated* 133 S. Ct. 1722 (2013), *reinstated*, 722 F.3d 838

(6th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014).

Before and after class certification, the parties engaged in extensive discovery.  Class

Counsel reviewed more than one million pages of documents, and deposed more than two dozen

key Whirlpool personnel. Whirlpool deposed 18 Class Representatives and inspected the

washing machines of dozens of Class Representatives.  Between them, the parties employed more than 20 testifying experts, nearly all of whom were subject to multiple depositions.

After class certification appeals were finished, the parties litigated motions for summary judgment, motions to exclude experts under *Daubert*, motions in limine, and motions to modify or decertify the class.  Finally, in October of 2014, the Ohio class proceeded to a bellwether trial. After three-and-a-half weeks of trial, the jury returned a defense verdict in two hours.  *See* verdict (docket no. 490); entry of final judgment (docket no. 491).  Thereafter, this Court awarded Whirlpool costs, and the parties took appeals and cross-appeals of the jury verdict and cost award.  The parties had completed appellate briefing and oral argument, and were awaiting a decision from the Sixth Circuit, when they settled.

Importantly, if the judgment entered in the bellwether case had been affirmed on appeal, it would not have resolved all Biofilm Claims.  Absent settlement, litigation would have continued with respect to claims involving Whirlpool-branded washers brought by plaintiffs residing in States other than Ohio.  *See* Plaintiffs' final approval motion at 14 (docket no. 640-1) ("The only alternative to the Settlement – as the parties recognized when they opted to resolve their claims by making difficult compromises – is trial after trial, one state at a time in *Whirlpool* and one state at a time in *Sears*."); Defendants' final approval motion at 16-17 (docket no. 642) ("Absent this settlement, the *Whirlpool* MDL and the *Sears* Actions – already in their ninth year of litigation – would likely continue for many more years.  Because a nationwide class trial would pose impose intractable management concerns and be improper under Rule 23, Class Counsel would need to proceed on a state-by-state basis in both this Court and the Northern District of Illinois.")

### B.    The *Sears* Class Action in Illinois.

In addition to manufacturing front-load washing machines for sale under its own "Duet" brand name, Whirlpool also manufactured the same machines for sale by Sears, under the "Kenmore" brand name.  From a mechanical design standpoint, the Duet and Kenmore machines are essentially identical.  Thus, at about the same time that Plaintiffs began filing claims against Whirlpool, other plaintiffs also began filing claims against Sears.

Specifically, in December of 2006, a group of five plaintiffs filed a lawsuit against Sears in the Northern District of Illinois, complaining that the Kenmore-brand front-load washers they had purchased from Sears were defective.  After two other groups of plaintiffs filed similar lawsuits against Sears, the three cases were consolidated.  *See Butler v. Sears, Roebuck & Co.*, case no. 06-CV-7023 (N.D. Ill.).  As they did in the *Whirlpool* MDL, the parties in *Sears* pursued lengthy motion practice and appellate review addressing the propriety of class certification.  Initially, the *Sears* court denied class certification, but this decision was reversed on appeal.  *See Butler v. Sears, Roebuck & Co.,* slip op., case no. 06-CV-7023 (N.D. Ill. July 20, 2012) (docket nos. 285 & 327), *reversed in relevant part*, 702 F.3d 359 (7th Cir. 2012), *vacated*, 133 S. Ct. 1722 (2013), and *reversed in relevant part*, 727 F.3d 796 (7th Cir. 2013), *cert denied*, 134 S. Ct. 1277 (2014).

Ultimately, the *Sears* court cited this Court and followed its lead, certifying the following class of Illinois Plaintiffs:

> All persons who are current residents of Illinois and who purchased certain models (listed below) of Whirlpool-Manufactured, Kenmore-Brand Front-Load Washing Machines ("Kenmore Front-Load Washers") for primarily personal, family, or household purposes, and not for resale, in Illinois.

*Leonard v. Sears, Roebuck & Co.*, 115 F. Supp. 3d 934, 937 (N.D. Ill. 2015).  The Illinois court

then scheduled trial for July of 2015.

As did the parties in the *Whirlpool* MDL, the parties in *Sears* pursued discovery before and after class certification.  Both this Court and the Illinois court appointed David R. Cohen as Special Master, who worked to coordinate discovery and motion practice between the *Whirlpool* and *Sears* cases.[1]  Trial preparations were heavily underway in the *Sears* case, with *Daubert* motions and a motion to decertify the class pending, when the parties settled.

## II.    The Claims At Issue.

Plaintiffs in the *Sears* case originally sought to bring claims against Sears on behalf of purchasers in six states: California, Illinois, Indiana, Kentucky, Minnesota and Texas.  *Leonard v. Sears, Roebuck & Co.*, 115 F. Supp. 3d 934, 939 (N.D. Ill. 2015).  Plaintiffs in this MDL case originally sought to bring claims against Whirlpool on behalf of purchasers in 11 states: Arizona, California, Florida, Illinois, Indiana, Maryland, New Jersey, New York, North Carolina, Ohio, and Texas.  *See* Third Amended Complaint at 31-32 (docket no. 80).

For purposes of settlement, the parties agreed to file an amended complaint that essentially combined the two existing complaints in this MDL and *Sears*.  Thus, the Fourth Amended Consolidated Complaint: (1) lists both Whirlpool and Sears as Defendants; (2) lists 37 named representative Plaintiffs; and (3) seeks certification of a nationwide class.  *See* docket no. 544-1.  In addition, the list of washing machines included in the class ("Class Washers") was

---

[1]  Plaintiffs' counsel is the same in the *Whirlpool* and *Sears* actions.  *See* Selbin declaration at 9, ¶¶12-13 (docket no. 545-12).

combined and slightly expanded.[2]

The essence of Plaintiffs' claims is that the Class Washers "contain a serious design defect that prevents adequate water drainage," which:

> causes them to (a) accumulate mold and mildew within the Washing Machines; (b) produce a moldy odor that permeates consumers' homes if the doors to the Washing Machines are left open; (c) produce a mold or mildew odor on clothes washed in the Machines; (d) fail to clean the Machines and remove moisture, residue, growth and/or bacteria that lead to the formation of mold, mildew and/or associated foul odors; and (e) be unusable in the manner, to the extent to, and for the purpose for which the Washing Machines were advertised, marketed, and sold.

*Id.* at 2, ¶2.  Plaintiffs assert claims for violation of the Magnuson-Moss Act (15 U.S.C. §§2301-2312) with respect to the written and implied warranties, violation of California's Song-Beverly Consumer Warranty Act (Cal. Civil Code §1790 *et seq.*), breach of the implied warranty of merchantability, and breach of express warranty under various states' laws.

Notably, Plaintiffs do *not* assert claims for damages due to any health problems allegedly caused by mold accumulation in the Class Washers, nor for compensation related to laundry that was allegedly ruined by the Class Washers.  Thus, to the extent class members wish to pursue any such claims, the Biofilm Settlement Agreement does not preclude them from doing so.

---

[2]  As part of settlement negotiations, the parties agreed to include, in the proposed settlement, washers that are mechanically identical to the Whirlpool and Kenmore washers at issue, but which were sold as Maytag washers after Whirlpool purchased Maytag in 2006.  *See* Settlement Agreement exh. 2 (docket no. 545-4) (listing qualifying "Class Washers"); *see also* Tubman declaration at 1, ¶2 (docket no. 545-11).

### III.      The Settlement Agreement.

One year ago, the parties were waiting for an opinion from the Sixth Circuit addressing their cross-appeals of this Court's judgments in *Glazer*; they were also preparing for trial in Illinois in *Butler*.  Litigation in both cases stopped, however, because the parties agreed to material settlement terms in November of 2015.  *See* Selbin declaration at 11, ¶20 (docket no. 545-12).

In May of 2016, this Court granted preliminary settlement approval and certified, for settlement purposes only, the following class:

> All residents of the United States and its territories who (a) purchased a new Class Washer, (b) acquired a Class Washer as part of the purchase or remodel of a home, or (c) received as a gift a new Class Washer not used by the donor or by anyone else after the donor purchased the Class Washer and before the donor gave the Class Washer to the Class Member.  Excluded from the Settlement Class are (a) officers, directors, and employees of Whirlpool or Sears, or their parents or subsidiaries, (b) insurers of Class Members, (c) subrogees or all entities claiming to be subrogated to the rights of a Class Washer purchaser, a Class Washer owner, or a Class Member, and (d) all third-party issuers or providers of extended warranties or service contracts for Class Washers.

Preliminary approval order at 4-5 (docket no. 551).

The Settlement Agreement provides to class members two tiers of benefits, depending on whether they actually experienced mold problems with their washer.  Class members who attest under oath they *did* "experience[] persistent bad odors and/or mold growth problems" within five years of purchasing a Class Washer have three choices.  They may file a claim for:

- A $50 cash payment; or

- A 20% rebate "off the best negotiated retail purchase price" of certain new washers or dryers; or

- up to $500 in reimbursement of documented, out-of-pocket expenses to service or replace a Class Washer because of mold problems.

8

Settlement Agreement at 8, 19 (docket no. 545-2); *see also* Settlement Agreement, exh. 7 (docket no. 545-9) (listing rebate-eligible washers and dryers).[3]  Class members who did *not* experience a mold problem within five years of purchase may file a claim for a 5% rebate "off the best negotiated retail purchase price" of certain new washers or dryers.  Settlement Agreement at 9, 21-22 (docket no. 545-2).

The average estimated retail price of the rebate-eligible washers and dryers ranges from $636 (for top-loading washers and matching dryers) to $849 (for front-loading washers and matching dryers).  Supplemental declaration of Casey Tubman at 1-2, ¶ 2 (docket no. 640-11).  Thus, a 20% rebate is worth between $127 and $170, and a 5% rebate is worth between $64 and $85.[4]

In exchange for the opportunity to file a claim for settlement benefits, class members agree to release all Biofilm claims against Whirlpool and Sears, as defined in the Agreement.

In addition to these benefits, the Settlement Agreement also provides that the 29 class representatives who were deposed, or had their washers inspected by a defense expert, will each receive $4,000 incentive awards; and the other 7 class representatives will each receive $1,000 incentive awards.  Settlement Agreement at 28-29 (docket no. 545-2).

After agreeing upon settlement terms, the parties discussed and negotiated attorney fees and costs.  For some time, the parties were not able to reach any accord.  Eventually, the parties

---

[3]  Of course, class members will not choose the second or third option unless its value would exceed that of the first option – $50 cash.  Thus, the minimum benefit amount payable to class members who experienced odor or mold problems is $50.

[4]  Unlike the 20% rebate, the 5% rebate can apply to *both* a washer and dryer.

agreed that: (i) Class Counsel would seek up to $7,450,000 in attorneys' fees and $7,300,000 in reimbursement of costs; and (ii) Whirlpool would not oppose counsel's request and would pay a Court-ordered award up to this amount.  Selbin declaration at 11, ¶21 (docket no. 545-12).  According to Class Counsel, all of "[t]he other terms of the Settlement are in no way contingent on Class Counsel's fees and costs request."  *Id.*

The Court appointed Angeion Group as settlement administrator.  Preliminary Approval Order at 11 (docket no. 551).  Angeion undertook a comprehensive notice program, consisting of mail and e-mail notice, publication notice in *USA Today*, an internet banner ad campaign, and creation of a settlement website and toll-free telephone hotline.  *See* Weisbrot Declaration at 2-4, ¶¶7-14 (docket no. 573-1).  The notice program included dissemination of claim forms.  Use of the claim form is straightforward.  "Prequalified" class members – that is, individuals who appear in Whirlpool's or Sears' records as having complained about mold problems with a Class Washer within five years of purchase – need only confirm their contact information and check some eligibility boxes.  Settlement Agreement at 8, 18 (docket no. 545-2).  All other class members must additionally provide proof of purchase.  *Id.* at 18.

As of the date of the final fairness hearing, class members have submitted about 255,000 claims online or in paper form, with over 202,000 persons claiming the $50 payment, over 29,000 persons claiming the 20% rebate, about 12,000 persons claiming the 5% rebate, and about 11,000 persons claiming reimbursement for out-of-pocket expenses.  *See* Selbin supplemental declaration at 4-5, ¶17 (docket no. 649-1).  The Settlement Administrator estimates that total claims filed may climb to nearly 300,000 by the deadline.

In addition to explaining how to file a claim, the settlement notice also advised class

10

members on how to request exclusion from the Settlement Class; 642 class members requested

exclusion by the August 9, 2016 deadline.  *See* Second Amended Supplemental Declaration on

Requests for Exclusion at 1, ¶3 (docket no. 635).  Further, the settlement notice advised class

members of their right to object to the settlement; 72 objections have since been filed, including

objections postmarked after the deadline and by persons who provided no proof of class

membership.  *See* docket no. 640-18 (listing objections filed through August 25, 2016); docket

nos. 643, 646, & 652 (three additional, late-filed objections).  To put these exclusions and

objections in context, 3.5 million class members received direct mail notice of the settlement,

and 5.5 million Class Washers were sold during the nine-year class period.  Weisbrot

supplemental declaration at 2, ¶5 (docket no. 649-2); Preliminary Approval Motion at 6 (docket

no. 545-1).


**IV.      Legal Standards for Approval of the Settlement Agreement.**

This Court must determine whether the parties' class-action Settlement Agreement

should be ratified.  Federal Rule of Civil Procedure 23(e) mandates that "[t]he claims, issues, or

defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the

court's approval."  This approval process includes several essential tasks.  First, to certify a class

for settlement, a court must consider whether the proposed class meets the requirements of Rule

23(a) & (b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  Second, as with

any certified class, this Court "must direct notice in a reasonable manner to all class members

who would be bound by the proposal," advising class members of the nature of the action, the

class definition, and their right to object or exclude themselves from the certified class.  Fed. R.

11

Civ. P. 23(e)(2), (5); *see also id.* (c)(2)(B).  And third, after a hearing, this Court must determine

that the terms of the settlement are fair, reasonable, and adequate.  *Id.* (e)(2).  *See In re Flonase*

*Antitrust Litig.*, 291 F.R.D. 93, 98 (E.D. Pa. 2013) ("a class action cannot be settled without the

approval of the court and a determination that the proposed settlement is 'fair, reasonable and

adequate'") (quoting *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 316

(3rd Cir. 1998)).  "Whether a class action settlement satisfies Rule 23(e) is committed to the

sound discretion of the district court."  *Lonardo v. Travelers Indem. Co.*, 706 F.Supp.2d 766, 778

(N.D. Ohio 2010) (citing *Bailey v. Great Lakes Canning*, Inc., 908 F.2d 38, 42 (6th Cir. 1990)).

To evaluate the fairness, reasonableness, and adequacy of a proposed class action

settlement, courts within the Sixth Circuit refer to a list of seven factors identified in *UAW v.*

*General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).   These factors are: "(1) the risk of

fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the

amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the

opinions of class counsel and class representatives; (6) the reaction of absent class members; and

(7) the public interest."  *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013)

(quoting *UAW,* 497 F.3d at 631).  In addition, "[a]lthough not included in the seven *UAW*

factors, in evaluating the fairness of a settlement [the Sixth Circuit has] also looked to whether

the settlement 'gives preferential treatment to the named plaintiffs while only perfunctory relief

to unnamed class members.'"  *Id.* at 755 (quoting *Williams v. Vukovich*, 720 F.2d 909, 925 n.11

(6th Cir. 1983)).

The Court will assess these eight factors two different ways.  First, the Court will set out

its general assessments in Section V of this opinion, immediately below.  Second, in Section VI

of this opinion, the Court will address specific criticisms made by the objectors.  Finally, because

the question of attorney fees is especially important when determining the fairness of a class

action settlement agreement, the Court analyzes that issue separately in Section VII of this

opinion.

V.      **Discussion.**

    A.      **Certification of the Settlement Class is Appropriate.**

Step one of final settlement approval requires this Court to decide whether the proposed

settlement class may be certified under Rule 23(a) and (b).  Few cases have dedicated more

attention to the question of class certification than this case.  As described above, in July of

2010, this Court certified a class of Ohio Plaintiffs under Fed. R. Civ. P. 23(a) & (b)(3).  That

decision was affirmed on appeal, following lengthy appellate proceedings.

After the Sixth Circuit affirmed, the parties cross-moved to alter this Court's original

certification decision – the Class sought to modify the class definition to exclude certain washer

models that had been previously included, while Whirlpool persisted in its view that the certified

class did not satisfy Fed. R. Civ. P. 23 in the first place.  The Court granted modification and

denied decertification, concluding that a re-defined class "me[t] all of the requirements of Rule

23, redefinition [wa]s a better choice than decertification, and the fact that the original class

definition [was] overbroad [in light of new evidence] does not show Plaintiffs obtained

certification improperly in the first instance."  Class Decertification Order at 20 (docket no. 366).

The proposed settlement class, which this Court earlier preliminarily certified for notice

purposes, is defined more broadly than in its earlier certification orders.  The proposed

13

settlement class additionally includes Whirlpool-manufactured washers sold using Kenmore and Maytag brands; further, rather than including the claims of purchasers from only a single state (Ohio), the settlement class is nationwide in scope.  *See* Preliminary approval order at 4. Nonetheless, this broader settlement class continues to meet the requirements of Fed. R. Civ. P. 23.

First, the settlement class easily satisfies Fed. R. Civ. P. 23(a).  With millions of class members, the settlement class meets Rule 23(a)(1)'s numerosity requirement, because joinder of absent class members is not simply impractical, it is impossible.  *See In re American Med. Sys., Inc.*, 75 F.3d 1069, 1076 (6th Cir. 1996) ("the Sixth Circuit has previously held that a class of 35 was sufficient to meet the numerosity requirement.") (internal quotation marks omitted).

Second, as the Sixth Circuit concluded earlier, Rule 23(a)(2)'s commonality element is satisfied because "the evidence confirms that the issues regarding alleged design flaws are common to the class."  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 855 (6th Cir. 2013).  This conclusion applies equally to the nationwide settlement class as it did to the Ohio class.

Third, Rule 23(a)(3)'s typicality requirement is satisfied because the claims of the class representatives are typical of the claims of all other class members.  Each class representative – like each class member – purchased a Class Washer, all of which suffered the same basic alleged design defect.  *See American Med. Sys.*, 75 F.3d at 1082 ("a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory") (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, §3-13 at 3-764 (3rd ed. 1992)).

14

And finally, the class representatives meet Rule 23(a)(4)'s adequacy requirement because they have interests in common with class members and have certainly shown – beginning with intensive pretrial discovery and motion practice, continuing through lengthy class certification proceedings and appeals therefrom, and on through trial and post-trial appeals—that they have and will vigorously prosecute the class's interests through qualified counsel.  And there is no suggestion that the class representatives have any "interests antagonistic to the [rest of] the class."  *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000).

The settlement class likewise satisfies Fed. R. Civ. P. 23(b)(3).  This rule requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Here, common evidence "prove[s] or disprove[s] as to all class members whether the alleged design defects caused the collection of biofilm, promoting mold growth, and whether Whirlpool [or Sears] failed to warn consumers adequately of the propensity for mold growth in the" Class Washers.  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d at 859; *id.* at 861 (Plaintiffs "showed that common questions predominate over individual ones and that the class action is the superior method to adjudicate Whirlpool's liability on the legal claims").   In fact, the *Glazer* trial proved that the Ohio class was sufficiently cohesive to have liability issues determined using the class action mechanism.  That the settlement class is modestly broader than the certified litigation class does not undermine this fundamental cohesion.  *See In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*,  2016 WL 772785 *8-9 (N.D. Ill. Feb. 29, 2016) (certifying a similarly-defined settlement class regarding CCU claims).

15

Certification of the settlement class is also superior to other methods for resolving the

Biofilm Claims.  *See* Fed. R. Civ. P. 23(b)(3).  It is safe to say that, absent certification of the

settlement class, no class representative or class member has "an individually viable claim in

light of the immense expense required to litigate this action."  *In re Polyurethane Foam Antitrust*

*Litig*., 314 F.R.D. 226, 272-73 (N.D. Ohio 2014).  And concerns of manageability do not bar

certification.  *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a

request for settlement-only class certification, a district court need not inquire whether the case,

if tried, would present intractable management problems, for the proposal is that there be no

trial.") (citation omitted).

Notably, contrary to their earlier position, Defendants now agree that class certification is

appropriate, for settlement purposes.  In sum, certification of the litigation class was appropriate,

and certification of the settlement class is even more so.


**B.**      **The Settlement Class Received Adequate Notice of the Settlement.**

Step two of final settlement approval centers on whether the proposed settlement class

received adequate notice of the terms of the settlement, and of their rights to object or exclude

themselves from the Class.  This notice requirement stems from the text of Rule 23, *see* Fed. R.

Civ. P. 23(e)(2), (5); *see also id.* (c)(2)(B), and more fundamentally, from due process

requirements.  A cause of action is a property right, and a property right may only be

extinguished under a procedure that satisfies due process.  *See Phillips Petroleum Co. v. Shutts*,

472 U.S. 797, 812 (1985) ("due process requires at a minimum that an absent plaintiff be

provided with an opportunity to remove himself from the class by executing and returning an

16

'opt out' or 'request for exclusion' form to the court," and notice reasonably calculated to apprise the absent plaintiff of the pendency of the action).

The notice program in this case, reviewed and approved by this Court in its May 2016 preliminary approval order, began with an "initial round" of targeted communication in early June of 2016.  Specifically, the Settlement Administrator mailed 3,817,399 postcards containing court-approved language to addresses contained in Whirlpool's and Sears' records, representing 3.5 million class members.[5]  Roughly 70,000 of these postcards were delivered to Prequalified Class Members, who appear in Defendants' records as having previously complained about mold problems.  Weisbrot compliance declaration at 3-4, ¶7 (docket no. 640-13); *see also* Weisbrot declaration at 4, ¶11 (docket no. 545-13) (explaining the use of post-card forwarding and skip tracing to ensure receipt of postcard notice by class members).  In the same period, the Settlement Administrator sent 311,000 copies of the Notice via e-mail to Class Members, and also published Notice in *USA Today*.  Weisbrot compliance declaration at 4, ¶¶9-10 (docket no. 640-13).

The notice program continued with a "second round" in early September of 2016, again involving mail, e-mail, and print publication.  This round especially targeted class members who had not already filed a claim.

The Settlement Administrator also engaged in an internet banner notice campaign, which generated more than 7 million impressions by late June of 2016, with another 6 million impressions anticipated before the close of the claims period.  *Id* at 4-5, ¶¶11-14.  These notices

---

[5] Some class members received more than one postcard because they had owned more than one Class Washer.

all referred class members to a settlement website and toll free number.  All told, the Settlement Administrator conservatively estimates that these outreach efforts will result in more than 82 percent of the class receiving e-mail or postcard notice of the settlement, with the average recipient receiving three such notices.  Weisbrot supplemental declaration at 2, ¶5 (docket no. 640-12).

Moreover, because this case has received widespread attention from the media, the official settlement notice was supplemented informally by numerous news reports.  For example, Class Counsel promoted a Consumer Reports article describing the Settlement on Facebook; this campaign generated 2,430,512 impressions and over 158,000 clicks.  Lichtman declaration at 2, ¶8 (docket no. 640-9); *see also* Plaintiffs' final approval motion exhibit O (docket no. 640-20) (listing over 120 news reports of the settlement).

It is clear that these efforts comprise "the best notice that is practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B).  Direct notice was sent repeatedly to all class members who could be identified with reasonable effort.  Publication notice was designed to reach all other class members who could not be identified using Defendants' records.  The results of this notice program attest to its adequacy.  As of this writing, over a quarter of a million claims have been filed with the Settlement Administrator, and class members may file claims until October 11, 2016.


### C.    The Settlement is Just, Fair, Reasonable, and Adequate.

The third and final step in final settlement approval focuses on the substance of the settlement itself.   "[T]he court may approve [a settlement that would bind class members] only

18

after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

"Several factors guide [the Court's] inquiry: (1) the risk of fraud or collusion; (2) the complexity,

expense and likely duration of the litigation; (3) the amount of discovery engaged in by the

parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class

representatives; (6) the reaction of absent class members; and (7) the public interest."  *UAW*, 497

F.3d at 631; *see also Vassalle,* 708 F.3d at 755 (listing an eighth factor, whether "preferential

treatment [is given] to the named plaintiffs while only perfunctory relief to unnamed class

members").  Applied to the settlement proposed in this long-running litigation, all of these

factors clearly weigh in favor of a conclusion that the settlement is fair, reasonable, and

adequate.

- **Risk of Fraud or Collusion**

In this case, there is no evidence to remove the "presumption that the class

representatives and counsel handled their responsibilities with the independent vigor that the

adversarial process demands."  *UAW*, 497 F.3d at 628.   Suggestions by objectors to the contrary

are pure speculation. The parties litigated the Biofilm Claims for almost a decade in two courts.

*Glazer* twice underwent *certiorari* briefing in the Supreme Court before proceeding to a

contested trial in this Court, which the Ohio class lost.  The *Glazer* verdict was followed by yet a

third set of proceedings before the Sixth Circuit, where cross-appeals were fully briefed and

argued prior to final settlement.  This history completely undermines any suspicion of collusion.

*See Moulton v. United States Steel Corp*., 581 F.3d 344, 351 (6th Cir. 2009) ("It is difficult to

maintain that Class Counsel" vigorously litigated a case for years "merely to mask its collusion

with [the defendant], and that the one entity with a bird's eye view of the proceedings – the

district court judge – somehow missed the signs that the parties were merely engaged in pretense and posturing.").

Throughout this drawn-out litigation, the parties talked settlement, including with the assistance of the Honorable Layn R. Phillips.  Counsel from both sides report independently that the settlement itself was concluded before the parties discussed attorney fees.  *See* Selbin declaration at 11, ¶¶20 (docket no. 545-12) ("The parties reached agreement on all material terms of a class deal on November 20, 2015 at the conclusion of an in-person meeting in Chicago.  Only after doing so did we turn to negotiating the issue of attorneys' fees and costs."); Defendants' final approval motion at 6 (docket no. 642) ("After agreeing on the class benefits and other substantive terms of the proposed class settlement, Defendants and Class Counsel negotiated the issue of Class Counsel's attorney fees and costs for more than five weeks.").  Moreover, the settlement was not and is not contingent on the attorney fee agreement reached between the parties.  Selbin declaration at 11, ¶¶20-21 (docket no. 545-12); *see also* Defendants' final approval motion at 24-25 (docket no. 642) ("The [fee] award will not subtract any amount from the Class, as Class Counsel's recovery is separate and apart from the benefits payable directly to Class Members.").

"Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary."  *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 531 (E.D. Ky. 2010) (internal quotation marks omitted); *see In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 350-51 (N.D. Ohio 2001) ("when a settlement is the result of extensive negotiations by experienced counsel, the Court should presume it is fair").  There are simply no indicia in this case that the parties engaged in fraud or collusion to reach settlement.

- **Cost of Litigation**

The complexity, expense, and likely duration of this litigation also favor approval of the settlement.  At the time the parties reached agreement, only the Ohio *Whirlpool* class had gone to trial, and that case was on appeal.  Still remaining were the claims of purchasers from the other 10 states in *Whirlpool*, and all six states in *Sears*.  Counsel for both the Defendants and the class maintain that, absent settlement (and regardless of the result on appeal in *Glazer*), the parties would have proceeded to litigate all of these other Biofilm Claims.  The duration, complexity, and expense of continued litigation would be onerous and overwhelming.  Settlement avoids a huge consumption of resources of the parties and the Court.

- **Amount of Discovery**

Settlement was reached in this case only after the parties engaged in extensive discovery, and that fact likewise supports final settlement approval.  Class Counsel reviewed more than one million pages of documents, Whirlpool deposed 18 class representatives, and the parties collectively retained more than 20 testifying experts, who wrote reports and were deposed. Selbin declaration at 10, ¶14 (docket no. 545-12); Defendants' final approval motion at 17–18 (docket no. 642).  This extensive discovery – coupled with the results of the bellwether trial – gave the parties a clear understanding of the strengths and weaknesses of their claims and defenses in this case.  *Cf. Olden v. Gardner*, 294 F. App'x 210, 218 (6th Cir. 2008) (explaining that the lack of pre-settlement discovery can "weaken[] the class counsels' ability to advocate effectively for the plaintiff class during settlement negotiations and therefore suggests that the settlement was not fair, reasonable, and adequate").

• **Likelihood of Success**

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits.  The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured."  *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984) (citation omitted). When called on to grant final approval, "the district court must specifically examine what the unnamed class members would give up in the proposed settlement, and then explain why – given their likelihood of success on the merits – the tradeoff embodied in the settlement is fair to unnamed members of the class." *Shane Group, Inc. v. Blue Cross Blue Shield*, 825 F.3d 299, 309 (6th Cir. 2016).

In a case that settles early in pretrial proceedings, such predictions can be difficult to make.  Little guesswork is required here, however, because, after a three-and-a-half week bellwether trial, a jury found for Whirlpool after just two hours of deliberation.  Thus, the Court agrees with Class Counsel that "experience from that trial demonstrates that Defendants had a reasonable likelihood of prevailing in some material number of future trials" and would continue to vigorously litigate claims brought by class representatives in other states.  Plaintiffs' final approval motion at 16 (docket no. 640-1).  Indeed, Whirlpool continues to insist the Class Washers are not defective, and contends that weaknesses in Plaintiffs' case exposed during the bellwether trial would have reappeared in follow-on Biofilm cases.  Defendants' final approval motion at 14-15 (docket no. 642).

In evaluating the Class's likely success on the merits, this Court's task is not to "decide whether one side is right or even whether one side has the better of these arguments," because that would "defeat the purpose of a settlement in order to approve a settlement."  *UAW*, 497 F.3d

22

at 632.  Rather, it is enough if the evidence shows that: (1) the parties are locked in a real dispute regarding whether the Class Washers are defective; and (2) the merits of the Class's case are not so overwhelming that continued litigation is a vastly better option than settlement.  In this case, it is clear that the settlement is a very good option for Plaintiffs.

• **Opinions of Counsel**

The opinions of Class Counsel and of the class representatives favor final settlement approval.  Class Counsel's law firms have extensive experience litigating consumer class actions, and Class Counsel support settlement approval.  *See* Lieff, Cabraser, Heimann, & Bernstein firm resume (docket no. 545-16); Carey Danis & Lowe firm resume (docket no. 545-17); Chimicles & Tikellis firm resume (docket nos. 545-18 & 649-4); Shepherd, Finkelman, Miller & Shah firm resume (docket no. 649-5).  Class Counsel has spent tens of thousands of hours becoming familiar with the strengths and weaknesses of their claims while litigating this case.  Class Counsel has also consulted with each of the class representatives regarding the proposed settlement, and each class representative believes "the Settlement is fair and reasonable to all members of the Class in light of the relief we sought[] and the risks and delay of continued litigation."  *See, e.g.*, Carlos Vecino declaration at 2, ¶5 (docket no. 640-17 at 72).

In sum, the Court has no reason to second-guess Class Counsel's conclusion that the settlement reached with the Defendants is fair, reasonable, adequate, and in the best interest of the class.

• **Class Member Reaction**

The reaction of class members likewise supports final approval.  Seventy-two objections were filed to settlement approval, including those that were filed late.  As explained above, more

23

than 3.5 million class members received direct mail or e-mail notice of the proposed settlement.
(Many more were likely apprised of the proposed settlement through the internet banner and
print publication portions of the notice program.)  Thus, just under 0.002 percent of class
members who received direct notice of the proposed settlement filed objections.  "That the
overwhelming majority of class members have elected to remain in the Settlement Class, without
objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the
settlements are 'fair, reasonable, and adequate.'"  *In re Cardizem CD Antitrust Litig.*, 218 F.R.D.
508, 527 (E.D. Mich. 2003).

   In contrast to the small handful of objections, about 255,000 class members have filed
claims so far, with over two weeks to go until the claim deadline.  This represents 7.3% of class
members who received direct notice.  Other courts have characterized response rates much lower
than this as a "favorable class reaction," especially in consumer class actions.  *Shames v. Hertz
Corp.*, 2012 WL 5392159 at *14 (S.D. Cal. Nov. 5, 2012) (citing cases where approval was
granted when the class response rate ranged from 2% to 9%); *see also White v. Experian Info.
Solutions, Inc.*, 803 F.Supp.2d 1086, 1100 (C.D. Cal. 2011) ("this underwhelming [5%] response
rate does not mean that the Settlement, on the whole, is not fair, reasonable and adequate").  In
addition, examination of statistics relating to class members who suffered the worst[6] reveals that:
(1) Whirlpool asserted at the final fairness hearing that only 7% of Class Washers actually

---

   [6] According to Plaintiffs, all class members suffered economic damages because their
Class Washers were not worth what they paid for them, due to a design defect.  But the defect
*only manifested itself through bad odor* in 7% of the Washers (according to Defendants –
Plaintiffs asserted the figure was 35%), and it was this cohort that suffered most tangibly.  *See*
final fairness hearing transcript at 36 (Sept. 21, 2016) (counsel for Defendants discussing Class
Washer mold rates).

suffered mold problems, meaning 385,000 of the 5.5 million total Class Washers; (2) 242,000

class members have so far filed claims attesting they suffered mold problems; and (3) therefore,

63% of class members who suffered mold problems have filed a claim.  This is a very high ratio.

In sum, this factor weighs in favor of approval.

• **Public Interest**

"Public policy generally favors settlement of class action lawsuits."  *Stinson v. Delta*

*Mgmt. Assocs.*, 302 F.R.D. 160, 165 (S.D. Ohio 2014).  Settlement in this case "provides relief

for a substantial number of class members, avoids further litigation, and frees the Court's judicial

resources."  *Id.*  Indeed, resolving this case through final approval of the proposed settlement

will also free judicial resources consumed by continued proceedings on appeal in the Sixth

Circuit, and several trials in the Northern District of Illinois.

• **Preferential Treatment**

A settlement can be unfair if it "gives preferential treatment to the named plaintiffs while

only perfunctory relief to unnamed class members."  *Vassalle*, 708 F.3d at 755 (internal

quotation marks omitted).  In this case, it is clear that class members are receiving much more

than "perfunctory relief."  The vast bulk of the settlement funds in this case will *not* be received

by the named, representative Plaintiffs.  Rather, the settlement funds will be distributed in a

straightforward fashion to every claimant, according to the benefit option they choose.

In *Vassalle*, the named plaintiffs received $2,000 plus exoneration of debts, while the

unnamed class members received no money and their debts were not exonerated.  *Id.* at 755-56.

The disparity in *Vassalle* was stark, amounting to essentially ***no*** relief to unnamed class

members; that is certainly not the case here.  Moreover, the total of $123,000 in incentive awards

payable to the named Plaintiffs (discussed further in section VIII below) will amount to a tiny

fraction of the $18 million-plus total in settlement benefits paid to all claimants.  Accordingly,

this factor, like all of the others, also weighs in favor of final approval of the Settlement

Agreement.

## VI.     Criticisms Made by the Objectors.

The eight *UAW / Vassalle* factors listed above each weigh in favor of final approval.  The

Court has also carefully examined the submissions filed by the objectors, who contend that

various aspects of the Settlement Agreement are unfair.  None of these objections are well-taken.

### A.     Summary.

The Court received 72 objections to the Settlement Agreement.  All but one were filed

*pro se*.  The exception is an objection filed twice by attorney Edward Siegel on behalf of three

class members.  *See* docket nos. 603 and 624 (duplicate objection).[7]

Many of these 72 objections do not meet threshold requirements.  At least five were

postmarked after the August 9, 2016 deadline.[8]  And at least another 19 fail because the objector

opted out of the settlement, provided no proof of class membership, or owns a product that is not

---

[7] For ease of reference, the Court refers to Siegel as the objector, rather than the three
class members he represents.  There is also evidence that Cochran is a serial objector.  *See*
docket no. 605 (Cochran objection); Plaintiffs' final approval motion at 36-37 (docket no. 640-1)
(detailing Cochran's history as an objector and her association with professional objector Joseph
Darrell Palmer).

[8] *See* docket nos. 633, 634, 644, 646, & 652.

a Class Washer.[9]  Persons who "are not members of the class or parties to the litigation . . . are not bound by the settlement, and it has no impact on their rights."  *In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, 2013 WL 1500471 at *4 (W.D. Tenn. Apr. 10, 2013).  Thus, these persons have no standing to object.  *See Newberg on Class Actions* §13:22 (5th ed. 2016) ("Courts regularly find that non Class Members have no standing to object to a proposed settlement or to the notice thereof.  Importantly, class members who opt out of the settlement are no longer class members and hence, by opting out of the class, lose the standing to object conferred by Rule 23 upon class members.") (footnotes omitted); *Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 930–31 (E.D. Mich. 2007) ("[O]pting out of a settlement and choosing to object logically are mutually exclusive options: if one actually opts out, she has no standing to object to the settlement as she will not be bound by it.").  Finally, five objections appear not to be objections at all – they are letters to the Court seeking to file claims.[10]

---

[9]  *See* docket nos. 559, 565, 566, 572, 588, 593, 595, 596, 598, 599, 607, 613, 615, 616, 617, 625, 627, 631, & 632.  Several of the individuals who do not own a Class Washer object that the class definition is too narrow; they assert they had the same mold problems and should be eligible for settlement benefits.  Of course, because they are not included in the settlement, these individuals are not releasing any claims and remain free to pursue damages from the Defendants; they have no standing to object.  Further, both this Court and the *Sears* court were careful to include, in their respective litigation classes, all of those – and only those – models of washing machines that shared the design defect at issue.  *See Class Certification Order* at 2, 27, 31 (docket no. 366) (redefining the class using a chart that "sets out precisely those [Whirlpool] Duet model numbers and manufacture dates that are appropriately included in the class" because they each "have the essential alleged common defect of crevices in the tub and/or bracket that promote mold growth"); *Leonard v. Sears, Roebuck & Co.*, 115 F. Supp. 3d 934, 937 (N.D. Ill. 2015) (same).  The Class Washers included in the Settlement Agreement track the definitions in these two certification orders.  Thus, the settlement class is crafted carefully to meet the commonality requirements of Rule 23.

[10]  *See* docket nos. 558, 560, 561, 571, & 622.  The Court forwarded these documents to the claims administrator.

This leaves about 43 objections that are procedurally valid.  Unsurprisingly, many of these objections raise the same issues.  *See* Lichtman declaration at 3-5, ¶12 (docket no. 640-9) (categorizing the objections by issue raised); objection chart (docket no. 640-18) (charting each objection).[11]  The Court addresses below those issues that warrant discussion.[12]

**B.      The Claims Are Frivolous.**

Six objectors argue the settlement should be rejected entirely because the underlying lawsuits are frivolous.  This objection is not well-taken for several reasons.  First, the long and hard-fought history of this case belies the assertion that the underlying Biofilm claims are frivolous.  At no time did Defendants move for sanctions because Plaintiffs made "claims, defenses, [or] other legal contentions" that were so devoid of merit that they were frivolous, Fed. R. Civ. P. 11(b)(2), and the appellate history of this case strongly suggests otherwise.  Moreover, literally hundreds of thousands of class members have filed claims for settlement benefits where they swore under oath they suffered the very mold problems described in Plaintiffs' original complaints.  These other class members would certainly disagree that the lawsuit is frivolous.

Furthermore, courts have noted that class members who believe the entire case is

---

[11] The Court has reviewed the Lichtman declaration and objection chart, as well as all of the individual objections.  This review confirms that Lichtman's characterizations of the objections are accurate.  Accordingly, the Court does not bother to list below string cites of the individual objections and instead incorporates by reference the Lichtman declaration and objection chart.

[12] Many of the objections simply contain conclusory assertions with no analysis or factual support.  *See, e.g.*, Cochran objection (docket no. 605) (offering four separate, single-sentence objections in a one-page document, including: "The [sworn] declaration for Non-Prequalified Class Members is wholly subjective.").  With some exceptions, the Court does not examine these bare arguments.

frivolous must "think that the settlement is *more* than fair to the class, since they believe the case has no merit whatsoever.  Therefore, this factor is at least neutral, but more likely weighs in favor of approval of the proposed settlement."  *True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052, 1082 (C.D. Cal. 2010) (emphasis in original).  Accordingly, this objection is overruled.


### C.    Documentation Requirements.

Eight objectors ask the Court not to approve the Settlement because it requires them to submit documentation proving they are actually Class Members, and/or proving their out-of-pocket expenses to pursue a claim for reimbursement.  But "requiring class members to include serial numbers on their claim forms [is] reasonable."  *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1010 (E.D. Wis. 2010).  This is because a minimal proof requirement "strike[s] a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits."  *Id.*  In this case, class members may prove they owned a Class Washer for the purpose of making a claim by supplying a serial number or other proof of purchase.  Settlement Agreement at 18, ¶IV.A.3 (docket no. 545-2).  This requirement is entirely reasonable.

Furthermore, if a class member went to trial, she would have to establish a valid claim by showing both proof of ownership of a Class Washer and also proof of damages.  It is unfortunate that some class members probably did spend hundreds of dollars to mitigate mold problems, but cannot now claim reimbursement because they did not retain receipts.  Those class members remain eligible for other types of settlement benefits, however, and the objectors offer no viable

29

alternative regarding how the settlement administrator could prevent fraudulent reimbursement claims without the receipt requirement.

Ultimately, the claim documentation requirements are not only reasonable but necessary. Accordingly, this objection is overruled.

### D.   Claims Administration.

Objector Siegel argues the Court should appoint "additional assistance or a replacement [Settlement] Administrator," and also order an "extension of the claims period," because the claims rate of "2.7%" is low and this indicates problems in settlement administration.  Siegel objection at 5, 6 (docket no. 603).  This objection is not well-taken.  Siegel's argument is based on incorrect information – the actual response rate is at least 4.6% of the entire class, not 2.7%. *See* Selbin supplemental declaration at 4-5, ¶17 (docket no. 649-1).  As noted earlier, this response rate is comparable to those in other consumer class actions.  *See Shames*, 2012 WL 5392159 at *14.  Because claims may be filed until October 11, 2016, this response rate will only increase.  And in any event, "Siegel . . . present[s] no evidence whatsoever of any 'problem' in the claims or notification process."  Defendants' final approval motion at 26 (docket no. 642). Siegel's speculative claim that the response rate in this case reveals undescribed problems with claims administration does not warrant rejection of the settlement, nor any change to the approved Settlement Administrator.  This objection is overruled.

### E.   Insufficient Compensation.

The complaint most commonly voiced by objectors, by far, is that the settlement benefits

30

are inadequate.  For example, a large number of objectors believe their Class Washer should be replaced without charge, or the purchase price refunded.  Others assert they should also be compensated for ruined laundry, personal injuries such as asthma attacks, and even the emotional distress they suffered due to smelly clothes.

These objections must be overruled for the simple reason that the objectors seek relief in excess of what Class Members could have recovered after a successful trial.  Plaintiffs at trial sought "to recover damages for economic injury only."  *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d at 856.  This injury was measured by the difference between the price of the Class Washer at the point of sale and the value the Washer would have had but-for the alleged defect.  *Id.* at 857.  As a matter of law, no class member would be entitled to a free replacement washer or a purchase price refund, even if that individual prevailed on the merits at trial.  *See* Plaintiffs' final approval motion at 21-22 (docket no. 640-1) ("Plaintiffs could not have recovered the full price paid for each machine, the full cost to purchase an equivalent washer today, or full replacement of the machines at no cost. * * * Plaintiffs' expert economist testifie[d] that damages were either $279 or $235.").

Further, Plaintiffs never made claims for personal injury or emotional distress in this litigation, and the Settlement expressly excludes claims for "(i) personal injury, (ii) emotional distress; (iii) damage to property other than the Class Washer itself, and (iv) economic loss claimed in any unrelated litigation."  Settlement Agreement at 37, ¶XI.B (docket no. 545-2).  Thus, any Class Member with such a claim still has it.  Objections seeking compensation above and beyond any damages that Plaintiffs might have obtained at trial, or for claims that are not released, must be overruled.

Other objectors make a slightly different argument – that the settlement benefits are simply not enough.  To assess this argument, the Court examines the damages Plaintiffs could have achieved if they won at trial, and how the settlement benefits compare.

To the extent a class member suffered a mold problem, it would diminish the utility or value of a Class Washer while leaving some residual value.  Therefore, Plaintiffs' expert, Christopher Knittel, estimated damages in two ways.  The first method was called "willingness-to-pay damages," calculated as the difference between (a) the price class members paid for Class Washers, and (b) the price class members would have paid for a Class Washer with known mold issues.  Knittel testified that the amount of "willingness-to-pay damages" was $279.  The second method was called "mold-avoidance damages," calculated as the costs incurred by class members "to help avoid or minimize mold and odor issues," such as cleaning their Washer. Knittel testified that the amount of "mold-avoidance damages" was $239.  *See* Knittel report at 5, ¶¶12-14 (docket no. 640-15).[13]

Thus, benefits available under the settlement compare to best-case class damages as follows:

- The $50 cash payout option is 17.9% of willingness-to-pay damages and 20.9% of mold-avoidance damages.

- The 20% rebate option is a $127.20 value for the purchase of an average eligible top-load washer.  This equates to 45.5% of willingness-to-pay damages, and 53.2% of mold-avoidance damages.

- The 20% rebate option is a $169.80 value for the purchase of an average eligible front-load washer.  This equates to 60.8% of willingness-to-pay damages, and

_____

[13] Of course, Whirlpool's experts opined that class members suffered no damages from any alleged defect.

71.0% of mold-avoidance damages.[14]

- The out-of-pocket reimbursement option depends on the amount of documented expenses incurred by a class member, but this option entitles a class member to as much as $500.  This equates to 179.2% of willingness-to-pay damages and 209.2% of mold-avoidance damages.

- The  5% rebate option is a $31.80 value toward the purchase of an average eligible top-loading washer and $42.45 for the purchase of an average eligible front-loading washer.  This equates to more than 10% of both willingness-to-pay damages and mold-avoidance damages.  This is a good result for class members who did not experience mold problems within five years of purchasing a Class Washer.

To summarize, Class Member claimants in this case will obtain settlement benefits that are between 10% and 209% of the damages they could have recovered at trial, with a weighted average somewhere near 25%.  *See* Selbin supplemental declaration at 4-5, ¶17 (docket no. 649-1) (undertaking similar calculations).[15]  This range of benefits compares very favorably with results in similar cases, including actions where (unlike here) damages could have been trebled. *See, e.g., In re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269 at *5 (N.D. Ohio Feb. 26, 2015) ("A settlement figure that equates to roughly 18 percent of the best-case-scenario classwide overcharges is an impressive result in view of these possible trial outcomes."); *Stop &*

---

[14] Of course, some class members who experienced mold problems will find unattractive the prospect of purchasing an additional Whirlpool-manufactured washer.  But more than 16% of claimants so far have requested the rebate benefit, showing that this option has real value to a sizable portion of the class.

[15] In fact, these percentages are actually understated substantially.  While the class's best-case scenario at trial was to recover $279 in "willingness-to-pay damages" for each Class Washer, plaintiffs would then have to pay attorney fees and costs, so their *actual recovery* would be closer to 60% of damages, or $167.  Accordingly, a truer assessment is that Class Member claimants in this case will obtain settlement benefits that are between 16% and 348% of the total recovery they could have obtained after trial, with a weighted average somewhere near 42%.

*Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 at *9 (E.D. Pa. May 19, 2005) (11.4% of damages); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 at *4 (E.D. Pa. June 2, 2004) (collecting cases approving anywhere from 5.35% to 28% of damages).

"The fact that numerous courts have approved settlements where the percent of damages [obtained through class settlement] was substantially lower than in this case provides objective evidence that the settlements are highly favorable." *Linerboard*, 2004 WL 1221350 at *4. And of course, absent settlement, the class faces the very real prospect of receiving no compensation whatsoever.

Ultimately, "[i]t is well-settled that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair. Indeed, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *In re Bear Stearns Companies, Inc. Securities Litig.*, 909 F. Supp. 2d 259, 270 (S.D.N.Y.2012) (citations and internal quotation marks omitted). The propriety of a settlement must be assessed as "a function of both (1) the size of the amount relative to the best possible recovery; and (2) the likelihood of non-recovery (or reduced recovery)." *Id.* Here, there was a very real risk of complete non-recovery, and the ratio of actual recovery to best-possible recovery is above average. The possibility "that the settlement could have been better . . . does not mean the settlement presented was not fair, reasonable or adequate," because "[s]ettlement is the offspring of compromise; the question . . . is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

In this case, the benefits the Settlement Agreement provides to class members are fair, reasonable, and adequate.  Objections that the Court should reject the Settlement Agreement because it does not provide higher amounts of benefits are not well-taken.[16]

### F.      Attorney's Fees.

The second-most common complaint voiced by objectors is that the requested award for attorney's fees and expenses is too high.  Relatedly, Siegel objects to certain settlement provisions regarding: (i) the Defendants' agreement not to challenge Class Counsel's fee request, and (ii) when Defendants will pay the fee award.  The Court addresses all of these objections in the following section.

In addition to these objections, Siegel and two others also object that the documentation of Class Counsel's fees and expenses is filed under seal, so they cannot review it.[17]  The Court addresses that objection here.

The Sixth Circuit has explained that district courts should place judicial records under seal only when it is clearly necessary, especially in class actions, "where by definition 'some members of the public are also parties to the case.'"  *Shane Group*, 825 F.3d at 305 (quoting  *In*

---

[16]  Siegel asserts that the total of benefit payments to the Class will be a mere $750,000, calculated by assuming 150,000 claimants will each seek a check for $50.  Siegel objection at 4 (docket no. 603).  To begin, Siegel's math is wrong – these assumptions would yield benefit payments of $7.5 million.  Furthermore, Siegel's assumptions are wrong, as reflected in the statistics cited on page 10 of this opinion.  Based on claims made as of the date of the final fairness hearing, the Settlement Administrator predicts total benefit payments in excess of $18 million.  *See* Selbin supplemental declaration at 4-5, ¶17 (docket no. 649-1).

[17]  *See* Siegel objection at 8 (docket no. 603); Cochran objection at 1 (docket no. 605); Hough objection at 1 (docket no. 593).

35

*re Cendant Corp.*, 260 F.3d 183, 194 (3rd Cir. 2001)). Thus, the Sixth Circuit reversed final

approval of a class action settlement in *Shane Group* partly because the district court had placed

under seal, "among other things, the Plaintiffs' Amended Complaint, the Plaintiffs' Motion for

Class Certification and Blue Cross's Response, and Blue Cross's motion to strike the report and

testimony of the Plaintiffs' expert witness, Dr. Jeffrey Leitzinger," as well as "Leitzinger's

[expert] report, whose valuation of the class's claims by all accounts was the keystone of the

settlement agreement." *Id.* at 306.

But the Sixth Circuit has also explained that the standard that applies to documents

supporting a request for attorneys' fees is at least slightly different – the only requirement is that

these documents must be provided to *the Court* for its own review:

> [The] key requirement for an award of attorney fees is that the documentation
> offered in support of the hours charged must be of sufficient detail and probative
> value to enable *the court* to determine with a high degree of certainty that such
> hours were actually and reasonably expended in the prosecution of the litigation.

*Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 281 (6th Cir. 2016) (quoting *Imwalle v.*

*Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008)) (emphasis added).

Other appellate courts agree with this rule. As the Second Circuit explained:

> Nor do we identify error in the district court's failure to order disclosure
> of class counsel's contemporaneous time records, appended to the fee request and
> filed under seal. While applications for attorney's fees [must] be supported by
> contemporaneous [billing] records, we are aware of no authority holding that
> class counsel must open its books to objectors for inspection by virtue of filing a
> fee motion. To the contrary, whether to grant objectors access to billing records
> is a matter within the district court's discretion.

*Cassese v. Williams*, 503 F. App'x 55, 58 (2nd Cir. 2012) (internal quotation marks and citation

omitted); *see also In re Pall Corp. Class Action Attorneys' Fees Application*, 2013 WL 1702227

at *4 (E.D.N.Y. Apr. 8, 2013), *report and recommendation adopted sub nom. In re Pall Corp.*,

2013 WL 3244824 (E.D.N.Y. June 25, 2013) ("Neither existing case law nor, frankly, the conduct of objectors' counsel in this case suggests that objectors' counsel should be provided with the detailed time records of counsel for the class plaintiffs.") (citing *Cassese*).

Documents supporting attorney fees and expenses are often filed under seal because they obviously include matters covered by attorney work-product and attorney-client privilege. Indeed, in the initial case management order filed in this case, the Court stated: (1) "Except upon a showing of extremely good cause, the Court will *deny* motions/requests that matters be filed under seal;" but, nonetheless, (2) "Lead Counsel [for Plaintiffs] *shall file under seal* with the clerk . . . [a monthly] report summarizing for all participating counsel such time and expenses reports, arranged according to the particular activities."  Docket no. 12 at 3, 9 (emphasis added).

It is true that outside review of Class Counsel's time records can help a court assess an appropriate fee award.  For example, in the *Sears* case, the amount of the fee award was hotly contested (unlike in this case), so the court allowed defendants to review redacted attorney time logs.  Based in part on defendants' arguments that certain time should not be included in the lodestar calculation, the court cut counsel's hours by about 11%.  *In re Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*, 2016 WL 4765679 at *18.  Similarly, another Judge in this Court recently relied upon objectors' review of counsel's time log summaries – not the logs themselves – when assessing an appropriate fee award.  *See In re Polyurethane Foam Antitrust Litig.*, 2016 WL 320182 at *22 (N.D. Ohio Jan. 27, 2016) (reviewing objectors' arguments and cutting lodestar hours by 20%).

In the circumstances of this particular case, however, the Court concludes that objectors have no right to see Class Counsel's fee and expense records, and any such review by objectors

would not affect the Court's ultimate conclusion.  As described more fully below, Class Counsel asserts their fee lodestar exceeds $33 million, their time logs account for $22 million, and they seek less than $7 million.  In other words, Class Counsel seeks compensation for less than 1/3 of their documented hours.  This Court's careful review of the records submitted shows that, even if some of the hours included in Class Counsel's lodestar should be disallowed, that percentage is small – nowhere remotely near 67%.  Put simply, a review by objectors of Class Counsel's time logs could not possibly convince the Court that the lodestar is so inflated that counsel's request is too high.

Accordingly, the objection that class members should be allowed greater access to documentation of Class Counsel's fees and expenses is overruled.


**VII.     Attorney Fees and Costs.**

In addition to determining whether the Settlement Agreement is fair, reasonable, and adequate, the Court must also ensure "that counsel is fairly compensated for the amount of work done as well as for the results achieved."  *Gascho*, 822 F.3d at 279 (internal quotation marks omitted).  Class Counsel seeks an award of fees and costs totaling $14,750,000.  Any award of fees and expenses will be paid by Defendants, in addition to amounts that Defendants pay to the class as settlement benefits.  *See* Settlement Agreement at 34, ¶X.A (docket no. 545-2) ("Defendants have agreed to pay Plaintiffs' Counsel reasonable attorney fees and costs, without reducing the amount of money available to pay Valid Claims submitted by Class Members or the amount of money to be paid for work performed by the Settlement Administrator.").

Numerous objectors, including Siegel, insist the requested award is too high.  Siegel also

38

asserts that certain "structural provisions" in the Settlement Agreement call the entire fee request into question.  The Court first examines the structural provisions Siegel complains of, and then turns to the amount.

### A.    Structural Provisions.

### 1.    Clear-Sailing Clause.

The Settlement Agreement provides that "[t]he amount of attorney fees and costs to be paid to Plaintiffs' Counsel shall be determined by the Court. * * * Class Counsel agrees to request, *and Defendants agree not to oppose*, up to $14,750,000 as the reasonable amount of attorney fees and costs to be paid by Whirlpool (on behalf of Whirlpool and Sears) to Plaintiffs' Counsel, subject to Court approval." *Id.* at 34, ¶X.C.  The italicized language is known as a "clear-sailing" clause.  *See In re Southwest Airlines Voucher Litigation*, 799 F.3d 701, 705 (7th Cir. 2015) ("In a typical 'clear-sailing' clause, the defendant agrees not to oppose a fee award up to a certain amount."); *Redman v. RadioShack Corp.*, 768 F.3d 622, 637 (7th Cir. 2014) (in "a 'clear-sailing clause' . . . , the defendant agrees not to contest class counsel's request for attorneys' fees").

While not "unlawful per se," "courts have recognized that . . . inclusion [of a clear sailing clause in a class action settlement] gives the district court a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class." *Gascho*, 822 F.3d at 291 (internal quotation marks omitted).  The fear is that a clear-sailing clause:

> creates the likelihood that plaintiffs' counsel, in obtaining the defendant's
> agreement not to challenge a fee request within a stated ceiling, will bargain away

> something of value to the plaintiff class.  It is unlikely that a defendant will gratuitously accede to the plaintiffs' request for a "clear sailing" clause without obtaining something in return.  That something will normally be at the expense of the plaintiff class.

*Malchman v. Davis*, 761 F.2d 893, 908 (2nd Cir. 1985) (Newman, J., dissenting); *see also*

*Redman* 768 F.3d at 637 (a clear-sailing clause "illustrates the danger of collusion in class

actions between class counsel and the defendant, to the detriment of the class members").

At the same time, however, clear-sailing clauses can serve perfectly legitimate purposes:

a defendant wants to know its exposure in the context of attorney fees, and a clear-sailing

provision accomplishes just that.  *See Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 425

(6th Cir. 2012) ("where . . . the amount of the fees is important to the party paying them, as well

as to the attorney recipient, it seems . . . that an agreement 'not to oppose' an application for fees

up to a point is essential to the completion of the settlement, because the defendants want to

know their total maximum exposure and the plaintiffs do not want to be sandbagged") (quoting

*Malchman*, 761 F.2d at 905 n.5); *see also Southwest Airlines*, 799 F.3d at 712-13 (citing *Redman*

and echoing its "deep skepticism" about clear-sailing clauses, but then approving a settlement

agreement containing such a clause anyway because there were no signs of collusion).

In this case, for several reasons, the Court is not concerned that Class Counsel may have

bargained away something of value to the class in exchange for a clear-sailing clause.  First, and

most important, the parties negotiated the type and amount of settlement benefits available to

class members over a month before they even began to discuss the issue of attorney fees.  Selbin

declaration at 11, ¶20 (docket no. 545-12); *see also* settlement term sheets at 5, ¶15 (docket nos.

650, 651, filed under seal) (confirming the timing of negotiation of attorney fees).  Second, the

uncontradicted evidence shows that, rather than show a willingness to place their own interest

above those of the class, Class Counsel did the opposite.  After the parties agreed on the settlement benefits that would be made available to the class, Class Counsel "agreed to accept a *reduced* fee amount in exchange for several material enhancements to the terms of the Class deal."  *Id.* (emphasis added).  Third, this is not a case where a clear-sailing clause results in a windfall for Class Counsel.  In fact, as explained below, this case has been largely a losing proposition for Class Counsel.  And fourth, the Settlement Agreement wins the class substantial benefits; this case is not like *Redman,* where the settlement benefits offered to class members were trivial and the participation rate was minuscule.  *See Redman*, 768 F.3d at 638–39 (noting that only "83,000 out of 16 million potential class members," or 0.25%, redeemed the settlement's $10 coupons).

In sum, the objection that the requested fee award should be rejected because the Settlement Agreement contains a clear-sailing clause is overruled.

### 2.     Quick-Pay Clause.

The Settlement Agreement also contains what is known as a "quick-pay clause," which "allows class counsel to be paid in short order, even if an appeal is taken."  *In re LivingSocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 22 n.25 (D.D.C. 2013); *see also* Settlement Agreement at 34, ¶X.D (docket no. 545-2) ("Whirlpool shall pay the Court-approved amount of attorney fees and costs, up to $14,750,000, within thirty (30) days after the Court's entry of the final approval order and final judgment, regardless of any appeal that may be filed or taken by any Class Member or third party.").

Siegel objects to the quick-pay clause because, he asserts, it "eliminates all risk of

41

payment to Class Counsel."  Objection at 4 (docket no. 603).  This is entirely wrong.  Nearly all quick-pay clauses, including the one in the Settlement Agreement in this case, contain reversionary language, requiring counsel to return the fees paid if the award is reversed on appeal.  *See, e.g, Brown v. Hain Celestial Grp., Inc*., 2016 WL 631880 at *10 (N.D. Cal. Feb. 17, 2016) (the quick-pay clause provides plaintiffs' counsel "the option of being paid fees before resolution of any appeal; [counsel] also must return [the fees] immediately if the settlement is overturned on appeal"); *see also* Settlement Agreement at 34, ¶X.D (docket no. 545-2) ("Class Counsel will repay to Whirlpool the amount of the award of attorney fees and costs in the event that the final approval order and final judgment are not upheld on appeal and, if only a portion of fees or costs (or both) is upheld, Class Counsel will repay to Whirlpool the amount necessary to ensure the amount of attorney fees or costs (or both) comply with any court order.").

In this case, "[t]he quick-pay provision does not harm the class members in any discernible way, as the [benefit amounts] available to the class will be the same regardless of when the attorneys get paid."  *Pelzer v. Vassalle*, 2016 WL 3626825 at *10 (6th Cir. July 7, 2016); *see also id.* at *31 ("Quick-pay provisions are common."); *Hain Celestial*, 2016 WL 631880 at *10 ("Courts . . . approve these 'quick pay' provisions routinely.") (collecting cases).

The essential purpose of a quick-pay clause is to disincentivize lawyers who are "professional objectors."  Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1625 (2009).  In nearly every class action settlement today, professional objectors file objections (often frivolous ones) simply in order to obtain standing to appeal the district court's

42

final approval order.[18]  The professional objector hopes that class counsel, in order to settle the appeal and gain access to the fee award, will pay the objector to go away.  Quick-pay clauses substantially reduce the leverage a professional objector can wield.  *See id.* at 1625-26 ("The virtue of the quick-pay provision is that objectors who bring meritless appeals can no longer delay the point at which class counsel receive their fees.  Thus, class counsel have little incentive to pay objectors a premium to avoid this delay.  As such, quick-pay provisions can reduce the 'holdout tax' that blackmail[ing] objectors can extract in class action litigation.").

Far from serving as proof that Class Counsel in this case somehow pursued their own interests at the expense of the class, the quick-pay clause serves the socially-useful purpose of deterring serial objectors.  *In re UnitedHealth Grp. PSLRA Litig.*, 643 F. Supp. 2d 1107, 1108 (D. Minn. 2009) ("emphatically den[ying]" a motion filed by, among others, attorney Siegel, for attorney fees related to objections to final approval).[19]

In sum, nothing about the structure of the Settlement Agreement or its provisions related

---

[18]  A few serial objectors offer relevant arguments and file well-researched legal briefs, but many are pure grifters who make any argument they can think of.  *See, e.g., In re Polyurethane Foam Antitrust Litig.*, 2016 WL 320182 at *8 (N.D. Ohio Jan. 27, 2016) (stating that an objection filed by the Center for Class Action Fairness is "lucid and filed in good faith," but the other objectors "(1) are serial objectors; (2) have improper motives; (3) plainly misstate the facts; (4) offer boilerplate language they have presented to other courts unsuccessfully; (5) have suffered serious disciplinary proceedings; (6) make scurrilous, unfounded accusations (e.g., perjury and fraud by [class] counsel); and/or (7) make extortionist threats").

[19]  Numerous courts have overruled objections filed by Siegel, often describing him as a serial objector.  *See In re Initial Pub. Offering Sec. Litig.*, 721 F. Supp. 2d 210, 214 (S.D.N.Y. 2010); *Rodriguez v. Schneider*, 480 F. App'x 876 (9th Cir. 2012); *In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241 (3rd Cir. 2009); *Carlson v. Xerox Corp.*, 355 F. App'x 523 (2nd Cir. 2009); *In re Bristol-Myers Squibb Sec. Litig.*, 2007 WL 2153284 (3rd Cir. June 27, 2007); *In re Wal-Mart Wage & Hour Emp. Prac. Litig.*, 2010 WL 786513 at *1 (D. Nev. Mar. 8, 2010); *In re AOL Time Warner Shareholder Derivative Litig.*, 2010 WL 363113 (S.D.N.Y. 2010).

to attorney's fees provide a basis for denying counsel's fee request.  All that remains, therefore, is a determination of whether the amount requested is reasonable.

### B.      The Fee Award.

In the context of a class action settlement, a court has available "two methods for calculating attorney's fees: the lodestar and the percentage-of-the-fund."  *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 498 (6th Cir. 2011).  "District courts have discretion 'to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them.'" *Id.* (quoting *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)).  In this case, Class Counsel asks the Court to use the lodestar method, and there has been no objection.[20]  Moreover, in cases like this one, where the settlement provides for a claims-made structure that has no upper cap on relief, courts typically use the lodestar method.  *See Gascho v. Global Fitness Holdings, LLC*, 2014 WL 1350509 at *34 (S.D. Ohio Apr. 4, 2014) (applying the lodestar method and explaining that, although "the percentage of the fund method is preferred in common fund cases, . . . this is not, however a common fund case because the provision for attorneys' fees . . . is independent of the award to the Class"), *report and recommendation adopted*, 2014 WL 3543819 (S.D. Ohio 2014), *affirmed*, 822 F.3d 269 (6th Cir. 2016).  Accordingly, this Court will use the lodestar method.

---

[20]  Siegel seems to suggest that the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1712(a), requires that the fee award must be calculated as a percentage of the benefits payable to the Class, because "the $50 checks are functionally the same as a coupon."  Objection at 6 (docket no. 603).  This suggestion is not well taken and the Court does not consider it.

Class Counsel seeks a total award of $14.75 million, composed of a fee award in the amount of $6,723,432.66 and an expense award in the amount of $8,026,567.34.  In *Bowling v. Pfizer*, 102 F.3d 777 (6th Cir. 1996), the Sixth Circuit set out a number of factors this Court should consider when setting a reasonable fee.  They are:

> (1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.

*Id.* at 780.  The Court's assessment of these factors in this case is as follows.

- ***Value of the Benefit Provided.***

The value of the benefit that Class Counsel rendered to the class is substantial.  As discussed above, the benefits available to class members under the Settlement Agreement compare very favorably to the best-case damages the class could have obtained at trial, especially considering that the only trial held with respect to Biofilm Claims resulted in no recovery for any Ohio class member.

- ***Value of the Services Rendered.***

The value of the services rendered by Class Counsel are also substantial.  Class Counsel has calculated the lodestar at more than $33 million, and has filed under seal attorney time logs from five firms accounting for $22 million of this total.  The Court has reviewed these logs and concludes the time is reported with sufficient detail for the Court to evaluate the claimed lodestar.  *See Imwalle*, 515 F.3d at 553 ("[t]he key requirement for an award of attorney fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours

45

were actually and reasonably expended in the prosecution of the litigation") (internal quotation marks and citations omitted).  The time logs also accurately reflect the work necessary in this complex and long-running case.  Specifically, the time logs reveal that Class Counsel: (1) reviewed more than 1 million pages of discovery; (2) waded through analyses submitted by more than twenty testifying experts; (3) prevailed in this Court (and in *Sears*) on the question of class certification of the Biofilm claims; (4) maintained victory on certification during lengthy appellate proceedings, which helped shape the law in this Circuit and others; (5) tried the claims of the Ohio class to a jury; and (6) fully briefed and argued an appeal of the final judgment following trial.  The lodestar figures also illustrate how complex this litigation was – it required Class Counsel willing and able to muster long-lasting dedication and deep financial resources to pursue this matter to conclusion.

Ultimately, counsel's lodestar figure results in a fractional multiplier of 0.2 – meaning that for every $100 of attorney time invested in this case during the last nine years, Class Counsel now requests $20 in compensation.  Counsel's request for a fee award of less than $7 million is not merely reasonable, it represents a bargain for the class.[21]

•    ***Class Counsel's Fee Arrangement.***

Class Counsel undertook representation of the plaintiff class on a purely contingent basis. Thus, for more than nine years, counsel has borne all the risk that accompanies contingent-fee representation, including the prospect – very real in this case, considering the result of the

---

[21] Siegel contends that Class Counsel may only recover fees for work performed after the conclusion of trial.  Class Counsel responds to this argument in detail, *see* Plaintiffs' final approval motion at 34-35 (docket no. 640-1).  The Court adopts Class Counsel's reasoning on this point.

bellwether trial – that the investment of tens of millions of dollars in attorney time (plus millions in out-of-pocket expenses) would be lost.

• ***Societal Interest in Rewarding Class Counsel.***

"Attorneys who take on class action matters serve a benefit to society and the judicial process by enabling . . . small claimants to pool their claims and resources." *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 1029, 1043 (S.D. Ohio 2001).  Moreover, "[s]ociety's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals," *In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387 at *5 (E.D. Tenn. May 17, 2013), such as  prosecuting tort claims regarding allegedly defective products.  *See In re Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*, 2016 WL 4765679 at *21 ("Congress has determined that it is in the public interest to 'encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms.'  15 U.S.C. §2310(a)(1).  Thus, this settlement encourages manufacturers to expeditiously identify and cure defects in their products, regardless of whether the defect manifests itself in every item sold.").

Ultimately, the public has an interest in compensating Class Counsel here, because recoveries in this case are far too small if pursued on an individual basis, leaving only contingent-fee class actions as a mechanism to pursue viable claims.

• ***Case Complexity and Risk.***

The Honorable Jack Zouhary of this Court recently approved a class action settlement and concluded the case was risky and complex because "Class Counsel filed this suit as a putative class action during a period of change and uncertainty in class certification standards.

*See, e.g., Whirlpool Corp. v. Glazer*, 133 S.Ct. 1722 (2013) (vacating decision affirming class certification and remanding for further consideration))." *In re Polyurethane Foam Antitrust Litig.*, 2016 WL 320182 at *20 (N.D. Ohio Jan. 27, 2016).  Judge Zouhary's observation applies even more to counsel in this case, who spearheaded the changes he cited.  Counsel's economic loss claims in this case were somewhat novel, as were arguments regarding class certification, requiring two opinions each from the Sixth and Seventh Circuit Courts of Appeals.

• ***Skill and Reputation of Class and Defense Counsel***.

The Class Counsel firms that litigated this case are well-respected in the field of consumer class actions, as were their adversaries.  Considering the enormous task of discovery, the complicated legal and factual issues surrounding the class certification and dispositive and *Daubert* motions, the caliber of opposing counsel, and the large, up-front, and contingent investment needed to litigate this case, the Court appreciates that the good results in this case are attributable directly to Class Counsel's skill and reputation.

Considered together, the *Bowling* factors counsel in favor of the requested attorney fee award of $6,723,432.66.

Class Counsel further requests $8,026,567.34 in reimbursement of costs.  Such awards are appropriate for "categories of expenses . . . of the type routinely charged to . . . hourly fee-paying clients."  *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003). It suffices to say that the expenses identified for reimbursement here – above all, more than $5 million in expert fees – are reasonable and described with adequate particularity.  Class

48

Counsel's reimbursement request is granted.[22]


## VIII.   Class Representative Service Awards.

Class Counsel asks the Court to award $4,000 to each of the 29 class representatives who responded to written discovery and either were deposed or had their Class Washers inspected by a defense expert.  Class Counsel asks the Court to award $1,000 to the other 7 class representatives.[23]

The Sixth Circuit has recognized that incentive awards can be appropriate.  *See Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003) ("Numerous courts have authorized incentive awards [as] efficacious ways of encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class."); *see also Lonardo*, 706 F. Supp. 2d at 787 ("Courts within the Sixth Circuit . . . recognize that, in common fund cases . . . where the settlement agreement provides for incentive awards, class representatives who have had

---

[22]  Given that the Settlement Agreement provides Class Counsel will request a maximum of $14,750,000 in fees and costs *combined*, *see* Agreement at 34, ¶X.C (docket no. 545-2), the amount of Counsel's fee request is obviously the "remainder" after subtracting the amount of costs.  If the cost amount had been lower, Counsel's fee request would surely have been correspondingly higher.  But even if the fee request alone had been $14,750,000 (and the cost request had been zero), the Court would probably still have granted the request, as the lodestar figure would still result in a fractional multiplier of 0.45 and all of the factors discussed above still point in the same direction.

[23]  The Settlement Agreement lists 30 named Plaintiffs who "responded to written discovery and [were] deposed or [had their washer] inspected by Defendants."  Settlement Agreement at 29 (docket no. 545-2).  Because two of them are husband and wife, Plaintiffs seek a single award for this couple, making for a total of 29 awards of $4,000.  The Settlement Agreement also lists seven named Plaintiffs who "were not subject to both written discovery and a deposition or inspection."  *Id.*  This makes for a total of 7 awards of $1,000, yielding a grand total of $123,000 in incentive awards.

extensive involvement in a class action litigation deserve compensation above and beyond amounts to which they are entitled by virtue of class membership alone."); *Polyurethane Foam*, 135 F. Supp. 3d at 694 ("[d]istrict courts in this Circuit routinely grant incentive awards to representative plaintiffs in antitrust matters, when the representative plaintiff actively participates in the litigation").

The requested incentive award amounts in this case are on the low end. *Cf. id.* (awarding $35,000 incentive awards). And the amounts requested are fairly proportionate to the named Plaintiffs' levels of participation. Accordingly, the Court approves the requested incentive awards.


## IX. Conclusion.

For the reasons set forth above, this Court **GRANTS** the parties' Joint Motion for Final Approval of Class Action Settlement and Class Counsel's Motion for an Award of Attorney's Fees and Costs and For Class Representative Service Awards. Therefore, this Court finds and orders as follows:

• The Parties and the members of the nationwide Settlement Class ("Settlement Class Members") have submitted to the jurisdiction of this Court for purposes of the Settlement; the Court has personal jurisdiction over the Parties and the Settlement Class Members; the Court has subject matter jurisdiction to release all claims and causes of action released in the Settlement; and the Court has subject matter jurisdiction to approve the Settlement.

• The settlement class as defined above is certified and Jonathan D. Selbin, Mark P. Chalos, and Jason L. Lichtman of the law firm Lieff Cabraser Heimann & Bernstein, LLP are appointed as Lead Class Counsel; and Steven A. Schwartz of the law firm Chimicles & Tikellis LLP, and James J. Rosemergy of the law firm Carey, Danis & Lowe are appointed as Class Counsel for the Settlement Class. Lead Class Counsel shall have the authority to determine and make an allocation of attorney fees and costs to any counsel representing any of the Plaintiffs who claim an entitlement to share in any fees or costs

50

approved by the Court and paid by Whirlpool.  Any disputes regarding such allocation shall be resolved by the Court.

- Trina Allison, Bonnie Beierschmitt, John Bettua, Sylvia Bicknell, Paula Call, Tracy Cloer, Mara Cohen, Kathryn Cope, Giuseppina P. Donia, Laurie Fletcher, Karen Freeman, Pramila Gardner, Gina Glazer, Jeff Glennon, Susan Hirsch, Karen Hollander, Derral Howard, Heidi Klein, Peggy Lemley, Twilla Martin, Denise Miller, Charles Napoli, Rebecca Nordan, Maggie O'Brien, Vic Pfefer, Jeffrey Robinson, Sandra Robinson, Sonja Sandholm-Pound, Shannon Schaeffer, Susan Scott, Donna Seeherman, Tracie Snyder, Andrea Strong, Phil Torf, Carlos Vecino, Jennifer Wainwright, and Jane Werman are appointed as class representatives.

- Angeion Group is appointed as Settlement Administrator.

- Members of the Settlement Class have been provided the best notice practicable of the Settlement and such notice satisfies all requirements of federal and Ohio laws and due process, and notice to appropriate federal and state officials pursuant to federal law has been timely sent.

- All timely objections filed by members of the Settlement Class have been considered by the Court and are overruled.  The Court finds that the Settlement Agreement is in all respects fair, reasonable, adequate, and in the best interest of the Settlement Class and hereby adopts and incorporates the terms of the Settlement Agreement for purposes of this Final Order and Judgment, including the definitions set forth in the Agreement.  The Parties are directed to consummate the Settlement Agreement in accordance with its terms.

- The Settlement Administrator has received, from certain members of the Settlement Class, requests for exclusion from the Settlement Class and has provided Class Counsel and Defendants' counsel copies of those requests.  Class Counsel and Defendants' counsel have jointly filed with the Court a list of those persons who have timely elected to be excluded. All persons named in the list on file with the Court as having filed timely exclusions with the Settlement Administrator are excluded from the Settlement Class and will not be bound by the terms of the Settlement.  Otherwise, each individual or entity that falls within the definition of the Settlement Class shall be bound by the terms of the Settlement.

- Whirlpool shall make the payments described in the Settlement Agreement, including, without limitation, payment to each Class Member who files a Valid Claim of the cash payment, cash rebate amount, or cash reimbursement, pursuant to applicable terms and documentation requirements set forth in the Settlement Agreement.  The Parties shall carry out their respective obligations as stated in the Settlement Agreement.

- In consideration of the terms of the Settlement Agreement, as to Plaintiffs and Class

51

Members, they are hereby found, deemed, and adjudged to have fully, finally, and forever released and discharged Releasees from all manner of claims, actions, causes of action, administrative claims, demands, debts, damages, costs, attorney fees, obligations, judgments, expenses, or liabilities for economic loss, in law or in equity, whether now known or unknown, contingent or absolute, including all claims that Plaintiffs now have or, absent this Agreement, may in the future have had, against Releasees, by reason of any act, omission, harm, matter, cause, or event whatsoever that has occurred from the beginning of time up to and including the Effective Date of the Settlement Agreement and that arise from or relate to any of the defects, malfunctions, or inadequacies of the Class Washers that are alleged or could have been alleged in the Lawsuits relating to an alleged mold or odor problem (including alleged mold or bacteria growth or bad odors inside the Washers; bad odors on laundry cleaned in the Washers as a result of biofilm, mold, bacteria, or mildew; failure of the Washers to adequately self-clean; or failure of Affresh Washer Cleaner to remedy the alleged defects or adequately clean the Washers), or to any act, omission, damage, matter, cause, or event whatsoever rising out of the initiation, defense, or settlement of the Lawsuits or the claims or defenses asserted in the Lawsuits, including all claims for out-of-pocket expense, consequential, diminution-in-value, benefit-of-the-bargain, cost-of-repair, cost-of-replacement, cost-of-maintenance including the purchase of Affresh, or premium-price damages.

- The Class Members' release specifically excludes claims for (i) personal injury, (ii) emotional distress; (iii) damage to property other than the Class Washer itself, and (iv) economic loss claimed in any unrelated litigation.

- Plaintiffs and Class Members have waived and relinquished all rights and benefits that they may have under, or that may be conferred upon them by, the provisions of Section 1542 of the California Civil Code and of all similar laws of other States, to the fullest extent that they may lawfully waive such rights or benefits pertaining to their released claims.

- In consideration of the terms of the Settlement Agreement, all Class Members, including Plaintiffs, are hereby found, deemed, and adjudged to have: (i) covenanted and agreed that neither Plaintiffs nor any of the Class Members, nor anyone authorized to act on behalf of any of them, will commence, authorize, or accept any benefit from any judicial or administrative action or proceeding, other than as expressly provided for in the Settlement Agreement, against Releasees, or any of them, in either their personal or corporate capacity, with respect to any claim, matter, or issue that in any way arises from, is based on, or relates to any alleged loss, harm, or damages allegedly caused by Releasees, or any of them, in connection with the Released Claims; (ii) waive and disclaim any right to any form of recovery, compensation, or other remedy in any such action or proceeding brought by or on behalf of any of them; and (iii) agree that the Settlement Agreement shall be a complete bar to any such action.

- Upon entry of this Final Order and Judgment, enforcement of the Settlement Agreement

52

shall be the exclusive remedy for all members of the Settlement Class, including Plaintiffs, all of whom are permanently barred and enjoined from instituting, commencing, prosecuting or continuing to prosecute, either directly or indirectly, any of the Released Claims.  Class Members who are prosecuting or asserting any of the Released Claims are ordered to take whatever measures necessary to effectuate dismissal of their claims.

- If, after entry of this Final Order and Judgment by the Court, a notice of appeal of this Final Order and Judgment is timely filed by any party, objector, claimant, or other person or entity, and if an appellate court makes a final determination that this Final Order and Judgment is in any respect invalid, contrary to law, or unenforceable (except for such determinations that are limited to the attorney fees, costs, or incentive awards), this Order shall be automatically vacated, the Settlement Agreement shall be null and void, and Defendants may fully contest certification of any class as if no Settlement Class had been certified.  In addition, the Parties shall return to their respective positions in this lawsuit as they existed immediately before the Parties executed the Settlement Agreement, and nothing stated herein or in the Settlement Agreement shall be deemed an admission or waiver of any kind by any of the Parties or used as evidence against, or over the objection of, any of the Parties for any purpose in this action or in any other action.

- The Parties entered into the Settlement Agreement solely for the purpose of compromising and settling disputed claims.  Nothing contained in the Settlement Agreement, any documents relating to the Settlement, the Preliminary Approval Order, or this Final Order and Judgment shall be construed, deemed, or offered as an admission by any of the Parties or any member of the Settlement Class for any purpose in any judicial or administrative action or proceeding of any kind, whether in law or equity.

- Final judgment shall be entered and all claims shall be dismissed with prejudice.

- This Court reserves jurisdiction over: (1) implementation of the Settlement Agreement and this action; (2) all matters related to the administration and consummation of the Settlement; and (3) all Parties to this action for the purpose of

implementing, enforcing, and monitoring compliance with, effectuating, administering, and interpreting the provisions of the Settlement Agreement and this Opinion and Order.

**IT IS SO ORDERED.**

s/ **Christopher A. Boyko**
**CHRISTOPHER A. BOYKO**
**UNITED STATES DISTRICT JUDGE**

**DATED**: September 23, 2016

54